UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
EASTERN DIVISION OF ASHLAND
CIVIL ACTION NO. 0:16-cv-00068-HRW

ESTATE OF BILLY COLLINS, JR.;
BILLY JOSEPH COLLINS,
ADMINISTRATOR                                      PLAINTIFF

VS.

STEPHEN WILBURN, ET AL.                            DEFENDANTS

*************************************************************

**DEPOSITION OF PLAINTIFF TAKEN ON BEHALF
OF DEFENDANTS, GARRETT ROBERTS, ET AL.**

DEPONENT:                              BILLY JOSEPH COLLINS

DATE OF DEPOSITION:                    FEBRUARY 28, 2017

*************************************************************


*************************************************************

**ATHA MAE MAGGARD**
Court Reporter
P.O. Box 1481
Prestonsburg, KY 41653
(606) 886-3377
athamaggard@gmail.com

*************************************************************

ORIGINAL

1

```
*************************************************************
```

## INDEX

APPEARANCES . . . . . . . . . . . . . . . . . . . .        2

CAPTION . . . . . . . . . . . . . . . . . . . . . .        3

WITNESS
      BILLY JOSEPH COLLINS
      Direct Examination by Mr. Shaw . . . . . . .      4-44
      Cross Examination by Mr. Gadansky. . . . . .     44-53

CERTIFICATE OF SERVICE. . . . . . . . . . . . . .        54

CERTIFICATION . . . . . . . . . . . . . . . . . .        55

```
*************************************************************
```

## APPEARANCES

FOR THE PLAINTIFF,               HON. MICHAEL J. CURTIS
BILLY COLLINS, JR.,              CURTIS LEGAL SERVICES, INC.
ET AL.                           P.O. BOX 1455
                                 ASHLAND, KY 41101


FOR THE DEFENDANT,               HON. CHRIS J. GADANSKY
STEPHEN WILBURN, ET AL.          McBRAYER, McGINNIS, LESLIE
                                    & KIRKLAND, PLLC
                                 9300 SHELBYVILLE ROAD
                                 SUITE 110
                                 LOUISVILLE, KY 40222


FOR THE DEFENDANT,               HON. JONATHAN SHAW &
GARRETT ROBERTS, ET AL.          HON. SEAN CONLEY
                                 PORTER, BANKS, BALDWIN
                                    & SHAW
                                 P.O. DRAWER 1767
                                 PAINTSVILLE, KY 41240


            ALSO PRESENT         MR. GARRETT ROBERTS
                                 MR. MASON KEEFER
                                 MR. DOUGLAS WILHITE


```
*************************************************************
```

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
EASTERN DIVISION OF ASHLAND
CIVIL ACTION NO. 0:16-cv-00068-HRW

ESTATE OF BILLY COLLINS, JR.;
BILLY JOSEPH COLLINS,
ADMINISTRATOR                                                PLAINTIFF

VS.

STEPHEN WILBURN, ET AL.                          DEFENDANTS

*************************************************************

        The Deposition of Billy Joseph Collins was taken

before Atha Mae Maggard, Notary Public in and for the State

of Kentucky at Large, at the Law Offices of PORTER, BANKS,

BALDWIN & SHAW, 327 Main Street, Paintsville, Kentucky, on

the 28th day of February, 2017, at the Hour of 9:15 a.m.,

for the purpose of using the same upon the trial of the

above-styled action now pending before the U.S. District

Court on behalf of the Defendants, Garrett Roberts, et al.

*************************************************************

1                The Witness, Billy Joseph Collins, being first

2    duly sworn, was examined and deposed as follows:

3

4    <u>DIRECT EXAMINATION BY HON. JONATHAN SHAW:</u>

5              Q       Mr. Collins, could you state your full

6    name for the record, please.

7              A       Billy Joseph Collins.

8              Q       Have you given a deposition before?

9              A       Yes.

10             Q       Okay.  How many times have you given a

11   deposition?

12             A       Once.

13             Q       What type of case did you give a

14   deposition in?

15             A       FELA, an injury.

16             Q       I'm sorry.

17             A       A railroad injury.

18             Q       Railroad injury.  How long ago was that?

19             A       October.

20             Q       October of this...

21             A       Yeah.

22             Q       ... past year?

23             A       Last year, yeah.

24             Q       Okay.

25             A       I think it was October, somewhere in that

1  neck of the woods.

2          Q       Did you have an action filed somewhere or

3  was this part of a comp claim or what?

4          A       Yeah.  I got hurt.

5          Q       Well, I understand you got hurt, but who

6  did you give a deposition to and where?

7          A       The railroad's lawyers, Conrad.

8          Q       Did you have a claim filed in circuit

9  court or was it a workers' comp?

10          A       I think it's circuit court.

11          Q       Circuit court, do you know what court it

12  would have been filed in?

13          A       Mingo County.

14          Q       Mingo County, alright.  This is going to

15  be, I guess, similar to that other than the fact that we're

16  not going to be asking about your injury.  I'm going to be

17  asking you some general background questions.  And if you

18  need to take a break at any time to talk to your attorney,

19  just let me know.  And if I ask you a question and you

20  answer it, I'm going to assume that you understood it, and

21  I'm going to hold you to your response.  Is that fair?

22          A       That's fair.

23          Q       Okay.  Now if I ask you something you're

24  not sure about, tell me, and I'll try to rephrase it a

25  different way.  I try not to be confusing, but sometimes I

5

1   am, so.   Where do you live?

2           A       Louisa.

3           Q       What's your address?

4           A       2079 Ced Gap Road, C-E-D.

5           Q       G-A-P?

6           A       Uh huh (affirmative).

7           Q       Okay.  How long have you lived there?

8           A       About four (4) years.

9           Q       Four (4) years, okay.  Where did you live

10  before that?

11          A       I lived with my aunt.

12          Q       Where was that at?

13          A       76 Mulberry Avenue.

14          Q       Is that in Louisa as well?

15          A       That's right.

16          Q       Okay.  How long did you live there?

17          A       A long time; since, since I was in middle

18  school.

19          Q       Alright.  What's your aunt's name?

20          A       Shelia Bowens.

21          Q       Is she your aunt on your mom's side or

22  your dad's side?

23          A       On my mom's.

24          Q       Mom's side, okay.  Your dad is Billy

25  Collins, Jr.?

```
1        A       Yes.

2        Q       What's your mother's name?

3        A       Angela Collins.

4        Q       What is your mother's maiden name?

5        A       Patrick.

6        Q       Where is your mom from?

7        A       Louisa.

8        Q       Do you have any brothers and sisters?

9        A       Yes, three (3) sisters.

10        Q       What are your sisters' names and ages?

11        A       Well, Amanda Collins, thirty-three (33);

12   Kimberly Collins, thirty-one (31); and Shelly Collins, she's

13   twenty-eight (28), around about.

14        Q       You said Shelly?

15        A       Yeah, Shelly.

16        Q       Okay.

17        A       Around about twenty-eight (28).

18        Q       Alright.  Is Amanda married?

19        A       Yeah.

20        Q       Who is she married to?

21        A       Timmy Adkins.

22        Q       Is it A-D or A-T?

23        A       A-D.

24        Q       A-D.  Is Kimberly married?

25        A       No.
```

| 1  | Q | Has she been married? |
|----|---|---|
| 2  | A | No. |
| 3  | Q | Is Shelly married? |
| 4  | A | No. |
| 5  | Q | Where does Amanda live? |
| 6  | A | Louisa.  I'm not sure what her address is. |
| 7  | Q | Okay.  Where does Kimberly live? |
| 8  | A | She lives in Summerville, South Carolina. |
| 9  | Q | How long has she lived there? |
| 10 | A | Hmm, I'd say about three (3) or four (4) |

11  years anyway.

| 12 | Q | Okay.  How about Shelly? |
|----|---|---|
| 13 | A | She's in jail. |
| 14 | Q | Where is she incarcerated at? |
| 15 | A | Over here. |
| 16 | Q | Big Sandy? |
| 17 | A | Yeah, the jail that's here in Paintsville. |
| 18 | Q | Okay.  How long has she been there? |
| 19 | A | I'm not sure, to be honest. |
| 20 | Q | Do you know what she's in there for? |
| 21 | A | No, I don't.  But I'd say it was right |

22  after he died, so about two (2) years or so, something like

23  that.

| 24 | Q | Alright.  Did your sisters live with your |

25  aunt as well?

8

1          A       Yeah, yeah.

2          Q       Okay.  And is your Aunt Shelia, is she

3   from Louisa?

4          A       Yeah.

5          Q       Okay.  What is her husband's name?

6          A       Lonnie.

7          Q       Does Lonnie work?

8          A       Yeah.

9          Q       What does he do?

10          A       He's a blocklayer, a bricklayer, a mason,

11   I guess.

12          Q       Does Shelia work?

13          A       Yeah.

14          Q       What does she do?

15          A       She's a nurse.

16          Q       Where is she a nurse at?

17          A       Three Rivers.

18          Q       Three Rivers.  How old are you?

19          A       Thirty (30).

20          Q       Not to be reflected on the record, but

21   what's your social security number?

22          A       XXX-XX-XXXX.

23          Q       Also not to be reflected on the record,

24   but what's your date of birth?

25          A       XX-XX-XX.

9

| 1 | Q | Are you married? |
|---|---|---|
| 2 | A | Yes. |
| 3 | Q | What's your wife's name? |
| 4 | A | Kayla. |
| 5 | Q | What's her maiden name? |
| 6 | A | Cordle. |
| 7 | Q | Is she from Lawrence County? |
| 8 | A | Yes. |
| 9 | Q | Who are her parents? |
| 10 | A | Rhonda and Darrell. |

11      Q     Do you have any children over the age of
12 eighteen (18)?

13      A     No, I don't.

14      Q     Do you belong to any churches, clubs,
15 civic groups, or unions in Lawrence County or other
16 counties?

17      A     No, just work, you know, work.

18      Q     What, what work do you do?

19      A     Railroad.

20      Q     So you're still employed with the
21 railroad?

22      A     Not anymore, no; I was.

23      Q     Okay, alright.  Are you currently drawing
24 disability?

25      A     That's right.

1      Q      Alright.  What's your highest level of

2   education?

3      A      High school.

4      Q      Lawrence County?

5      A      Yes.

6      Q      What year did you graduate?

7      A      2004.

8      Q      Have you ever been in the military?

9      A      No.

10      Q      How long have you worked for the railroad?

11      A      Ten (10) years, right out of high school.

12      Q      Other than working for the railroad, had

13   you ever been employed full-time anywhere else?

14      A      No.

15      Q      Have you ever been convicted of a felony?

16      A      No.

17      Q      Charged with a crime in the last ten (10)

18   years?

19      A      A DUI.

20      Q      Outside of your deposition today and your

21   railroad case, have you ever testified in court before, in

22   civil court or criminal court?

23      A      No.

24      Q      Okay.  Have you ever been a party to a

25   lawsuit before?

1          A          No.

2          Q          Okay, alright.  We're here today regarding

3    your father.  Was he, at the time of his death, was he

4    employed?

5          A          No.

6          Q          Do you know when he was last employed?

7          A          Ah, I can't--no, no, I don't.  It's been

8    awhile.

9          Q          Okay.  When you say it's been awhile, are

10   we talking about five (5) years, ten (10) years?

11         A          I'd say over five (5) years.

12         Q          Okay.  Do you know why your father had not

13   been employed?

14         A          He was disabled for something.  I'm not, I

15   didn't know...

16         Q          Okay.

17         A          ... his money or his medical history much.

18         Q          Alright.  So he received a disability

19   check?

20         A          Yeah.

21         Q          Do you know how long he had been disabled?

22         A          No, but it was over five (5) years.  Yeah,

23   maybe ten (10).  Yeah, I know it was over five (5) years.

24         Q          Did you ever live with your father?

25         A          No.  He lived with me.

12

1          Q          Okay.

2          A          I did whenever I was younger, yeah.

3          Q          Okay.

4          A          Yeah, whenever I was in the, the middle

5     school.

6          Q          Okay.  So you went from living with your

7     dad to living with your aunt?

8          A          Aunt, yeah.

9          Q          Okay.  Were your mother and father

10    married?

11         A          No.

12         Q          Okay.  Had they been married?

13         A          Yeah.  That's whenever I was younger,

14    whenever, that's when I moved in with my aunt.  We all moved

15    in with my aunt...

16         Q          Okay.

17         A          ... when they got divorced.

18         Q          Okay.  Oh, so your mom moved in with--you,

19    you and your mom moved...

20         A          Yeah.  Our family moved in with my aunt,

21    yeah.

22         Q          Okay, alright, okay.

23         A          You're getting it now, huh?

24         Q          Okay.

25         A          And then, you know, my mom, after she got

13

1   a place, I just stayed.

2          Q        Okay, alright.  But your dad didn't move

3   in with your aunt?

4          A        No.

5          Q        Okay, alright.  Do you know if your dad

6   belonged to any churches, clubs, civic groups, or unions?

7          A        No, no.

8          Q        Outside of you and your three (3) sisters,

9   would, ah, did your father have any other children?

10          A        No, not that I know of.

11          Q        Just the four (4) of you.  Do you know

12   what your dad's highest level of education was?

13          A        I'm not sure.

14          Q        Was he ever in the military any?

15          A        No.  I don't, I know he didn't graduate,

16   so I'm not sure.

17          Q        Do you know if your dad has ever been

18   convicted of a felony?

19          A        Yeah, but I don't know how many or what

20   for.

21          Q        Do you know if he served any jail time

22   anywhere?

23          A        Yeah.

24          Q        Okay.  Do you know roughly when or where

25   or what for?

14

1          A          Yeah, around 2000 or 2001.  He went till,

2   he went for like four (4) years, maybe, maybe 2000,

3   somewhere in '3 maybe...

4          Q          Okay.

5          A          ... whenever I was in high school.

6          Q          What was he incarcerated for?

7          A          DUI.

8          Q          Okay.  Was it a felony DUI offender?

9          A          I would say, yeah.  I'm not sure, you

10  know.

11         Q          Okay.

12         A          I don't know.

13         Q          Do you know of any other extended jail

14  times?

15         A          No, not that I, no, not that I recall.

16         Q          Do you know if your dad had been involved

17  in any other--had he ever been involved in a lawsuit, to

18  your knowledge?

19         A          Not to my knowledge.

20         Q          Were you close to your dad?

21         A          Yeah.

22         Q          How often would you see him?

23         A          Every day almost after I, you know, got

24  hurt.  He lived with me.

25         Q          Okay.

15

1        A        Well, he lived in a camper on my property.

2        Q        Alright.

3        A        Well, you know, he stayed with me.  You

4   know how it is.

5        Q        So, so your dad, he had a camper that was

6   on your property?

7        A        Yeah.

8        Q        Okay.  How long had he lived, lived there?

9        A        Well, I'd say before that, I'd say

10   probably two (2) years.

11        Q        Two (2) years, okay.  As a part of

12   discovery, I sent you some interrogatories.

13        A        Yeah.  I went to, ah...

14        Q        Take a look at these and see if those look

15   familiar.

16        A        Uh huh, yeah.

17        Q        Let's go ahead and mark those--those were

18   not verified, but those are your, your answers, correct?

19        A        Yeah.

20        Q        Okay.  Let's mark those as Defendant's

21   Exhibit 1.

22        A        That's about the same thing as I just

23   answered.

24        Q        Okay, if you'll pass them back over.  In

25   those interrogatories, you list your father's date of birth

16

1      as April 22nd, 1959.

2             A        Uh huh (affirmative), 04-22-59.

3             Q        Is that correct?

4             A        Yeah.

5             Q        Okay.  And you've also got his social

6      security number listed, XXX-XX-XXXX.

7             A        Yes.

8             Q        When your father last lived, what was

9      your, what was the address where your father lived?  Did he

10     use your address?

11            A        Yeah.  He used my, yeah, mailing and

12     stuff.

13            Q        Alright.  And what was that address?

14            A        2079 Ced Gap Road.

15            Q        Now your sisters, do any of your sisters

16     have any children over the age of eighteen (18)?

17            A        No.

18            Q        Interrogatory No. 4 asked about anyone

19     that you might know that had, would have any discoverable

20     information concerning the circumstances surrounding your

21     father's death.  And at that time, you put, "Unknown at this

22     time, we reserve the right to supplement this

23     interrogatory."

24            A        Uh huh (affirmative).

25            Q        Do you know of anyone, as we sit here

17

1   today?

2          A       No.

3          Q       Okay.  Have you talked to anyone or has

4   anyone told you that they were there that night or that

5   they...

6          A       No, no.

7          Q       Do you know anybody that works at the fire

8   department?

9          A       Yeah, my uncle does.

10         Q       Who is your uncle?

11         A       Jack Arrowood.

12         Q       And how long has he worked for the fire

13  department?

14         A       I don't know when he started volunteering.

15  He was a volunteer.  I'm not even sure.

16         Q       Is it the Louisa Fire Department or which,

17  which fire department?

18         A       Yes, Louisa, the one downtown.

19         Q       Okay.  Do you have any family members that

20  have worked as a police officer?

21         A       No.

22         Q       EMS?

23         A       No.

24         Q       Other than your Uncle Jack, any other

25  firefighters in your family?

18

1          A       No.

2          Q       In Interrogatory No. 5, we asked for a

3  list of individuals that you might call as witnesses.  And

4  it says, "See Initial Rule 26 Disclosure statement."  You

5  list as witnesses basically the parties; your sister,

6  Kimberly; Dr. Austin.  As we sit here today, do you know of

7  any other witnesses who may be called?

8          A       No.

9          MR. CURTIS:       If we do, we'll supplement.  Of

10 course, we'll adopt any and all witnesses that you all set

11 out too.

12         MR. SHAW:       Right.

13         MR. CURTIS:       And likewise, I'm sure you all

14 will do the same with us.

15         Q       In response to Interrogatory No. 7, you

16 state that the only facts known to you are the facts that

17 are on the video and the facts that were in the police

18 report.

19         A       That's...

20         Q       Is that correct?

21         A       ... correct.

22         Q       Okay.  Your father passed away May 29th,

23 2015.  Is that correct?

24         A       Yes.

25         Q       Okay.  When, when had you last seen your

19

1   father before that?

2              A          The prior day.

3              Q          Prior day.  How was he doing or do you

4   know what--what, what was he doing that day?

5              A          He, he seemed alright.

6              Q          Are you aware or do you know of a, I

7   guess, a 911 call that was placed the day before by an

8   individual?

9              A          Hmm, 911, ut ha (negative), I didn't call

10  911.

11             Q          Are you aware of any 911 calls that were

12  placed...

13             A          No.

14             Q          ... regarding your father?

15             A          Ut ha (negative).

16         MR. CURTIS:        You have to say yes or no.

17         MR. COLLINS:       No.

18             Q          Alright.

19             A          No.  No, I'm not sure.  No, that's the

20  first I've heard of that.

21             Q          Alright.  Do you know or are you aware of

22  what, what circumstances led to the police being called on

23  the evening of May 29th?

24             A          On the day that he died?

25             Q          Yes.

20

1          A       Oh, yeah.  They said, I think, he got

2   stuck or something.  His truck got stuck at the high school

3   or something happened like that.

4          Q       Had you...

5          A       I'm not really sure.

6          Q       ... been to the high school graduation

7   that evening?

8          A       No.

9          Q       Okay.  Was any member of your family

10  graduating that evening?

11         A       No.

12         Q       Okay.  Do you know if your dad had

13  attended graduation that evening?

14         A       Yes.

15         Q       Okay.  Do you know who he was attending it

16  with or what...

17         A       No.

18         Q       Okay.  Did he tell you he was going to go

19  to the graduation?

20         A       No.

21         Q       Do you know if your dad had a family

22  doctor, someone he would see?

23         A       Yeah, Dr.--he's my mom's, that's our

24  neighbor--Webb.  It took me a second.

25         Q       Okay.  Where does your mom live?

21

1          A        She lives in Louisa.

2          Q        Do you know her address?

3          A        Hmm, Garden Street, I don't know.

4          Q        Do you know which pharmacies your dad used

5    for his prescriptions?

6          A        Hmm, he used the one that was over by the

7    hospital.  I'm not sure what's the name of it, Riverview

8    maybe or Louisa something.

9          Q        Alright.

10         A        I'm not sure what the name of it is.

11         Q        Now your dad appeared to be a pretty good-

12   sized guy.  Would that be a fair characterization?

13         A        I'd say he's my height; probably two...

14         Q        Okay.  How tall are you?

15         A        About five seven (5' 7"), five eight (5'

16   8").

17         Q        Okay.

18         A        About two thirty (230), I'd say.

19         Q        Alright.

20         A        He had a big belly.

21         Q        Was he pretty stout?

22         A        No.

23         Q        He wasn't stout?

24         A        No.

25         Q        Okay.

1          A          Maybe in the past, but not, not present.

2     He had a heart attack.

3          Q          When did he have a heart attack?

4          A          About, ah--it was within the month of

5     this.

6          Q          Do you know where he went to the hospital

7     at?

8          A          Yeah.  He went to--well, I don't know if

9     you'd call it a heart attack or what.  I guess it would be a

10    heart attack.  He had heart surgery anyway.

11         Q          Okay.

12         A          He went to Three Rivers first.  They sent

13    him to have a stent put in or whatever at King's Daughters.

14         Q          How many, how many times was your dad

15    hospitalized, to your knowledge?

16         A          I don't know.  I'd say a few though.

17         Q          And the reason I ask is in your discovery

18    responses, Interrogatory No. 9, we asked for the name and

19    address for each and every physician, medical doctor,

20    chiropractor, surgeon.

21         A          Oh, I don't know all that now.  I mean the

22    only ones I know is what I...

23         Q          Okay.  Well, the answer is, "Only

24    knowledge Plaintiff has of decedent going to the hospital is

25    when the police took him after the incident."

1          A          Well, I mean, I got his medicals records

2    there one time at the hospital, but that's all.

3          Q          Okay, alright.  So you know the, the heart

4    issue and going to Three Rivers?

5          A          Yeah, that's about it.

6          Q          What, what other hospitals can you recall

7    your father going to?

8          A          I don't...

9          MR. CURTIS:          You told me...

10         MR. COLLINS:          Yeah, Eastern State.

11         Q          Eastern State?

12         A          He went to Eastern State.  Yeah, he got

13   picked up, a 202, and went to Eastern State.

14         Q          How long was he at Eastern State?

15         A          I would say a week.

16         Q          Okay.  Do you know what he went for or

17   what was going on?

18         A          Yeah.  He was bipolar and manic; so they

19   sent him over there while he was manic, I guess.

20         Q          Do you know of any other diagnoses that

21   your father had besides bipolar and manic?

22         A          Oh, yeah.  He had COPD.  You know, he

23   couldn't breathe.  I can't think of what all.  I mean just

24   normal problems, I guess, his breathing problem and his

25   heart.

```
 1          Q        How long had he had issues with his heart?
 2          A        I think he had just found out.  I mean,
 3  you know, he had blood pressure, but I think he just found
 4  out, you know.
 5          Q        Okay, so a blood pressure issue.
 6          A        Yeah.
 7          Q        How long had he had blood pressure issues?
 8          A        I'm not sure.  I just know he took
 9  medicine and stuff.  I didn't really ask him about it.  He
10  was no talker about his health.  He was always good, you
11  know.
12          Q        Was your dad, do you know if your dad was
13  diabetic?
14          A        I don't think so.
15          Q        Do you know if he had been diagnosed with
16  heart disease?
17          A        No, I don't know.
18          Q        He had heart issues?
19          A        He had heart issues.
20          Q        You said he had COPD?
21          A        Yes.
22          Q        Any issues with asthma, do you know?
23          A        I'm not sure.  He was using an inhaler,
24  but I don't know if it was for asthma or COPD or what.
25          Q        Have he ever had any type of stomach
```

1   trouble that you're aware of?

2          A        No.  He, he has a, he had a scar.  I don't

3   know what that was for.

4          Q        How, how far did the scar extend?

5          A        All the way down.

6          Q        And you're pointing at your neck and

7   you're going all the way down?

8          A        The neck all the way down past his belly

9   button, that's all I know.  I believe it was from a car

10  wreck or something, but I don't know what, you know, the

11  surgery or anything was.

12         Q        Do you know if your dad had any kidney

13  problems?

14         A        Not that I know of.

15         Q        Had your dad ever had any issues with

16  narcotics?

17         A        Not that I know of.

18         Q        Do you know what medications he was

19  prescribed?

20         A        No, I don't.

21         Q        Do you know if he took medications?

22         A        No, I don't.

23         Q        Had your father ever had any problems with

24  alcohol?

25         A        Yeah, he, before, but not at the time.

26

1      Q       When had he before?

2      A       Oh, he had quit drinking for probably--

3  well, he would just drink every once in awhile there the

4  last couple of years...

5      Q       Okay.

6      A       ... but prior to that he did.

7      Q       Would he drink beer or...

8      A       Yeah.

9      Q       ... whiskey or...

10     A       Both.

11     Q       ... a little bit of everything?

12     A       Yeah.

13     Q       Okay.

14     A       Prior to that, yeah.  But he, he, he had

15  slowed way down for the last year or two (2) years probably.

16     Q       You mentioned that your father had went to

17  Eastern State Hospital for approximately a week.  Any other

18  psychiatric treatment or evaluations that you're aware of?

19     A       Something whenever he was incarcerated, he

20  was, but I'm not, you know, I'm not sure of that.

21     Q       Do you know where he was incarcerated?

22     A       In Virginia, but the last place was--I

23  went and got him--I don't remember.  I can look it up

24  probably, but...

25     Q       Okay.  If you could and provide it through

27

1    your counsel, that would help.

2           A       Okay.

3           Q       So he'd been incarcerated in Virginia?

4           A       Uh huh (affirmative).

5           Q       Was he incarcerated in Kentucky?  Do you

6    know what states he was incarcerated in?

7           A       No, the--yeah, it was in Virginia that

8    time.

9           Q       Okay.  And that was the four (4) years?

10          A       Yeah.

11          Q       Okay.

12          A       Four (4) or so years, yeah.

13          Q       And then he may have been incarcerated in

14   Kentucky another time, is that...

15          A       No, not for no extended stays.

16          Q       Okay.  Well, what do you consider

17   extended?

18          A       Three (3) or four (4) days, a week.

19          Q       Okay, alright.

20          MR. CURTIS:       That would be three (3) or four

21   (4) days too long, wouldn't it?

22          MR. SHAW:       That depends on where you're at.

23          MR. COLLINS:       That would be extended to me, I

24   know that.  One (1) was extended for me.

25          Q       So you last saw your dad on May 28th?

28

1          A        Yeah.  I think so, yeah.  I didn't see him
2    that day, no.

3          Q        Where, where would, where would you have
4    seen him at?

5          A        At my house.

6          Q        Did he seem okay?

7          A        Yeah, I mean.  I think we got--I'm trying
8    to remember.  Yeah, he was alright.  Yeah, he was alright.
9    Yeah, he seemed alright.

10         Q        On May 29th, what was the first--well,
11   when did you first have notice of what, what had happened?
12   Where were you at?

13         A        I was at home.

14         Q        At home.  Then what happened?

15         A        I think my mom called me.

16         Q        Do you know if your sister was working
17   that evening?

18         A        I'm not sure.

19         Q        What did your mom--so she called and
20   said...

21         A        Yeah, you know.

22         Q        ... there had been an acc-, an incident
23   or...

24         A        Yeah.  I didn't even know what happened
25   until after that.

29

1          Q          Okay.  Well, what did you do after you got

2     the phone call?

3          A          I went to the hospital.

4          Q          Who all was there?

5          A          My sister.

6          Q          Which sister?

7          A          My older sister.

8          Q          Is that Kimberly?

9          A          No, Amanda.

10         Q          Amanda.

11         A          And my mom and my aunt and my uncle,

12    Lonnie and Shelia.  I think that's it, I believe.  And the

13    state police was there, you know, and all that.

14         Q          Were you interviewed by the state police?

15         A          The next, yeah, sometime after that; not

16    that night.

17         Q          Okay.  Have you ever seen a copy of the

18    interview that you gave?

19         A          No.

20    MR. CURTIS:          Do you all have a copy?

21    MR. SHAW:          I'm not sure if we do or not.

22    MR. COLLINS:          Well, it wasn't like really an

23    interview.  It was more like we met and said--because, you

24    know, I, I don't know what really went on.  I guess that's

25    what he, he was just trying to say what happened, I guess.

30

1          Q          Okay.

2          A          I mean I don't think it was really an

3   interview.

4          Q          What did he, what did he tell you had

5   happened, if you recall?

6          A          Oh, he said that he had been at graduation

7   and his truck got stuck and that he was disorderly and that

8   they took him to the police station and there was an

9   incident there and that was about it.

10         Q          Had you ever known your dad to be

11  disorderly before?

12         A          No, not...

13         Q          So it was out of character for him?

14         A          Yeah.  Well, he wasn't really--no.  Yeah,

15  he never was, not around me anyway.  I don't know about

16  anything else.  I can just say what I know.

17         Q          Do you know of anything that would have

18  been going on or happening with him that would have caused

19  him to be upset?

20         A          Not that I know of; I guess his truck

21  getting stuck maybe.

22         Q          Okay.  But he hadn't mentioned anything to

23  you on the 28th or...

24         A          No.

25         Q          ... the 27th?

31

1        A       No, he hadn't ever.

2        Q       There wasn't anything going on that was

3   causing...

4        A       He never would discuss any problems

5   really.

6        Q       Okay.  But even without discussing

7   problems, do you know of anything that was going on in his

8   life that would have caused any type of mental distress or

9   anguish?

10       A       Maybe, not unless it was a heart attack or

11  something.

12       Q       Okay.

13       A       I mean that would probably put you down.

14  That would be my guess; I mean I wouldn't know for sure.

15       Q       How long had he been out of the hospital?

16       A       Out of the hospital, I think it was less

17  than a week, if not, just a little over.  I know it wasn't

18  over two (2) weeks...

19       Q       Okay.

20       A       ... I don't think.

21       Q       Had your dad been out much since he had

22  got out of the hospital?

23       A       Yeah.

24       Q       Okay.

25       A       He never slowed down.

32

1        Q        Is it your understanding or do you know
2   did your father pass away at the hospital?
3        A        That's what they say.  I don't know, but
4   that's what, yeah, that's my understanding.
5        Q        Did you--were you at the hospital before
6   your father passed away or had he already passed away?
7        A        No, that was, it was after.
8        Q        And as a part of your discovery responses,
9   you sent us a copy of, I guess, the funeral bill.
10       A        Yeah.  That's where they wanted that, I
11  guess.
12       Q        Are there any other expenses that you're
13  aware of that the family had to pay out of pocket?
14       A        No.  I haven't paid anything, no, just the
15  funeral and to file this.
16       Q        Did your father have any type of life
17  insurance benefits, anything like that?
18       A        No, not that I know of.
19       Q        Did anybody in your family file for the
20  social security death benefits?
21       A        No.  I didn't know there was such a thing.
22       Q        To your knowledge, if you know, was
23  Sheriff Roberts on the scene the night...
24       A        I don't know.
25       Q        ... of the 29th?  Okay.  Do you know the

33

1  officers that were on the scene that night?

2        A        Just from the video.

3        Q        Just from the video.  Do you know Stephen

4  Wilburn?

5        A        Yeah.  I know who he is.

6        Q        How do you know him?

7        A        By just...

8        Q        You just know he's a police officer in

9  town?

10       A        Yeah, yeah.

11       Q        You haven't had any dealings with him,

12  didn't know...

13       A        No, I never did, no.

14       Q        Okay, alright.  What about Jordan Miller?

15       A        I just knew he was a police officer too.

16       Q        Okay.  Greg Fugitt?

17       A        I never had--I just knew he was the chief.

18       Q        How about Sheriff Roberts?

19       A        I knew he was the sheriff.  I mean I never

20  had any dealings with none of them.

21       Q        Okay.  What about Officers Keefer and

22  Wilhite?

23       A        No, no.

24       Q        You just knew they were police officers,

25  but you...

1        A        Yeah, I mean, you know...

2        Q        Okay.

3        A        ... you've got a handful.

4        Q        It's a small town; I understand.

5        A        Yeah.

6        Q        Okay.  There's a claim that there are

7   Unknown Defendants in this case.  Do you have any idea who,

8   who they may be at this point?

9        A        No.

10       Q        Okay.  So really the only thing that you

11  know is what's in that video and that's it?

12       A        Pretty much.

13       Q        Okay.

14       A        Pretty much.

15       Q        I've got a copy...

16       A        I mean because every time I would call

17  someone, I'd call down to the city, "I'm not allowed to

18  talk."  And then I'd call the state, call the state police,

19  "We're not allowed to talk.  You've got to call Anna

20  Melvin."  I call Anna Melvin, "You've got to call back to

21  the state police."  That's all I would get.

22       Q        Have you ever seen...

23       A        I never, you know, I mean that, that was

24  kind of wrong, I believe.  Someone should have come forward

25  with something.

35

1          Q          Have you ever seen the state police

2    report?

3          A          Not that I remember.

4          Q          Okay.

5          A          I haven't seen no police reports that I

6    remember.

7          Q          Okay.

8          MR. CURTIS:          Yeah.  We'll, we'll request the

9    state police report.

10         MR. SHAW:          Do you not have it yet?

11         MR. CURTIS:          No.

12         MR. SHAW:          Okay.

13         MR. CURTIS:          You all haven't furnished it to

14   me.

15         MR. COLLINS:          I don't think I have it.  No,

16   that's like, like I say, they wouldn't give me anything.

17         Q          Okay, alright.

18         A          Nothing; he wouldn't even talk to me.

19         Q          I've got a copy of the Verified Complaint.

20         A          Yeah.

21         Q          If you would, just look at the last page.

22   Is that your signature?

23         A          Yeah, that's my signature.

24         Q          I'll introduce that as Defendant's 2.

25   Let's see.  Do you know anything about the training that any

36

1   of these police officers received...

2          A       No.

3          Q       ... or anything about their educational

4   background or their experience?

5          A       No, I don't.

6          Q       Have you heard anything that would be

7   critical of, of their experience as a professional police

8   officer?

9          A       I just know that one guy got fired one

10  time, but that's it.

11         Q       Which guy?

12         A       Well, I don't know if he got fired or

13  suspended or something, for giving kids alcohol or

14  something...

15         Q       Who?

16         A       ... that's what somebody told me, ah,

17  Wilburn, but none of these.

18         Q       Okay.  Have you heard anything about any

19  of the other officers that, that you've...

20         A       No.

21         Q       ... heard, that you've...

22         A       No.  I, I don't get into it.

23         Q       Okay, alright.

24         A       I try to stay to myself.

25         Q       Well, I mean, do you have any reason to

37

1  believe that these officers weren't trained, hadn't been

2  through the academy, hadn't received, you know, all the...

3            A       No, I wouldn't.

4            Q       ... required training under state law,

5  that type of thing?

6            A       No, I wouldn't.

7            Q       Okay, alright.  How long has Sheriff

8  Roberts been sheriff?

9            A       Awhile.  He got sheriff whenever I was in

10  school.

11           Q       Okay.

12           A       Probably 2004, somewhere like that, I

13  think it was

14           Q       Have you talked to your sisters about this

15  case?

16           A       Yeah.

17           Q       Do they have any insight or thoughts or

18  what, what are they telling you?

19           A       They don't tell me anything.  I, I usually

20  tell them.

21           Q       Okay, alright.  Well, I didn't know if

22  they came and said they heard something or...

23           A       No.  They, ah--I don't talk to them about

24  it, I don't talk to them to know...

25           Q       What about...

1          A        ... I mean, unless, you know, it's

2     something like today.  You know, I'll call and tell my

3     sisters what went on today and that will be...

4          Q        Okay.

5          A        ... the end of that.

6          Q        What about your aunt and uncle, have they

7     mentioned anything?

8          A        No.  They don't talk about it either.

9          Q        What about your uncle that works at the

10    fire department...

11         A        No.

12         Q        ... has he mentioned anything?

13         A        Ut ha (negative).

14         Q        Okay.

15         A        No, he wouldn't, even if he did know.

16         Q        Okay.  Why do you think he wouldn't

17    mention anything?

18         A        That's just the way they are.  I mean they

19    don't bring it up to me and I don't bring it up to them,

20    never have.

21         Q        Alright.  Have you ever been tased?

22         A        Me?

23         Q        Yeah.

24         A        No.

25         Q        Okay.  Do you know anything about tasers?

39

1          A          Ut ha (negative).

2          Q          Okay.

3          A          Not anything but the obvious.

4          Q          I know, you know, sometimes around the

5     flea markets around here and stuff, you can pick up those

6     tasers.  I didn't know if you had ever...

7          A          Oh, no, no.

8          Q          Alright.

9          A          No.

10         Q          Now you've got a claim that law

11    enforcement knew that your dad had mental health issues.  Do

12    you know anything about that?

13         A          He was picked up on a 202A once, and they

14    knew, a small town.

15         Q          Okay.  Well, I mean the fact that he was--

16    so he was picked up once and transported to Eastern State

17    and then later released?

18         A          I don't know if he was transported to

19    Eastern State.  He probably went to Three Rivers first, I

20    think.

21         Q          Okay.

22         A          You know, and then from there, I guess, he

23    went to Eastern State.

24         Q          Alright.

25         A          I think that's it.

40

1        Q        I mean the fact that they transported him

2   to Three Rivers, what--I mean did somebody report to the

3   police that he had mental issues or what?

4        A        Yeah, yeah.

5        Q        Do you know who, who would have reported

6   that?

7        A        Yeah.  My sister did the 202A.

8        Q        Okay, alright.  Well, tell me about that.

9        A        I'm not really sure about that.  I was

10  working out of town.

11       Q        Okay.  Well, which sister was it?

12       A        My older sister.

13       Q        Amanda?

14       A        Amanda.

15       Q        Okay.  What has Amanda told you about

16  that?  What do you, what do you understand happened?

17       A        She said that he was acting manic or

18  whatever, because I guess she knows more about all that

19  mental stuff.  She's a nurse, so.

20       Q        Okay.

21       A        She said before he got in trouble or

22  whatever.

23       Q        So before he got in trouble, she...

24       A        Or something, I mean, that he needed help,

25  that he wasn't acting right, you know...

41

1          Q          Okay.

2          A          ... he wasn't to her.

3          Q          Do you know when that was?

4          A          Not exactly.  It had to be probably two

5     (2) or three (3) years prior to this maybe.

6          Q          Okay.  So we're talking about a few years

7     before this incident...

8          A          Yeah.

9          Q          ... that your dad had been transported?

10         A          Yeah.

11         Q          Okay.  Do you know of other, any other

12    incidents that would have occurred outside of this incident,

13    which you believe might have put somebody on notice that he

14    had mental issues?

15         A          Yeah, when he throwed the coffee on the

16    mayor, you know, that wouldn't probably be right.

17         Q          When he what now?

18         A          Threw coffee on the mayor one time.

19         Q          When was that?

20         A          I can't remember.  I seen it in the news

21    here.  I wouldn't think somebody in their right mind would

22    do that.

23         Q          How long ago?  Are you talking about years

24    ago or...

25         A          No.  It was, well, I mean about, around

1  about the same time that the 202A was, I think.

2          Q          Okay.  So a couple, two (2), two (2) or

3  three (3) years prior to this?

4          A          Yeah.

5          Q          Okay.  Anything else?

6          A          No.

7          Q          Okay, alright.

8          MR. CURTIS:          Maybe Wilburn would know.

9          MR. COLLINS:          Yeah, he, oh, yeah, Wilburn

10  would know, yeah, but I thought he was talking...

11          MR. SHAW:          We're not asking you to testify.

12          MR. CURTIS:          Well, I mean they'll bring it up

13  eventually.

14          MR. COLLINS:          I thought he, I thought he was

15  talking about these.

16          Q          Okay.  What would--I mean we've got the

17  sheriff and two (2) deputies sitting here.  Do you know any

18  of these individuals?

19          A          I just know who they are, not, no...

20          Q          Okay.

21          A          ... not personally.

22          Q          Do you know of anything that would lead

23  you to believe that they had any knowledge of your dad's

24  mental capacity?

25          A          Other than what's in the report, no.

43

1          MR. SHAW:          Okay, alright.  Let's go off the

2    record for one second.

3          OFF THE RECORD

4          MR. SHAW:          Okay.  Pass the witness.

5

6    CROSS EXAMINATION BY HON. CHRIS J. GADANSKY:

7          Q      Mr. Collins, I'm Chris Gadansky.  We met

8    briefly right before the deposition.  I'm counsel for the

9    City, City of Louisa folks.  I appreciate you coming in

10   today.  I've just got a few follow-up.  It shouldn't take

11   too long.  There's a possibility that I may ask a question

12   that Jon has already asked.  If that's the case, it's not

13   intentional, and I apologize.  I'll try to avoid that, if

14   possible.  There was a couple of mentions of your dad being

15   treated or at least admitted and treated at Eastern State.

16   To the best of your knowledge, how, how many times are we

17   talking about?

18          A      That's the only one that I recall.

19          Q      There was two (2) or three (3) years ago,

20   correct?

21          A      That's it.

22          Q      Okay.  I took your testimony to mean that

23   there was one maybe a week or two (2) before this incident.

24          A      No.

25          Q      Is that, is that not right?

44

1          A        No.

2          Q        Okay, okay.  Do you know why he was picked

3    up and, and sent to Eastern State?

4          A        No.

5          Q        Okay.  Was that something he would talk

6    about with you or anybody, anybody else or would he kind of

7    keep that stuff to himself?

8          A        Kept it to hisself.

9          Q        Okay.  And by that, I mean not just being

10   admitted to Eastern State, but any mental disorders he, you

11   know, was facing or, or health, mental health care that he

12   was receiving.

13         A        He didn't want to talk about any of his

14   health to me.

15         Q        Okay.  Do you know, do you know the

16   circumstances by which he was picked up and sent to Eastern

17   State?  I know you said he was first probably sent to Three

18   Rivers.  Is that right?

19         A        Yeah, I think so.  Oh, when the police,

20   after the police picked him up?

21         Q        Right.

22         A        Yeah.  I think he was sent to Three Rivers

23   and then to Eastern State.

24         Q        Okay.  Do you know...

25         A        I think that's how the process works.

                                45

1          Q          Okay.  Do you know who picked him up, what
2     agency, what officer?
3          A          No.  I'm not for sure, but I believe that
4     he went to the department or something like that.
5          Q          You think he voluntarily showed up?
6          A          Yeah, I think so, something like that.
7          Q          Okay.  To the best of your knowledge...
8          A          He wouldn't ever talk to me about any of
9     his troubles...
10         Q          No, I understand.  I understand.
11         A          ... I mean.
12         Q          And that's, that's fine.  We're trying
13    just to understand what you know and what other folks know.
14    And if you don't know, that's, that's fine.  We'd rather
15    that than, you know...
16         A          Make something up?
17         Q          Precisely.  Nothing but the facts, man.
18         A          That's what I'm telling you.  I'm telling
19    you I, I worked out of town there for, well, since I got out
20    of high school until...
21         Q          Sure.
22         A          So I was only in on the weekends.
23         Q          To the best of your knowledge, had he been
24    hospitalized anytime before that Eastern State, I mean any--
25    when I say hospital, I mean any mental or psychiatric

46

1   hospitalization before that Eastern State incident?

2          A        Something, I think, I believe that

3   something whenever he was incarcerated in Virginia.

4          Q        Okay.  What about anything after that

5   Eastern State?

6          A        Not that I know of.

7          Q        Okay.  To the best of your knowledge, did

8   he have any, did he seek any psychiatric mental health care

9   while he was living with you?

10         A        Not that I know of.

11         Q        Okay.

12         A        Like I say, he never discussed anything

13  with me.

14         Q        Understood.  Do you know which, when you

15  said he showed up to the department--again still talking

16  about Eastern State--do you know which department he showed

17  up at?

18         A        I believe, I don't know the facts or

19  anything, but what I believe is the sheriff's department.

20         Q        Okay.  To the best of your knowledge--

21  well, I know you testified that your knowledge of the events

22  that evening, the subject evening that brings us here today,

23  is limited basically about what's on that video, correct?

24         A        Yeah, other than he was at the high school

25  graduation and his truck got stuck.

47

1        Q        Understood.  Do you know if Chief Fugitt

2  was on scene at the department when, when the incident

3  occurred?

4        A        Oh, yeah, someone, ah--I can't, I don't

5  know if it's a fact, but I've heard that he was.

6        Q        Okay.  Do you remember seeing him on the

7  video?

8        A        No.  I didn't see him on the video.

9        Q        Okay, okay.

10       A        I heard that he was at the high school.

11       Q        Understood.

12       A        But like I said, it's not factual.  I

13  can't say that I saw him there.

14       Q        Do you know why your dad would have--and

15  if you don't, you don't--but, ah, or if you've been told by

16  anyone, I'd, I'd like to know that, or if you know

17  personally, why your dad would have shown up at a police

18  department to be, I'm assuming based on your answers, your

19  understanding is he showed up to be admitted to a mental

20  health hospital or to seek, seek some kind of mental

21  treatment?

22       A       I don't know if he was there or--I don't

23  know.  I really, that's what I don't really know.

24       Q       Okay.  You, so you don't know why he came

25  to the department?

```
1          A       No, I really don't.

2          Q       Okay, alright.

3          A       I don't know why, why he was there.

4          Q       Fair enough.  Do you have any, as we sit

5   here today, any facts, independent evidence, proof of any

6   kind that Chief Fugitt knew of your dad's mental health

7   treatment prior to the, to the incident?

8          A       No.

9          Q       What about Officer Miller?

10         A       No.

11         Q       And what about Officer Wilburn?

12         A       I, I don't know if he knew of any

13  treatments or anything like that, but they were neighbors.

14         Q       They were neighbors?

15         A       At one point, yeah.

16         Q       Was this before he lived with you?

17         A       Yeah.

18         Q       Okay.  Anything specific that you know by

19  virtue of being neighbors that your dad, that Officer

20  Wilburn knew he had any kind of, you know, mental health

21  disorder?

22         A       I think he did.  I think he did.

23         Q       Okay.  Why, why do you think he did?

24         A       They got into an altercation before.  You

25  know, I think he did.
```

1          Q          You're talking about...

2          A          I don't really know, that's what I'm

3     saying, but that's what I've been told, that they got into

4     it.

5          Q          Do you know when?

6          A          Ah, no, actually I don't, but just that's

7     --I mean they were living, you know, kind of in the same

8     apartment complex.

9          Q          Do you know who told you that?

10         A          My sister told me.

11         Q          You're talking about Amanda?

12         A          Yeah, and my brother-in-law told me that.

13         Q          And what's his name?

14         A          Timmy.

15         Q          Okay.  Is, and this is one of those

16    instances where I wasn't paying attention in class when Mr.

17    Shaw was asking you and you've probably answered already,

18    but Timmy is married to Amanda?

19         A          That's right.

20         Q          Okay.  Where do they live in relation, at

21    that time, to Officer Wilburn and, and your dad?

22         A          They lived just in the same town.  They

23    didn't live close.

24         Q          Okay, okay.  Do you know how they heard

25    about it, just if...

50

1          A          I don't know if--no, I don't.  I don't
2   know if he had told them or...

3          Q          And do you have any specifics about what
4   kind of altercation it was?

5          A          Ut ha (negative), not really.

6          Q          If it was physical, if it was yelling?

7          A          Yeah, it wasn't physical.  No, it wasn't
8   physical.

9          Q          Okay.  Did I, I probably did ask, but do
10  you know about when that altercation would have been?

11         A          I'm not sure.

12         Q          Okay.  Is there anything else you can tell
13  us about any of the City of Louisa police officers, Wilburn,
14  Miller, Fugitt, having any other kind of interaction with
15  your dad?

16         A          I know that they have.  They told me that
17  they have, Fugitt has, but what I don't know.

18         Q          Do you know if any of those officers I
19  just named, again Fugitt, Wilson, sorry, Fugitt, Wilburn,
20  and Miller, had arrested your father prior to this incident?

21         A          I believe that--well, I know Wilburn had,
22  but I, I believe that Fugitt had too.

23         Q          Do you know what for?

24         A          No.

25         Q          Do you know when?

51

1         A        It was within the last, well, before he

2    died, I'd say within the last five (5) years.

3         Q        Okay.

4         A        Like I said, it's hard for me to say all

5    this stuff.  I mean I just know he got arrested, but what,

6    what it was for, I don't, you know, I can't...

7         Q        And that's, that's understood.  And again,

8    it's not a quiz.  I don't--you know, just to the best of

9    your knowledge.

10        A        Oh, yeah, I understand that.  That's what

11   --I'm just trying to give you the best knowledge that I

12   have.

13        Q        You're trying to...

14        A        But I don't want you to think I'm trying

15   to keep anything from you either.

16        Q        I, I don't, not for a second, not for a

17   second.

18        A        Because, you know, I worked out of town.

19   My sister, she was the one that mainly was around the most.

20        Q        No, I, I don't think that for a second.

21   Again, we're...

22        A        Up until I got hurt.

23        Q        ... we're just trying to fact, fact find

24   and explore facts and that's, that's, that's all.

25             MR. GADANSKY:      Okay.  I think that's all the

1  questions I've got.  I appreciate it.

2          MR. COLLINS:      Not a problem.

3          MR. CURTIS:      We're done.

4          MR. SHAW:      That's it.

5          MR. CURTIS:      Any re-follow-up or anything?

6          MR. SHAW:      I'll think of something

7  afterward, about two (2) hours from now.

8

9                    * * * * * * * * * *

10         Thereupon the taking of the deposition of BILLY

11  JOSEPH COLLINS was concluded.

12                   * * * * * * * * * *

53

CERTIFICATE OF SERVICE

This is to certify that the foregoing deposition has been mailed to the following persons:

ORIGINAL TO:

Hon. Jonathan Shaw
PORTER, BANKS, BALDWIN & SHAW
P.O. Drawer 1767
Paintsville, KY 41240

COPIES:

Hon. Michael J. Curtis
CURTIS LEGAL SERVICES, INC.
P.O. Box 1455
Ashland, KY 41101

Hon. Chris J. Gadansky
McBRAYER, McGINNIS, LESLIE
    & KIRKLAND, PLLC
9300 Shelbyville Road, Suite 110
Louisville, KY 40222

Hon. Jonathan Shaw
PORTER, BANKS, BALDWIN & SHAW
P.O. Drawer 1767
Paintsville, KY 41240

This the 27th day of March, 2017.

Atha Mae Maggard
Freelance Court Reporter

CERTIFICATE

STATE OF KENTUCKY)

COUNTY OF FLOYD  )

I, ATHA MAE MAGGARD, Notary Public for the State
of Kentucky at Large, do certify that the foregoing
deposition was taken at the time and place stated in
caption; that the witness was duly sworn before me before
testifying; that the deposition was taken by me in shorthand
notes and on tape recorder and later transcribed on the
computer by me; and that the foregoing 54 pages of
typewritten material is a true and correct copy of my said
shorthand notes and tape recordings.

Given under my hand this 27th day of March, 2017.

Atha Mae Maggard
Notary Public
State of KY at Large

My commission expires
August 6, 2020

55

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CIVIL ACTION NO. 0:16-cv-00068-HRW

ESTATE OF BILLY COLLINS, JR.;
BILLY JOSEPH COLLINS, ADMINISTRATOR                PLAINTIFF

-vs-                    ANSWERS TO INTERROGATORIES

STEPHEN WILBURN, et al.                             DEFENDANTS

** ** ** ** ** ** **

INTERROGATORY NO. 1:    Please state the full name, date
and place of birth and Social Security Number of Plaintiff's
decedent, Billy Collins, Jr.

**ANSWER:** Billy Collins Jr., ~~████~~, Clearwater, Florida,
~~████~~

INTERROGATORY NO. 2:    Please state the name and address
of each and every person who assisted in providing information
used in answering these Interrogatories.

**ANSWER:** Billy Joseph Collins, P.O. Box 351, Louisa, KY 41230

INTERROGATORY NO. 3:    Please state whether Billy Collins,
Jr. has any children and if so, please state the names and
addresses of those children.

**ANSWER:** Billy Joseph Collins, Louisa, KY;  Amanda Adkins, Louisa,
KY; Kimberly Collins, Summersville, SC;
Shelly Collins, whereabouts are unknown to Plaintiff.

INTERROGATORY NO. 4:    Please state the name and last
known address of each and every person known to you or your
attorney who has or purports to have any type of knowledge or
discoverable information concerning the circumstances of the
incident which is the subject matter of this action.  Please
include the names and addresses of any and all eye witnesses.

**ANSWER:**  Unknown at this time, we reserve the right to supplement
this interrogatory.

INTERROGATORY NO. 5:    Please state the names and
addresses of each and every person whom you intend to call as a
witness to testify on your behalf, either by deposition or in
person, at the trial of this action.



DEFENDANT'S
EXHIBIT

/

**ANSWER:**   See Initial Rule 26 Disclosure statement.   Other witnesses are unknown at this time, we reserve the right to supplement this interrogatory.

INTERROGATORY NO. 6:    Please state the name and address of each and every expert witness whom you intend to call as a witness, either in person or by deposition, at the trial of this action and for each such expert, set out the subject matter on which each expert is expected to testify and further state the substance of facts and opinions which each expert will testify and a summary of the grounds of each opinion of such expert.

**ANSWER:**   Dr. George Kirkham; See Dr. Kirkham Preliminary Report. We reserve the right to supplement this interrogatory.

INTERROGATORY NO. 7:    Please set out in as much detail as possible your understanding or version of how the incident in question occurred.

**ANSWER:**  The only facts known to the Plaintiffs is that according to the police report their father was arrested for driving without a license and disorderly conduct.   The rest of the facts are on the video.

INTERROGATORY NO. 8:   Had Billy Collins, Jr. ever filed a claim seeking workers compensation benefits, disabled Social Security benefits, or SSI and if so, please state the approximate date when such benefits were applied for, the injury, illness or disability which was the reason for the application for such benefits and the ultimate outcome of the claim or claims.

**ANSWER:**  He was on Social Security Disability.

INTERROGATORY NO. 9:  Please state the name and address of each and every physician, medical doctor, chiropractor, surgeon, osteopath or other healthcare practitioner, as well as each hospital, medical center or institution which has examined, diagnosed or provided any type of treatment to Plaintiff's decedent, Billy Collins, Jr., during the ten (10) years preceding his death.

**ANSWER:**  Unknown to Plaintiff.  Only knowledge Plaintiff has of decedent going to the hospital is when the police took him after this incident.

INTERROGATORY NO. 10:  Please state whether or not Billy Collins, Jr. was ever a party to any criminal proceeding or was ever convicted of a felony, and if so, please set out in detail

the approximate date, city, county and state of any such criminal proceeding, the action number of such proceeding, if known, and the outcome of each such proceeding.

**ANSWER:**   Plaintiff is only aware of DUI and misdemeanor charges.


INTERROGATORY NO. 11:   Will you execute medical authorizations permitting the Defendants and their counsel to obtain the medical records of Plaintiff's decedent, Billy Collins, Jr.?  Medical authorizations in triplicate are attached hereto.

**ANSWER:** No medical authorizations were attached.

INTERROGATORY NO. 12:  Please provide a list of all pharmacies, hospitals, stores, etc., as well as the addresses of each, at which Billy Collins, Jr., deceased, or someone on his behalf, visited to receive or obtain medication and/or prescriptions within the ten (10) year period preceding his death.

**ANSWER:**  Unknown.

INTERROGATORY NO. 13:   Within the last fifteen (15) years preceding his death, you are requested to provide a complete history of employment for Billy Collins, Jr., deceased.  With respect to each of his employers, you are requested to provide the following information:

(a)  The name and address of each employer;
(b)  The name and address of each immediate supervisor in each such employment;
(c)  His occupational title and the nature of his duties at each such employment; and
(d)  The amount of his wages or earnings at each such employment.

**ANSWER:**  Plaintiff states that Mr. Collins had been on social security for many years, estimates 10 years and states that he can recall him working at a tire shop many years ago.  Plaintiff does not recall the name of the tire shop.


INTERROGATORY NO. 14:   Please state the amount of money which you intend to demand or request of the jury at the trial of this case for each item of damages claimed by the plaintiff herein, setting out specifically each item of damage claimed and the amount of recovery which you seek for each.

**ANSWER:**   At this time we will be asking the Jury for $5,000,000.00 for damages.

INTERROGATORY NO. 15:    Please state each and every fact upon which you rely in support of the allegations contained in Numerical Paragraph 16 of your complaint, which states that each defendant:
"While in the custody of the {defendants} use of force against decedent was willful, negligent, grossly negligent, excessive and caused his death".

**ANSWER:**   All facts are in the video, support of these facts comes from our expert.

INTERROGATORY NO. 16:    For each fact listed in the preceding interrogatory, please set forth in detail any knowledge as to who breached their duties, what duties were breached, what information exists to support these facts, by whom the information was provided, and when the information was provided.

**ANSWER:**   All facts are in the video, support of these facts comes from our expert.


## REQUEST FOR PRODUCTION OF DOCUMENTS


REQUEST NO. 1:  Please attach the Federal and State income tax returns and W-2 forms for Billy Collins, Jr. for the years 2015, 2014, 2013, 2012 and 2011.

**ANSWER:**  Decedent was on Social Security Disability and did not file taxes to Plaintiffs knowledge.

REQUEST NO. 2:  Please provide supporting documentation for all special damages, including medical expenses, funeral expenses, cost of administration of the Estate of Billy Collins, Jr. and any and all other documents supporting Plaintiff's claim for damages in this civil action.

**ANSWER:** Receipt for the funeral and the receipt for filing of the estate are attached along with the receipt for hiring an expert in this matter.  Any medical bills from the hospital, ambulance, coroner will be supplied if any are received.

REQUEST NO. 3:   Please provide a complete copy of the probate or estate file opened for the Estate of Billy Collins, Jr. including, but not limited to all inventories listing assets of the decedent, Billy Collins, Jr. and funeral expenses, costs of administration and the like.

**ANSWER:**   Will be provided upon receipt.

REQUEST NO. 4:   All documents reviewed or referred to by the Plaintiff of others assisting the Plaintiff in responding to Defendants' Interrogatories.

**ANSWER:**   Video

REQUEST NO. 5:   Attached hereto in triplicate are copies of the Authorization for Release of Medical Records and Tests; Authorization for Release of Employment Records; and Authorization for Release of Social Security and Kentucky Cabinet for Human Resources Records which please have the administrator sign and return, together with the other documents requested herein.

**ANSWER:**   No attachments were provided with this document.

> CURTIS LEGAL SERVICES, PSC
> 1212 Bath Avenue, Suite 620
> P.O. Box 1455
> Ashland, Kentucky 41105
> Telephone (606)324-5435
> Fax (606)324-5496
>
> Michael J. Curtis

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Answers to Interrogatories was mailed to:

Jonathan C. Shaw
PORTER, BANKS, BALDWIN & SHAW
P.O. Drawer 1767
Paintsville, KY 41240

Michael J. Curtis

**WILSON FUNERAL HOME, INC.**
1270 Highway 2565
Louisa, Kentucky 41230
(606) 638-0034

No. 6645

Date _6/1/15_

Received From _Angela Collins_    $ _3000_

_Three Thousand Dollars & 00/100 Cents_ _____ Dollars

For Funeral Expenses of _Billy Collins Jr._

| | | |
|---|---|---|
| Amount of Account | $ _8877_ | ☑ Check # _1027_ |
| Amount Paid | $ _3000_ | ☐ Cash |
| Balance Due | $ _5877_ | ☐ Social Security |
| | | ☐ VA Benefit |
| | | ☐ Life Insurance |

Thank You,

AOC-805
Rev. 10-05
Page 3 of 3

Case No. 15- P. 00123

IN RE:  Estate of  Billy B. JR. Collins Jr.

## ORDER

[✓]   Petition filed this 15 day of October , 2015.

[  ]   Will tendered this _____ day of _____, 2_____.

Upon hearing, the Will offered was proven by _____

and **ORDERED PROBATED** as the Last Will and Testament of Decedent this _____ day of _____, 2_____.

The Court appoints:  Billy Joseph Collins                                             as

[  ] Executor/Executrix OR [✓] Administrator/Administratrix of said estate and fixes bond in the sum of

$ 2000 _____ [  ] with surety OR [  ] without surety.

Date: Oct. 15        , 2015.        _John T. Clay_
                                        **Judge's Signature**

Distribution:
     Case File
     Revenue Cabinet

ENTERED THIS 15th DAY OF
OCT , 20 15
BY MAILING COPIES TO
ALL COUNSEL OF RECORD
JODI L. PARSLEY, CLERK
LAWRENCE CIRCUIT COURT
BY _____ D.C.

COMMONWEALTH OF KENTUCKY
LAWRENCE CIRCUIT COURT
CASE NO. 16-CI-<u>00114</u>

ESTATE OF BILLY COLLINS, JR.;
BILLY JOSEPH COLLINS, Administrator                    PLAINTIFF

VS

STEPHEN WILBURN, Individually and
in his capacity as Police Officer, Agent,
Servant or Employee of the City of
Louisa, Kentucky
  SERVE: Stephen Wilburn
          Louisa City Police Department
          215 N. Main Cross St., Ste. 1
          Louisa, KY 41230

FILED THIS ___20___ DAY OF
___May___, 20 16
JODI L PARSLEY, CLERK
LAWRENCE CIRCUIT COURT
BY: ___S. H.___                    D.C.

and

JORDAN MILLER, Individually and in his
capacity as a Police Officer, Agent,
Servant or Employee of the City of
Louisa, Kentucky
    SERVE: Jordan Miller
            Louisa City Police Department
            215 N. Main Cross St., Ste. 1
            Louisa, KY 41230

and

GREG FUGITT, Individually and in his
capacity of Chief of Police of the
Louisa City Police Department
    SERVE: Greg Fugitt
            Louisa City Police Department
            215 N. Main Cross St., Ste. 1
            Louisa, KY 41230

and

GARRETT ROBERTS, Individually and in his
capacity as Lawrence County Sheriff
    SERVE: Garrett Roberts
            Lawrence County Sheriff's Office
            310 E. Main Street
            Louisa, KY 41230

and



DEFENDANT'S
EXHIBIT

2

OFFICER KEEFER, Individually and in his
capacity as a Deputy, Agent, Servant
or Employee of the Lawrence County Sheriff's Office
    SERVE: Officer Keefer
          Louisa County Sheriff's Office
          310 E. Main Street
          Louisa, KY 41230

and

OFFICE WILHITE, Individually and in his
capacity as a Deputy, Agent, Servant or
Employee of the Lawrence County Sheriff's Office
    SERVE: Officer Wilhite
          Lawrence County Sheriff's Office
          310 E. Main Street
          Louisa, KY 41230

and

LOUISA CITY POLICE DEPARTMENT
    SERVE: Greg Fugitt
          Louisa City Police Department
          215 N. Main Cross St., Ste. 1
          Louisa, KY 41230

and

CITY OF LOUISA, KENTUCKY
    SERVE: Harold Slone, Mayor
          215 N. Main Cross Street
          Louisa, KY 41230

and

LAWRENCE COUNTY SHERIFF'S OFFICE
    SERVE: Garrett Roberts
          310 E. Main Street
          Louisa, KY 41230

and

LAWRENCE COUNTY, KENTUCKY
    SERVE: John A. Osborne
          Lawrence County Judge Executive
          122 South Main
          Louisa, KY 41230

and

UNKNOWN DEFENDANTS                                    DEFENDANTS

** ** ** ** ** **
VERIFIED COMPLAINT
** ** ** ** ** **

Comes now Billy Joseph Collins, as Administrator of the
Estate of Billy Collins, Jr., and for his cause of action herein
states as follows:

(1) The Plaintiff, Billy Joseph Collins, at all times
complained of herein is a resident of the Commonwealth of
Kentucky.  He is the natural son of Billy Joseph, Jr., who was a
resident of the Commonwealth of Kentucky.  Billy Joseph Collins
is duly appointed Administrator of the estate of his nature
father, Billy Collins, Jr., (hereinafter decedent); having been
so appointed on October 15, 2015 in the Lawrence District Court,
in Probate Case No. 15-P-113.

(2) On or about May 29, 2015 and/or at all times complained
of herein, Louisa City Police Officer Stephen Wilburn was acting
both individually and/or in his capacity as agent, servant or
employee of the Louisa City Police Department and/or the City of
Louisa, Kentucky.  He is individually liable and the Louisa City
Police Department (hereinafter Police Department) are vicariously
liable.

(3) Defendants Greg Fugitt and Louisa City Police Department
are also liable for their negligent training and supervision of
other police officer defendants.

3

(4) The Defendant, Sheriff Garrett Roberts, at all times herein, is and was the duly elected Sheriff of Lawrence County, Kentucky.

(5) The Defendant, Officer Keefer, was and at all times relevant herein, a deputy and an employee, under the dictates, authority and/or control of Lawrence County Sheriff, Garrett Roberts and the Lawrence County Sheriff's Office.

(6) The Defendant, Officer Wilhite, was and at all times relevant herein, a deputy and an employee, under the dictates, authority and/or control of Lawrence County Sheriff, Garrett Roberts and the Lawrence County Sheriff's Office.

(7) The Defendant, Lawrence County Sheriff's Office, is vicariously liable and liable under the doctrine of Respondeat/Superior for the acts of Sheriff Roberts and Deputy Keefer and Deputy Wilhite as the Defendants were acting under color of law pursuant to KRS 344 and 42 USC Section 1983. Defendant, Lawrence County, Kentucky, is also liable for their negligent training and supervision and/or monitoring of Defendants Keefer and Wilhite.

(8) On or about May 29, 2015 and/or all times complained of herein, Louisa City Police Officer Jordan Miller was acting both individually and in his capacity as an agent, servant or employee of the Louisa City Police Department and the City of Louisa, Kentucky.  The City of Louisa is vicariously liable for the acts of Miller.

4

(9) On or about May 29, 2015 and/or all times complained of herein, Lawrence County Deputy Keefer was acting individually or in his capacity as agent, servant or employee of the Lawrence County Sheriff's Office and Lawrence County, Kentucky. The Lawrence County Sheriff's Office and Lawrence County, Kentucky are vicariously liable for the acts of Keefer.

(10) On or about May 20, 2005 and/or all times complained of herein, Lawrence County Deputy Wilhite was acting individually or in his capacity as agent, servant or employee of the Lawrence County Sheriff's Office and Lawrence County, Kentucky. The Lawrence County Sheriff's Office and Lawrence County, Kentucky are vicariously liable for the acts of Wilhite.

(11) Chief Greg Fugitt is the Chief of Police for the Louisa City Police Department. He has a duty to maintain the current necessary prescribed training in regard to use of all types of force, including but not limited to the use of "taser" electrical conductive weapons, to all of his police officer subordinates including the co-defendants. Fugitt breached his duty in this regard and that breach of duty was a proximate cause of the death of decedent.

(12) The Lawrence County Sheriff's Office is vicariously liable to the Plaintiff as Keefer and Wilhite were acting within the scope of their employment of the Lawrence County Sheriff's Office.

5

(13) The Lawrence County Sheriff's Office is liable for negligent supervision, training and monitoring of Keefer and Wilhite.

(14) Lawrence County, Kentucky is liable for their negligent failure to supervise, train and monitor Keefer and Wilhite.

(15) Defendants are also jointly and severally liable as they were at all times complained of herein, acting in concert or in complicity with each other in acting without probable cause and knowingly acting without probable cause and acting contrary to the United States Constitution and KRS 344 in both beating and negligent use of an electrical conductive weapon (tasing) Plaintiff's decedent on or about May 29, 2015.

(16) While in the custody of the Louisa City Police Department and those other named Defendants, Louisa City Police Officer's and Lawrence County Sheriff's Office Deputies use of force against decedent was willful, negligent, grossly negligent, excessive and **CAUSED HIS DEATH** (emphasis added); and so blatantly a violation of decedent's rights under both the United States Constitution and Kentucky Constitution such that punitive damages are warranted.

(17) The Defendant, Police Chief Greg Fugitt, was and at all times relevant herein, the chief of police and an employee of the City of Louisa, Kentucky, under the dictates, authority and/or control of the City of Louisa, Kentucky. Fugitt and the City of Louisa, Kentucky are vicariously liable for the acts of its police officers.

6

(18) The Defendant, City of Louisa, Kentucky, is vicariously liable and liable under the doctrine of Respondeat/Superior for the acts of Chief Fugitt and all of the other Defendants were acting under color of law pursuant to KRS 344 and 42 U.S.C. §1983.  The Defendant, City of Louisa, Kentucky is also liable for their negligent training and supervision and/or monitoring of their police officers/employees.

(19)  The Defendant, Sheriff Garrett Roberts, was and at all times relevant herein, the Sheriff of Lawrence County, Kentucky, under the dictates, authority and/or control of the Lawrence County, Kentucky.  Roberts and Lawrence County, Kentucky are vicariously liable for the acts of its police officers.

(20)  The Defendant, Lawrence County, Kentucky, is vicariously liable and liable under the doctrine of Respondeat/Superior for the acts of Sheriff Roberts and all of the other Defendants were acting under color of law pursuant to KRS 344 and 42 U.S.C. §1983.  The Defendant, Lawrence County, Kentucky is also liable for their negligent training and supervision and/or monitoring of their police officers/employees.

(21) All Defendants are liable per se as they, acting in conspiracy with and in complicity with each other in violating KRS 344 and 42 U.S.C. §1983.

(22) The Defendants tortious conduct was a result of customs and practices, either written or unwritten, that were systematically applied to persons situated such as the decedent and was so applied to the decedent in this case.  The

7

implementation of these customs and practices whether written or unwritten by the Defendants named herein were a proximate cause of decedent's death.

(23) Plaintiff submits that there are other defendants currently unknown to the Plaintiff who were present at the time of the violation of decedent's Constitutional rights, both state and federal, as well as those rights guaranteed both statutorily and by common law, and whom did participate in the beating and tasing decedent to death.   The Plaintiff relies upon Civil Rule 4.15.

(24) Due to the intentional disregard of, and the deliberate and reckless or grossly negligent indifference to the rights of the Plaintiff, the Plaintiff is entitled to punitive damages.

(25) The Plaintiff is entitled to attorney fees as a result of the Defendants acts as alleged herein.

(26) The amount of damages sought herein is the minimum amount necessary to incur the jurisdiction of this Court.

WHEREFORE, the Plaintiff Billy Joseph Collins, as Administrator of the Estate of Billy Collins, Jr., demands a judgment against the Defendants, jointly and severally, in an amount for which the proof will show, punitive damages and for attorney's fees and for a trial by jury.

8

CURTIS LEGAL SERVICES, PSC
1212 Bath Avenue, Suite 620
P.O. Box 1455
Ashland, Kentucky 41105
Telephone (606)324-5435
Fax (606)324-5496

_____
Michael J. Curtis

STATE OF KENTUCKY

COUNTY OF BOYD

    I, BILLY JOSEPH COLLINS, as Administrator of the Estate of
Billy Collins, Jr., after first being duly sworn, state that the
foregoing Complaint is true and correct to the best of my
knowledge and belief.

_____
BILLY JOSEPH COLLINS

    SUBSCRIBED AND SWORN TO before me this 20th day of April,
2016, by BILLY JOSEPH COLLINS.

My Commission Expires: _3/10/19_

_____
NOTARY PUBLIC, STATE-AT-LARGE
ID# 528084

9

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CIVIL ACTION NO. 0:16-cv-00068-HRW

ESTATE OF BILLY COLLINS, JR.;
BILLY JOSEPH COLLINS, ADMINISTRATOR                 PLAINTIFF

-vs-                    ANSWERS TO INTERROGATORIES         .

STEPHEN WILBURN, et al.                              DEFENDANTS

** ** ** ** ** ** **

INTERROGATORY NO. 1:    Please state the full name, date
and place of birth and Social Security Number of Plaintiff's
decedent, Billy Collins, Jr.

**ANSWER:** Billy Collins Jr., ████████, Clearwater, Florida,
████████

INTERROGATORY NO. 2:    Please state the name and address
of each and every person who assisted in providing information
used in answering these Interrogatories.

**ANSWER:** Billy Joseph Collins, P.O. Box 351, Louisa, KY 41230

INTERROGATORY NO. 3:    Please state whether Billy Collins,
Jr. has any children and if so, please state the names and
addresses of those children.

**ANSWER:** Billy Joseph Collins, Louisa, KY;  Amanda Adkins, Louisa,
KY; Kimberly Collins, Summersville, SC;
Shelly Collins, whereabouts are unknown to Plaintiff.

INTERROGATORY NO. 4:    Please state the name and last
known address of each and every person known to you or your
attorney who has or purports to have any type of knowledge or
discoverable information concerning the circumstances of the
incident which is the subject matter of this action.  Please
include the names and addresses of any and all eye witnesses.

**ANSWER:**  Unknown at this time, we reserve the right to supplement
this interrogatory.

INTERROGATORY NO. 5:    Please state the names and
addresses of each and every person whom you intend to call as a
witness to testify on your behalf, either by deposition or in
person, at the trial of this action.



DEFENDANT'S
EXHIBIT

1

**ANSWER:** See Initial Rule 26 Disclosure statement. Other witnesses are unknown at this time, we reserve the right to supplement this interrogatory.

INTERROGATORY NO. 6:    Please state the name and address of each and every expert witness whom you intend to call as a witness, either in person or by deposition, at the trial of this action and for each such expert, set out the subject matter on which each expert is expected to testify and further state the substance of facts and opinions which each expert will testify and a summary of the grounds of each opinion of such expert.

**ANSWER:** Dr. George Kirkham; See Dr. Kirkham Preliminary Report. We reserve the right to supplement this interrogatory.

INTERROGATORY NO. 7:    Please set out in as much detail as possible your understanding or version of how the incident in question occurred.

**ANSWER:** The only facts known to the Plaintiffs is that according to the police report their father was arrested for driving without a license and disorderly conduct. The rest of the facts are on the video.

INTERROGATORY NO. 8:   Had Billy Collins, Jr. ever filed a claim seeking workers compensation benefits, disabled Social Security benefits, or SSI and if so, please state the approximate date when such benefits were applied for, the injury, illness or disability which was the reason for the application for such benefits and the ultimate outcome of the claim or claims.

**ANSWER:** He was on Social Security Disability.

INTERROGATORY NO. 9:   Please state the name and address of each and every physician, medical doctor, chiropractor, surgeon, osteopath or other healthcare practitioner, as well as each hospital, medical center or institution which has examined, diagnosed or provided any type of treatment to Plaintiff's decedent, Billy Collins, Jr., during the ten (10) years preceding his death.

**ANSWER:** Unknown to Plaintiff. Only knowledge Plaintiff has of decedent going to the hospital is when the police took him after this incident.

INTERROGATORY NO. 10:  Please state whether or not Billy Collins, Jr. was ever a party to any criminal proceeding or was ever convicted of a felony, and if so, please set out in detail

the approximate date, city, county and state of any such criminal proceeding, the action number of such proceeding, if known, and the outcome of each such proceeding.

**ANSWER:**   Plaintiff is only aware of DUI and misdemeanor charges.


INTERROGATORY NO. 11:     Will you execute medical authorizations permitting the Defendants and their counsel to obtain the medical records of Plaintiff's decedent, Billy Collins, Jr.? Medical authorizations in triplicate are attached hereto.

**ANSWER:** No medical authorizations were attached.

INTERROGATORY NO. 12:  Please provide a list of all pharmacies, hospitals, stores, etc., as well as the addresses of each, at which Billy Collins, Jr., deceased, or someone on his behalf, visited to receive or obtain medication and/or prescriptions within the ten (10) year period preceding his death.

**ANSWER:**  Unknown.

INTERROGATORY NO. 13:     Within the last fifteen (15) years preceding his death, you are requested to provide a complete history of employment for Billy Collins, Jr., deceased.  With respect to each of his employers, you are requested to provide the following information:

(a)  The name and address of each employer;
(b)  The name and address of each immediate supervisor in each such employment;
(c)  His occupational title and the nature of his duties at each such employment; and
(d)  The amount of his wages or earnings at each such employment.

**ANSWER:**   Plaintiff states that Mr. Collins had been on social security for many years, estimates 10 years and states that he can recall him working at a tire shop many years ago.  Plaintiff does not recall the name of the tire shop.


INTERROGATORY NO. 14:    Please state the amount of money which you intend to demand or request of the jury at the trial of this case for each item of damages claimed by the plaintiff herein, setting out specifically each item of damage claimed and the amount of recovery which you seek for each.

**ANSWER:**   At this time we will be asking the Jury for
$5,000,000.00 for damages.

INTERROGATORY NO. 15:    Please state each and every fact upon
which you rely in support of the allegations contained in
Numerical Paragraph 16 of your complaint, which states that each
defendant:
"While in the custody of the {defendants} use of force against
decedent was willful, negligent, grossly negligent, excessive and
caused his death".

**ANSWER:**   All facts are in the video, support of these facts
comes from our expert.

INTERROGATORY NO. 16:    For each fact listed in the preceding
interrogatory, please set forth in detail any knowledge as to who
breached their duties, what duties were breached, what
information exists to support these facts, by whom the
information was provided, and when the information was provided.

**ANSWER:**   All facts are in the video, support of these facts
comes from our expert.


REQUEST FOR PRODUCTION OF DOCUMENTS


REQUEST NO. 1:  Please attach the Federal and State income tax
returns and W-2 forms for Billy Collins, Jr. for the years 2015,
2014, 2013, 2012 and 2011.

**ANSWER:**  Decedent was on Social Security Disability and did not
file taxes to Plaintiffs knowledge.

REQUEST NO. 2:  Please provide supporting documentation for all
special damages, including medical expenses, funeral expenses,
cost of administration of the Estate of Billy Collins, Jr. and
any and all other documents supporting Plaintiff's claim for
damages in this civil action.

**ANSWER:** Receipt for the funeral and the receipt for filing of the
estate are attached along with the receipt for hiring an expert
in this matter.  Any medical bills from the hospital, ambulance,
coroner will be supplied if any are received.

REQUEST NO. 3:  Please provide a complete copy of the probate or estate file opened for the Estate of Billy Collins, Jr. including, but not limited to all inventories listing assets of the decedent, Billy Collins, Jr. and funeral expenses, costs of administration and the like.

**ANSWER:**   Will be provided upon receipt.

REQUEST NO. 4:  All documents reviewed or referred to by the Plaintiff of others assisting the Plaintiff in responding to Defendants' Interrogatories.

**ANSWER:**   Video

REQUEST NO. 5:  Attached hereto in triplicate are copies of the Authorization for Release of Medical Records and Tests; Authorization for Release of Employment Records; and Authorization for Release of Social Security and Kentucky Cabinet for Human Resources Records which please have the administrator sign and return, together with the other documents requested herein.

**ANSWER:**   No attachments were provided with this document.

> CURTIS LEGAL SERVICES, PSC
> 1212 Bath Avenue, Suite 620
> P.O. Box 1455
> Ashland, Kentucky 41105
> Telephone (606)324-5435
> Fax (606)324-5496
>
> Michael J. Curtis

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Answers to Interrogatories was mailed to:

Jonathan C. Shaw
PORTER, BANKS, BALDWIN & SHAW
P.O. Drawer 1767
Paintsville, KY 41240

Michael J. Curtis

**No 6645**

**WILSON FUNERAL HOME, INC.**
1270 Highway 2565
Louisa, Kentucky 41230
(606) 638-0034

Date 6/1/15

Received From _Angela Collins_   $ 3000

_Three Thousand Dollars & 00/100 Cents_   Dollars

For Funeral Expenses of _Billy Collins, Jr._

Amount of Account   $ 8877

Amount Paid   $ 3000

Balance Due   $ 5877

☑ Check # 1027
☐ Cash
☐ Social Security
☐ VA Benefit
☐ Life Insurance

_Thank You,_

AOC-805
Rev. 10-05
Page 3 of 3

Case No. 15-P.00113

IN RE: Estate of _Billy D. Collins Jr._____

### ORDER

[✓]   Petition filed this _15_ day of _October_ , 2 _015_ .

[ ]   Will tendered this _____ day of _____, 2_____.

Upon hearing, the Will offered was proven by _____

and **ORDERED PROBATED** as the Last Will and Testament of Decedent this _____ day of _____, 2____.

The Court appoints: _Billy Joseph Collins_____ as

[ ] Executor/Executrix OR [✓] Administrator/Administratrix of said estate and fixes bond in the sum of

$ _2000_____ [ ] with surety OR [ ] without surety.

Date: _Oct. 15_____, 2_015_         _John T. Clay_____
                                                         **Judge's Signature**

Distribution:
        Case File
        Revenue Cabinet

ENTERED THIS _15th_ DAY OF
_Oct._ 20 _15_
BY MAILING COPIES TO
ALL COUNSEL OF RECORD
JODI L. PARSLEY, CLERK
LAWRENCE CIRCUIT COURT
BY _____ D.C.

COMMONWEALTH OF KENTUCKY
LAWRENCE CIRCUIT COURT
CASE NO. 16-CI-00114

ESTATE OF BILLY COLLINS, JR.;
BILLY JOSEPH COLLINS, Administrator                        PLAINTIFF

VS

STEPHEN WILBURN, Individually and
in his capacity as Police Officer, Agent,
Servant or Employee of the City of
Louisa, Kentucky
  SERVE: Stephen Wilburn
          Louisa City Police Department
          215 N. Main Cross St., Ste. 1
          Louisa, KY 41230

and

JORDAN MILLER, Individually and in his
capacity as a Police Officer, Agent,
Servant or Employee of the City of
Louisa, Kentucky
    SERVE: Jordan Miller
            Louisa City Police Department
            215 N. Main Cross St., Ste. 1
            Louisa, KY 41230

and

GREG FUGITT, Individually and in his
capacity of Chief of Police of the
Louisa City Police Department
    SERVE: Greg Fugitt
            Louisa City Police Department
            215 N. Main Cross St., Ste. 1
            Louisa, KY 41230

and

GARRETT ROBERTS, Individually and in his
capacity as Lawrence County Sheriff
    SERVE: Garrett Roberts
            Lawrence County Sheriff's Office
            310 E. Main Street
            Louisa, KY 41230

and

FILED THIS __20__ DAY OF
_____May_____, 20 16
JODI L. PARSLEY, CLERK
LAWRENCE CIRCUIT COURT
BY: __S. L._____ D.C.



DEFENDANT'S
EXHIBIT

2

OFFICER KEEFER, Individually and in his
capacity as a Deputy, Agent, Servant
or Employee of the Lawrence County Sheriff's Office
    SERVE: Officer Keefer
           Louisa County Sheriff's Office
           310 E. Main Street
           Louisa, KY 41230

and

OFFICE WILHITE, Individually and in his
capacity as a Deputy, Agent, Servant or
Employee of the Lawrence County Sheriff's Office
    SERVE: Officer Wilhite
           Lawrence County Sheriff's Office
           310 E. Main Street
           Louisa, KY 41230

and

LOUISA CITY POLICE DEPARTMENT
    SERVE: Greg Fugitt
           Louisa City Police Department
           215 N. Main Cross St., Ste. 1
           Louisa, KY 41230

and

CITY OF LOUISA, KENTUCKY
    SERVE: Harold Slone, Mayor
           215 N. Main Cross Street
           Louisa, KY 41230

and

LAWRENCE COUNTY SHERIFF'S OFFICE
    SERVE: Garrett Roberts
           310 E. Main Street
           Louisa, KY 41230

and

LAWRENCE COUNTY, KENTUCKY
    SERVE: John A. Osborne
           Lawrence County Judge Executive
           122 South Main
           Louisa, KY 41230

and

2

UNKNOWN DEFENDANTS                                    DEFENDANTS

```
**   **  **   **   **   **
```
VERIFIED COMPLAINT
```
**   **  **   **   **   **
```

Comes now Billy Joseph Collins, as Administrator of the
Estate of Billy Collins, Jr., and for his cause of action herein
states as follows:

(1) The Plaintiff, Billy Joseph Collins, at all times
complained of herein is a resident of the Commonwealth of
Kentucky.  He is the natural son of Billy Joseph, Jr., who was a
resident of the Commonwealth of Kentucky.  Billy Joseph Collins
is duly appointed Administrator of the estate of his nature
father, Billy Collins, Jr., (hereinafter decedent); having been
so appointed on October 15, 2015 in the Lawrence District Court,
in Probate Case No. 15-P-113.

(2) On or about May 29, 2015 and/or at all times complained
of herein, Louisa City Police Officer Stephen Wilburn was acting
both individually and/or in his capacity as agent, servant or
employee of the Louisa City Police Department and/or the City of
Louisa, Kentucky.  He is individually liable and the Louisa City
Police Department (hereinafter Police Department) are vicariously
liable.

(3) Defendants Greg Fugitt and Louisa City Police Department
are also liable for their negligent training and supervision of
other police officer defendants.

3

(4) The Defendant, Sheriff Garrett Roberts, at all times herein, is and was the duly elected Sheriff of Lawrence County, Kentucky.

(5) The Defendant, Officer Keefer, was and at all times relevant herein, a deputy and an employee, under the dictates, authority and/or control of Lawrence County Sheriff, Garrett Roberts and the Lawrence County Sheriff's Office.

(6) The Defendant, Officer Wilhite, was and at all times relevant herein, a deputy and an employee, under the dictates, authority and/or control of Lawrence County Sheriff, Garrett Roberts and the Lawrence County Sheriff's Office.

(7) The Defendant, Lawrence County Sheriff's Office, is vicariously liable and liable under the doctrine of Respondeat/Superior for the acts of Sheriff Roberts and Deputy Keefer and Deputy Wilhite as the Defendants were acting under color of law pursuant to KRS 344 and 42 USC Section 1983. Defendant, Lawrence County, Kentucky, is also liable for their negligent training and supervision and/or monitoring of Defendants Keefer and Wilhite.

(8) On or about May 29, 2015 and/or all times complained of herein, Louisa City Police Officer Jordan Miller was acting both individually and in his capacity as an agent, servant or employee of the Louisa City Police Department and the City of Louisa, Kentucky. The City of Louisa is vicariously liable for the acts of Miller.

4

(9) On or about May 29, 2015 and/or all times complained of herein, Lawrence County Deputy Keefer was acting individually or in his capacity as agent, servant or employee of the Lawrence County Sheriff's Office and Lawrence County, Kentucky.  The Lawrence County Sheriff's Office and Lawrence County, Kentucky are vicariously liable for the acts of Keefer.

(10) On or about May 20, 2005 and/or all times complained of herein, Lawrence County Deputy Wilhite was acting individually or in his capacity as agent, servant or employee of the Lawrence County Sheriff's Office and Lawrence County, Kentucky.  The Lawrence County Sheriff's Office and Lawrence County, Kentucky are vicariously liable for the acts of Wilhite.

(11) Chief Greg Fugitt is the Chief of Police for the Louisa City Police Department.  He has a duty to maintain the current necessary prescribed training in regard to use of all types of force, including but not limited to the use of "taser" electrical conductive weapons, to all of his police officer subordinates including the co-defendants.  Fugitt breached his duty in this regard and that breach of duty was a proximate cause of the death of decedent.

(12) The Lawrence County Sheriff's Office is vicariously liable to the Plaintiff as Keefer and Wilhite were acting within the scope of their employment of the Lawrence County Sheriff's Office.

5

(13) The Lawrence County Sheriff's Office is liable for negligent supervision, training and monitoring of Keefer and Wilhite.

(14) Lawrence County, Kentucky is liable for their negligent failure to supervise, train and monitor Keefer and Wilhite.

(15) Defendants are also jointly and severally liable as they were at all times complained of herein, acting in concert or in complicity with each other in acting without probable cause and knowingly acting without probable cause and acting contrary to the United States Constitution and KRS 344 in both beating and negligent use of an electrical conductive weapon (tasing) Plaintiff's decedent on or about May 29, 2015.

(16) While in the custody of the Louisa City Police Department and those other named Defendants, Louisa City Police Officer's and Lawrence County Sheriff's Office Deputies use of force against decedent was willful, negligent, grossly negligent, excessive and **CAUSED HIS DEATH** (emphasis added); and so blatantly a violation of decedent's rights under both the United States Constitution and Kentucky Constitution such that punitive damages are warranted.

(17) The Defendant, Police Chief Greg Fugitt, was and at all times relevant herein, the chief of police and an employee of the City of Louisa, Kentucky, under the dictates, authority and/or control of the City of Louisa, Kentucky. Fugitt and the City of Louisa, Kentucky are vicariously liable for the acts of its police officers.

6

(18) The Defendant, City of Louisa, Kentucky, is vicariously liable and liable under the doctrine of Respondeat/Superior for the acts of Chief Fugitt and all of the other Defendants were acting under color of law pursuant to KRS 344 and 42 U.S.C. §1983. The Defendant, City of Louisa, Kentucky is also liable for their negligent training and supervision and/or monitoring of their police officers/employees.

(19) The Defendant, Sheriff Garrett Roberts, was and at all times relevant herein, the Sheriff of Lawrence County, Kentucky, under the dictates, authority and/or control of the Lawrence County, Kentucky. Roberts and Lawrence County, Kentucky are vicariously liable for the acts of its police officers.

(20) The Defendant, Lawrence County, Kentucky, is vicariously liable and liable under the doctrine of Respondeat/Superior for the acts of Sheriff Roberts and all of the other Defendants were acting under color of law pursuant to KRS 344 and 42 U.S.C. §1983. The Defendant, Lawrence County, Kentucky is also liable for their negligent training and supervision and/or monitoring of their police officers/employees.

(21) All Defendants are liable per se as they, acting in conspiracy with and in complicity with each other in violating KRS 344 and 42 U.S.C. §1983.

(22) The Defendants tortious conduct was a result of customs and practices, either written or unwritten, that were systematically applied to persons situated such as the decedent and was so applied to the decedent in this case. The

7

implementation of these customs and practices whether written or unwritten by the Defendants named herein were a proximate cause of decedent's death.

(23) Plaintiff submits that there are other defendants currently unknown to the Plaintiff who were present at the time of the violation of decedent's Constitutional rights, both state and federal, as well as those rights guaranteed both statutorily and by common law, and whom did participate in the beating and tasing decedent to death.   The Plaintiff relies upon Civil Rule 4.15.

(24) Due to the intentional disregard of, and the deliberate and reckless or grossly negligent indifference to the rights of the Plaintiff, the Plaintiff is entitled to punitive damages.

(25) The Plaintiff is entitled to attorney fees as a result of the Defendants acts as alleged herein.

(26) The amount of damages sought herein is the minimum amount necessary to incur the jurisdiction of this Court.

WHEREFORE, the Plaintiff Billy Joseph Collins, as Administrator of the Estate of Billy Collins, Jr., demands a judgment against the Defendants, jointly and severally, in an amount for which the proof will show, punitive damages and for attorney's fees and for a trial by jury.

CURTIS LEGAL SERVICES, PSC
1212 Bath Avenue, Suite 620
P.O. Box 1455
Ashland, Kentucky 41105
Telephone (606)324-5435
Fax (606)324-5496

_Michael J. Curtis_

Michael J. Curtis

STATE OF KENTUCKY

COUNTY OF BOYD

I, BILLY JOSEPH COLLINS, as Administrator of the Estate of Billy Collins, Jr., after first being duly sworn, state that the foregoing Complaint is true and correct to the best of my knowledge and belief.

_BILLY JOSEPH COLLINS_

BILLY JOSEPH COLLINS

SUBSCRIBED AND SWORN TO before me this 20th day of April, 2016, by BILLY JOSEPH COLLINS.

My Commission Expires: 3/10/19

Virginia K. Sode
NOTARY PUBLIC, STATE-AT-LARGE
ID# 528084

9