1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF KENTUCKY
2          EASTERN DIVISION OF ASHLAND

3    _____

4
ESTATE OF BILLY COLLINS, JR.;
5    BILLY JOSEPH COLLINS, ADMINISTRATOR,

6         Plaintiff,

7    versus              ACTION NO. 0:16-cv-00068-HRW

8    STEPHEN WILBURN, ET. AL.,

9         Defendants.

10   _____

11          **DEPOSITION OF OFFICER MASON KEEFER**

12        On the 7th day of March, 2017, beginning at
     approximately 3:05 p.m., at the law office of Eldred
13   E. Adams, Jr., located at 110 East Main Street,
     Louisa, Kentucky, before me, Angela F. Crigger, a
14   Stenotype Reporter and Notary Public within and for
     the Commonwealth of Kentucky, appeared **OFFICER MASON**
15   **KEEFER**, Witness, who being by me first duly sworn,
     gave his oral deposition in the causes pursuant to
16   Notice of Counsel for the respective parties as
     hereinafter set forth.  Said deposition is taken for
17   purposes of discovery and all other purposes under
     the Federal Rules of Civil Procedure.

18

19

20

21
              **ANGELA F. CRIGGER REPORTING**
22                **POST OFFICE BOX 1035**
              **WARFIELD, KENTUCKY  41267**
23                **\* (304) 393-4320 \***

24

25

                          -1-

```
 1                    A P P E A R A N C E S:

 2

 3

 4            On Behalf of the Plaintiff:

 5             Michael J. Curtis, Esq.
           CURTIS LEGAL SERVICES, INC.
 6          1212 Bath Ave., 6th Floor
              Post Office Box 1455
 7          Ashland, Kentucky  41101

 8

 9

10           On Behalf of the Defendants:

11              Shawn Conley, Esq.
          PORTER, SCHMITT, BANKS & BALDWIN
12             Post Office Drawer 1767
           Paintsville, Kentucky  41240-1448
13

14            Chris J. Gadansky, Esq.
       McBRAYER, McGINNIS, LESLIE & KIRKLAND, PLLC
15          9300 Shelbyville Road, Suite 110
             Louisville, Kentucky  40222
16

17

18

19

20

21

22

23

24

25
```

-2-

```
1                        I N D E X

2

3    EXAMINATION OF WITNESS:

4    OFFICER MASON KEEFER

5    Direct Examination by Mr. Curtis      Page 04

6

7    EXHIBITS:

8    Plaintiff's Exhibit No. 7 - Drawing    Page 33

9

10   Reporter's Certificate - Page 43

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CRIGGER REPORTING SERVICE

```
 1              OFFICER MASON KEEFER, called as a

 2    witness, after first being duly sworn, was examined

 3    and testified as follows, to wit:

 4                    DIRECT EXAMINATION

 5    BY MR. CURTIS:

 6         Q.   State your name, please.

 7         A.   Mason Keefer.

 8         Q.   And who are you employed by?

 9         A.   The Lawrence County Sheriff's Office.

10         Q.   How long have you been employed?

11         A.   Since August of 2012.

12         Q.   August of 2012?

13         A.   Yes, sir.

14         Q.   Let me ask you this.  How old are you?

15         A.   32.

16         Q.   Where you born and raised?

17         A.   Huntington, West Virginia.

18         Q.   Where did you go to school?

19         A.   Spring Valley High School, Westmoreland

20    Middle School, and Kellogg Elementary School.

21         Q.   And after you graduated from school, did you

22    go to college or anything?

23         A.   Yes.

24         Q.   Where did you go to school?

25         A.   Marshall University.
```

CRIGGER REPORTING SERVICE

1      Q.   What did you study?

2      A.   Criminal Justice.

3      Q.   How long were you at Marshall?

4      A.   Five years.

5      Q.   Five years.  Do you have your degree?

6      A.   My bachelor's, yes, sir.

7      Q.   Were you employed while in school?

8      A.   Yes.

9      Q.   Who were you employed by?

10     A.   I had several jobs.  I worked for a

11   contractor, for Bellamy Construction, through high

12   school and college.  I did several different things

13   for them.  I worked at a carpet place in Huntington

14   that's shut down.  It was Danny Booth Carpet and

15   Floor Designs.  I worked there for a short period of

16   time.  And then I worked at Cabell Huntington

17   Hospital for the majority of my college years.

18     Q.   What did you do at Cabell?

19     A.   I started in security.  I worked in security

20   for probably three years, and then I went from

21   security to radiology and worked there for a year and

22   a half, two years.

23     Q.   What did you do in radiology?

24     A.   Transported patients.  Just went and got

25   patients for X-rays and CAT scans.

—5—

1      Q.   Okay.  You live here in Louisa now; correct?

2      A.   Yes, sir.  Yes.

3      Q.   Are you married?

4      A.   Yes, sir.

5      Q.   Is your wife from here?

6      A.   No.  She's from Kenova.

7      Q.   Do you have any relatives here?

8      A.   Very distant relatives, I believe.

9      Q.   Very distant?

10     A.   Yeah.  My grandmother is from 37, from Route

11     37 in Wayne County.  So I've got some family out here

12     that I don't really know if I see them.  But no

13     close, like no first cousins out here or anything.

14     Q.   Let me ask you this.  When was your first

15     job with the police department?

16     A.   I hired in with the Louisa Police

17     Department, I believe it was October or November of

18     2008.  I started the Academy in November of '08.  So

19     it was either early November or late October when I

20     hired in.

21     Q.   With the city police department?

22     A.   With Louisa Police Department, yes, sir.

23     Q.   What made you come here?

24     A.   A guy I worked with at Cabell, he knew that

25     the Louisa Police Department was hiring.  And I

—6—

CRIGGER REPORTING SERVICE

1   didn't want to work at a big agency, so I applied out

2   here and got a job.

3        Q.   Okay.  And how long were you with the --

4        A.   From November of '08 to, I believe, October

5   of 2011, I worked for the Louisa Police Department.

6        Q.   Why did you leave?

7        A.   I went to Ashland Police Department.

8        Q.   And then how long were you with Ashland?

9        A.   Just a couple of months.

10       Q.   A year?

11       A.   No.  I didn't like Ashland Police

12   Department.

13       Q.   Did you tell Todd Kelley that?  The obvious

14   question is why didn't you like APD?

15       A.   I'd been working evening shift for a long

16   time at Louisa City Police Department, and I never

17   liked working straight nights.  And I started the

18   nightshift rotation at Ashland, and opposite

19   schedules of my wife.  And she didn't want to move to

20   Ashland either, so I resigned from Ashland.

21       Q.   Okay.  So you left on good terms?

22       A.   Yes, sir.

23       Q.   And then you got hired by Sheriff Roberts?

24       A.   Yes, sir.

25       Q.   And do you all have ranks or anything?

—7—

```
1         A.   Yes, sir.

2         Q.   And what is your rank with them?

3         A.   Deputy.

4         Q.   Deputy?

5         A.   Yes, sir.

6         Q.   Who is the SO2, or is there an SO2?

7         A.   We don't have -- I don't know what you're

8    referring to.  You're talking about like chain of

9    command?

10        Q.   Yes.  And the reason I say SO2, I know in

11   Boyd County, they're sort of like that.

12        A.   Yeah.  The way our agency works, you've got

13   the sheriff, and then you've got a chief deputy, and

14   then you've got a sergeant, and then deputies.

15        Q.   Who is the chief deputy?

16        A.   Mark Wheeler.

17             MR. CONLEY:  Mark who?

18             THE WITNESS:  Wheeler.

19        Q.   Mark Wheeler.  And who is the sergeant?

20        A.   Chuck Jackson.

21        Q.   Now, when you hired on with the sheriff's

22   department, you had already had the training, the

23   initial training; correct?

24        A.   Yes, sir.

25        Q.   And that was through the Louisa Police
```

CRIGGER REPORTING SERVICE

1   Department?

2       A.   Yes, sir.

3       Q.   Was the training that you had, that's 16

4   weeks?

5       A.   18.

6       Q.   18?

7       A.   Yes, sir.

8       Q.   You were present when Officer Wilburn

9   testified.   Would that be consistent?

10      A.   What do you mean?

11      Q.   When he testified about his training?

12      A.   Yes, sir.   Yes, sir.

13      Q.   Now, did you have any training as it related

14  to people who are mentally challenged?

15      A.   Yes, sir.

16      Q.   And where was that training?

17      A.   I've had several inservice trainings, our

18  40-hour yearly training.   I've had several inservice

19  trainings on subjects with mental health issues.

20      Q.   And did you know Billy Collins?

21      A.   Yes, sir.

22      Q.   Did you know he had mental health issues?

23      A.   Not for sure.   I had heard that he had, but

24  I didn't know for sure that he did.

25      Q.   Who had you heard that from?

———9———

1    A.   I don't recall.

2    Q.   Just people?

3    A.   Yeah.  Just somebody.

4    Q.   And what kind of mental problems had you

5    heard?

6    A.   I didn't know.  I had just basically heard

7    mental issues.  I never heard any diagnosis or

8    anything.

9    Q.   And use of force training?

10   A.   Uh-huh.

11   Q.   You had that in the Academy; correct?

12   A.   Yes, sir.

13   Q.   And that's part of the yearly training, too?

14   A.   Yearly.  We go to different trainings.  It's

15   not the same every year.  We have inhouse training,

16   where we go over our use of force policy and stuff.

17   Q.   And who conducts that?

18   A.   I believe Sergeant Jackson is in charge of

19   that.

20   Q.   And does that occur once a year?

21   A.   I don't recall that.

22   Q.   When was the last time that you had that

23   training from Jackson?

24   A.   We just had it last month or this month.

25   Last month, I believe.

— 10 —

CRIGGER REPORTING SERVICE

1    Q.   Prior to May of 2015?

2    A.   I don't recall.

3    Q.   Okay.  Would it be correct to say that any

4  training that you had would be part of your personnel

5  file?

6    A.   Yes, sir.

7         MR. CURTIS:  We need a copy of that.

8         MR. CONLEY:  Sure.

9    Q.   The Taser training, who was responsible for

10  the Taser training for the sheriff's department?

11   A.   We don't have a Taser instructor at the

12  sheriff's department.  There had been an instructor

13  that came in and taught our Taser training.

14   Q.   Was that the individual that Wilburn was

15  talking about?

16   A.   I believe so, yes, sir.

17   Q.   And was that done on a yearly basis?

18   A.   I believe so, yes, sir.

19         MR. CURTIS:  I need a copy of that,

20  too.

21         MR. CONLEY:  Mike, do you want to just

22  send me a request and we'll comply with that?  That

23  might make it easier, because I'm afraid I'll forget.

24         MR. GADANSKY:  Join the club.

25   Q.   Were you trained in the use of the Taser

—11—

1    with the Louisa Police Department, too?

2         A.   Yes, sir.

3         Q.   Now, prior to Billy Collins' incident, had

4    you ever used the Taser before?

5         A.   Yes, sir.

6         Q.   How many times, approximately?

7         A.   Approximately two, maybe three.

8         Q.   Do you recall what prompted the use?

9         A.   On the other occasions?

10        Q.   Right.

11        A.   Yes, sir.  Both times the subjects were

12   fighting with officers or trying to flee.

13        Q.   Okay.  Did you use the Taser in the Billy

14   Collins' case?

15        A.   Yes, sir.

16        Q.   How many times?

17        A.   I can't recall exactly how many times that I

18   cycled my Taser, but I fired one Taser cartridge.

19        Q.   You fired one?

20        A.   Yes, sir.

21        Q.   And what location?

22        A.   The lower abdomen area on the --

23        Q.   Ribcage?

24        A.   Yes, sir.  I don't remember which side.

25   Probably the -- I don't recall which side.

―12―

1      Q.   Prior to you deploying your cartridge, how

2   many times had the Taser been deployed?

3      A.   Had my Taser been deployed?

4      Q.   No.  When you deployed yours to the ribcage

5   area, had you seen Tasers being deployed prior to

6   that?

7      A.   No, sir.

8      Q.   Had anyone told you that they had deployed a

9   Taser?

10      A.   Yes, sir.

11      Q.   Who?

12      A.   I believe Sergeant Wilburn told me that they

13   deployed a Taser.

14      Q.   And did he tell you how many times?

15      A.   No, he did not.  Not that I can recall, at

16   least.

17      Q.   And he had deployed his before you deployed

18   yours; correct?

19      A.   I don't think he had shot his actual

20   cartridge yet.  I think he had used the drive-stun

21   method with the Taser.

22      Q.   Did he tell you how many times he used the

23   drive-stun Taser?

24      A.   No.  No, sir.

25      Q.   Now, there's a use of force policy for the

—13—

1    sheriff's department; correct?

2         A.  Yes, sir.

3         Q.  Do you know who prepared that?

4         A.  The forms that we use?  Is that what

5    you're --

6         Q.  No.  The continuum use of force?

7         A.  I don't know who prepared it, no.

8         Q.  Is Sergeant Jackson the one that trained you

9    all on the policies implemented by the sheriff's

10   department?

11        A.  I don't recall.  When I hired in they gave

12   you a copy of the policies and procedures, and you

13   read them, and then you sign off when you have read

14   and understand them.  But I don't recall who gave me

15   the policies.  And the trainings, we had had multiple

16   officers there.  So I don't know really who was in

17   charge of that, of the training.

18        Q.  How often do these trainings take place?

19        A.  I don't recall.

20        Q.  Do you remember the last training you had

21   before May 29th of 2015?

22        A.  I do not.

23        Q.  Now, had you ever arrested Mr. Collins prior

24   to May 29th of 2015?

25        A.  Yes, sir.

---14---

1    Q.   Was it for the DUI?

2    A.   Yes, sir.

3    Q.   Do you remember when that was?

4    A.   I do not recall when it was.  It was before

5    the incident, but I don't recall how long before.

6    Q.   Where was the location?

7    A.   I arrested him on Route 32, just outside of

8    Louisa, in the area of Five Forks Road, Route 32.

9    Q.   When you arrested him did you smell alcohol

10   on him?

11   A.   I believe so, yes.

12   Q.   And did he comply with your commands?

13   A.   Yes, sir.

14   Q.   And was there any backup?

15   A.   Yes, sir.

16   Q.   Who was the backup?

17   A.   I don't recall all the officers that were

18   there.  I was the primary officer, so they were

19   behind me.  I don't think anybody else had any direct

20   contact.  They were just there as backup officers.

21   Q.   Do you remember Sergeant Wilburn being

22   there?

23   A.   Yes, sir.

24   Q.   Do you remember anything that he did or

25   anything?

—15—

1          A.   No, sir.

2          Q.   So he observed you doing it?

3          A.   I believe so, yes.

4          Q.   And when you arrested Mr. Collins, you were

5     cool, calm and collective?

6          A.   Yes, sir.

7          Q.   And polite?

8          A.   Yes, sir.

9          Q.   Not argumentative with him?

10         A.   No, sir.

11         Q.   Not demanding or anything like that?

12         A.   No, sir.

13         Q.   And he complied with all your commands?

14         A.   Yes, sir.

15         Q.   Now, you prepared a report; correct?

16         A.   Yes, sir.

17         Q.   And this is the report that you submitted to

18    your expert; is that correct?

19         A.   (Witness views document.) I don't know.

20              MR. CONLEY:  Let me object to that.

21         Q.   I mean, if you don't know.

22         A.   I don't know that.  The report you handed me

23    appears to be the report that I prepared.

24         Q.   Is that in your handwriting?

25         A.   Appears to be, yes, sir.

—16—

1      Q.   And did you sign it and everything?

2      A.   I don't believe we do sign it, but I've

3   printed my name on the front of it.

4      Q.   Now, does that report contain your

5   recollection of the events that occurred on May 29th?

6      A.   Yes, sir.

7      Q.   According to the report, you were in the

8   sheriff's office when this first started; correct?

9      A.   Yes, sir.

10     Q.   And the sheriff's office is just basically a

11  across the street from City Hall?

12     A.   Approximately two, two and a half blocks.

13     Q.   Two, two and half blocks from where the

14  police department is?

15     A.   Yes, sir.

16     Q.   So it would just take a matter of seconds

17  for you to get there; correct?

18     A.   Yes, sir.

19     Q.   And you heard Sergeant Wilburn ask for

20  Jordan Miller on the radio; correct?

21     A.   Yes.  Yes, sir.

22     Q.   Do you recall what Wilburn was saying?

23     A.   I believe he just asked for Patrolman

24  Miller.  I don't know if he asked for him to come to

25  the police department or what, but I recall him

—17—

1    asking for Officer Miller.

2        Q.  And you could hear commotion?

3        A.  I believe I heard commotion, something.  I

4    heard something that didn't seem normal.

5        Q.  So you left to assist?

6        A.  Yes, sir.

7        Q.  And while you were passing Kelly Brothers,

8    you heard Sergeant Wilburn begin yelling backup on

9    the radio; correct?

10       A.  Yes, sir.  Yeah.  He was asking for backup

11   on the radio.

12       Q.  Then you exited the vehicle, and you

13   observed Mr. Collins -- is this -- barricaded in the

14   foyer?

15       A.  (Witness views photograph.) Yes, sir.  It

16   appears to be.

17       Q.  Now, where were you when you observed this?

18       A.  When I pulled into the parking lot, I was in

19   the parking lot right directly in front of the police

20   station.

21       Q.  Right.

22       A.  And when I exited my vehicle I could see him

23   in the doorway.

24       Q.  You seen him in the doorway?

25       A.  Yes, sir.  There's a glass window.  I could

— 18 —

```
 1    see him through the window.

 2         Q.   So you could see him through the glass

 3    window?

 4         A.   Uh-huh.

 5         Q.   Now, in front of that glass window would be

 6    a railing?

 7         A.   Uh-huh.  Yes, sir.

 8         Q.   And there would be steps going into it?

 9         A.   It's a ramp, I believe, sir.

10         Q.   A ramp?

11         A.   Yes, sir.

12         Q.   Right.  And there would be a ramp going into

13    that doorway; correct?

14         A.   Correct.

15         Q.   And you saw him in that glass area?

16         A.   Uh-huh.

17         Q.   You have to say yes?

18         A.   Yes, sir.  I'm sorry.  I'm sorry.  Yes, sir.

19         Q.   That's okay.  And could you see anyone else

20    in that area?

21         A.   Inside the foyer?

22         Q.   Right.

23         A.   No, sir.

24         Q.   So the door that he had barricaded, was that

25    the door away from the entry?
```

CRIGGER REPORTING SERVICE

1        A.   It would be the door exiting City Hall

2   itself.

3        Q.   Okay.  It would be the door exiting City

4   Hall?

5        A.   To exit City Hall, yes, sir.

6        Q.   There was nothing to prevent anyone from

7   going in the front door where the railings were?

8        A.   That was the door he had barricaded, yes,

9   sir.

10       Q.   Oh, that's the door he had barricaded?

11       A.   Yes, sir.  He had the exterior door of the

12  building barricaded.

13       Q.   Okay.  Now, you're familiar with that area;

14  correct?

15       A.   Yes, sir.

16       Q.   Now, you could have secured that area in and

17  of itself; correct?

18                MR. CONLEY:  Objection.

19       Q.   If you know?

20       A.   As far as I know, I don't believe you could

21  secure that area.

22       Q.   You couldn't?

23       A.   I don't believe so.

24       Q.   Why?

25       A.   There's the door behind -- when you enter

—20—

1    the foyer you've got two other doors.  One goes into

2    the police station and one goes into City Hall.

3         Q.  Okay.  But at that point in time he wasn't

4    destroying property in the area, was he?

5         A.  At that point in time he was holding the

6    door shut.

7         Q.  And the situation could have been diffused,

8    couldn't it?

9                   MR. CONLEY:  Objection to the form.

10                  MR. GADANSKY:  Object to the form.

11                  MR. CONLEY:  But go ahead and the

12   question if you can.

13        A.  Not that I know of.

14        Q.  What do you mean, "not that I know of"?

15        A.  I don't know of a way of diffusing that

16   situation, the way it presented itself.

17        Q.  Well, the way it presented itself, he's in

18   there by himself, and he's not letting the police in;

19   correct?

20        A.  That's correct.

21        Q.  He's not destroying any property?

22        A.  He had punched the glass window.

23        Q.  The window wasn't broken out?

24        A.  Not at the time, no.

25        Q.  And you didn't know that until after the

—21—

```
 1    fact?

 2         A.   Know what?

 3         Q.   That he had punched the window?

 4         A.   No.  He punched the window in my presence.

 5         Q.   In your presence?

 6         A.   When I was walking up, yes, sir.

 7         Q.   But he didn't yell at you, did he?

 8         A.   I don't recall.

 9         Q.   He didn't threaten you, did he?

10         A.   I don't recall.

11         Q.   So he's in there, in the foyer, barricading

12    because the officers are on the other side of the

13    door; correct?

14         A.   That's correct.

15         Q.   And Billy is mentally challenged?  He's got

16    a mental handicap?

17                   MR. CONLEY:  I'm going to object

18    because I think he already testified that he

19    wasn't --

20         Q.   Let me ask you this.  Were you aware of the

21    incident involving the mayor in 2012, when he threw

22    the coffee on him?

23         A.   Yes, sir.

24         Q.   And you were aware that there was a mental

25    petition filed?
```

—22—

1       A.   No, sir.

2       Q.   You wasn't?

3       A.   I was not aware of that, no, sir.

4       Q.   The sheriff's department was the one that

5   transported him?

6       A.   I'm aware of that now.  But at the time, I

7   don't believe I was aware.

8       Q.   But not at the time?

9       A.   No, sir.

10       Q.   But you were aware of the incident involving

11   the mayor; correct?

12       A.   Yes, sir.  Yes, sir.

13       Q.   And that wasn't rational?

14       A.   I just knew he poured coffee on the mayor.

15   I didn't know the specifics of it.  But, no, it

16   doesn't appear to be.

17           MR. CONLEY:  Let me go ahead and enter

18   an objection here real quickly, though.  I think

19   we've gone over his qualifications.  He's not a

20   trained mental health professional.

21           THE WITNESS:  Correct.

22           MR. CONLEY:  He's not a psychiatrist,

23   psychologist.  I mean, you can go ahead and answer

24   the questions that he asked, but I just want to note

25   a continuing objection to any questions regarding his

—23—

1    mental state or capacity.  I think that goes beyond

2    the scope of his training and expertise.  But go

3    ahead.  I'm sorry.

4         Q.  Now, he's in there and you approach the

5    door, but you do not enter that way.  You go around

6    and enter which way?

7         A.  No.  I enter through the exterior door.

8         Q.  Exterior door?

9         A.  Yes, sir.

10        Q.  Where the subject was?

11        A.  Yes, sir.

12        Q.  And when you entered the exterior door where

13   he was, what happened?

14        A.  When we first entered the door that's when I

15   deployed my Taser.

16        Q.  Okay.  Who was with you?

17        A.  I believe Sergeant Wilburn, Steven Wilburn,

18   was standing beside me when he did that.

19        Q.  Wilburn was?

20        A.  Uh-huh.  Yes, sir.

21        Q.  When you approached there, did you see

22   Wilburn?

23        A.  When I approached the door?

24        Q.  Right.

25        A.  Yes, sir.

—24—

CRIGGER REPORTING SERVICE

1    Q.  Where was he?

2    A.  He was standing beside me.  We walked up the

3    handicap ramp or the ramp together.

4    Q.  But he was inside the building and came out,

5    wasn't he?

6    A.  No, sir.  This is before all of that.

7    Q.  Before all of that?

8    A.  Yes, sir.

9    Q.  So he was in there, you all approached the

10   door.  And once inside, you deployed your Taser?

11   A.  No, sir.  I deployed my Taser from outside

12   the building.

13   Q.  Outside?

14   A.  Yes, sir.

15   Q.  And it struck him; correct?

16   A.  Yes, sir.  To the best of my knowledge.

17   Q.  And what happened after that?

18   A.  It wasn't effective when it struck him.  I

19   believe he had grabbed the wires and pulled them out.

20   Q.  Okay.  Then what?

21   A.  He had the wires in his hands, so I cycled

22   the Taser again.  Because where it appeared he had

23   the wires in his hand, I was hoping that it would

24   take effect, that he would get tangled in the wires

25   and that the Taser would work on him.  It did not.

-25-

1      Q.  You've had a Taser strike you; correct?

2      A.  Yes, sir.

3      Q.  How many times?

4      A.  Just once.

5      Q.  Just once?

6      A.  Yes, sir.

7      Q.  That's all; correct?

8      A.  Yes, sir.

9      Q.  You don't want to have it again?

10     A.  I don't want to have it again, no, sir.

11     Q.  So you all push the door open and you tase

12 Billy in the left side of the abdomen, and he grabbed

13 the wire and pulled -- it says pulled?

14     A.  On them.

15     Q.  Pulled on them?

16     A.  Yes, sir.

17     Q.  "I tried again several times to recycle my

18 Taser because it appeared he was still holding the

19 Taser wires.  It had not affected him"; is that

20 correct?

21     A.  That's correct, sir.

22     Q.  If I'm not reading this correctly, correct

23 me.  Okay?  "Then he began punching the door glass

24 after that"?

25     A.  Yes, sir.  Yes, sir.

1      Q.   Sergeant Wilburn entered the police

2 department from the what door?

3      A.   Let's see.  From the rear door.

4      Q.   From the rear door?

5      A.   Yes, sir.

6      Q.   Where is the rear door?

7      A.   In my report the rear door would have been

8 the door that faced Kelly Brothers Furniture, on the

9 other side of the building.

10      Q.   On the other side of the building?

11      A.   Yes, sir.  Not the normal entrance for

12 officers.

13      Q.   So he came in from the rear door?

14      A.   Yes, sir.

15      Q.   And you came in from the front door?

16      A.   Yes, sir.

17      Q.   Now, before you entered the front door, can

18 you see the rear door?

19      A.   No, sir.

20      Q.   How was it you were able to see Wilburn?

21           MR. CONLEY:  I think he's confused

22 about which door you're talking about.

23           THE WITNESS:  Yes, sir.

24           MR. CONLEY:  There's the door to the

25 exterior in the back, and then there's the door to

—27—

1    the foyer.

2                    MR. CURTIS:  Right.

3                    MR. CONLEY:  And I think maybe there's

4    some confusion.

5                    MR. GADANSKY:  You can draw it, if you

6    want.

7        Q.  Why don't you draw it?

8        A.  Okay.  (Witness drawing.)

9                    MR. GADANSKY:  Understanding he's not

10   Michelangelo.  Maybe he is.  I don't know.

11                   MR. CONLEY:  No.  It doesn't look like

12   it so far.

13       A.  So if this is fire department, then you've

14   got the police department and City Hall here.  You've

15   got the ramp, and like this would be the railing

16   right here.  This would be the ramp.  This is what I

17   can --

18       Q.  You have the road coming down?

19       A.  Yes, sir.  The road comes through here.

20       Q.  Right.

21       A.  And then you've got the parking lot right

22   here.  I parked my vehicle in the middle of the

23   parking lot.

24       Q.  Right.

25       A.  So the one I would consider the rear door is

—28—

1        the door over here.

2            Q.  Okay.  Mark rear door.

3            A.  (Witness complies.) That's what I would

4        consider the rear door to the actual police station

5        to enter the police department.

6                    MR. GADANSKY:  Go ahead and mark the

7        name the street, if you don't mind.

8                    MR. CURTIS:  Right.

9                    MR. CONLEY:  What?

10                   MR. CURTIS:  Well, that's okay.

11                   MR. GADANSKY:  The name of the street

12       in front of --

13                   THE WITNESS:  Is it Main Cross?

14                   MR. FUGITT:  Main Cross is in front of

15       City Hall and Pike Street is to the side of it.

16           A.  So this would be Main Cross that runs this

17       direction.

18           Q.  Okay.  And this street would be Pike?

19           A.  I believe so, yes.  Pike.

20           Q.  And where did you come in?

21           A.  This door right here, the door to the foyer.

22           Q.  Okay.  So you came in the door in the foyer?

23           A.  Uh-huh.

24           Q.  Mark your entry right there?

25           A.  Okay.  (Witness complies.)  I put FD for

——————29——————

1    foyer door.  And then you've got the foyer that's in

2    here, and then you've got another door inside here to

3    the police station.

4        Q.  Okay.

5        A.  And then you've got a door right here to

6    City Hall.

7        Q.  City Hall?

8        A.  Yes, sir.

9        Q.  So the rear door is where Wilburn came in?

10       A.  Yes, sir.

11       Q.  Mark where Wilburn came in?

12       A.  (Witness complies.)

13       Q.  And you're coming in this side?

14       A.  Yes, sir.

15       Q.  How can you see him?

16       A.  I couldn't from this door.  He came in this

17   door right here.

18       Q.  Okay.  So he came in the rear door to this

19   door?

20       A.  Yeah.  And then entered the foyer.

21       Q.  And then entered?

22       A.  Yes.

23              MR. CONLEY:  I think that's where the

24   confusion was.

25              THE WITNESS:  Yes, I think that's --

—30—

```
 1    yeah.

 2         Q.  Okay.

 3         A.  Yeah.  Because this is the actual entrance

 4    to the police station, the two entrances to the

 5    police station.

 6              MR. GADANSKY:  Can we put an X maybe

 7    where Mr. Collins was?  Are you okay with that?

 8              MR. CURTIS:  Yeah.

 9              THE WITNESS:  Yes, sir.  Do you want

10    me to put Collins under it?

11              MR. GADANSKY:  Sure.

12         Q.  Put C?

13         A.  (Witness complies.)

14         Q.  Put Mr. Pfeifer.  I mean --

15              MR. CONLEY:  Keefer.

16         A.  Keefer?

17         Q.  Keefer.  Put a K?

18         A.  Put a K for myself.

19         Q.  And then put a W over there for Wilburn?

20         A.  Okay.  (Witness complies.)

21         Q.  Okay.  Now, it says "he opened the front

22    door."  Are you referring to Mr. Collins?

23         A.  Can I see the report?

24         Q.  Yes.

25         A.  Where would that be at?
```

CRIGGER REPORTING SERVICE

1    Q.  Let's see.  Right here, right after the

2    door?

3    A.  Okay.  Let's see.  That would be -- Sergeant

4    Wilburn.

5    Q.  Sergeant Wilburn?

6    A.  Opened the front door of the police

7    department, yes, sir.

8    Q.  Okay.  So when we're saying he opened the

9    door, we're saying Sergeant Wilburn opened the front

10   door; right?

11   A.  Yes, sir.  The door that would -- yes.

12   Q.  "To the police department, and tased Billy

13   in the back"?

14   A.  Yes, sir.

15   Q.  Was it in the upper or lower back?

16   A.  I don't recall.  I believe it was the upper

17   back, but I don't --

18   Q.  Okay. " At this point Deputy Wilhite, Miller

19   and myself" found the -- what is that?  Found?  This

20   right here, that word right there?

21   A.  Forced.

22   Q.  Forced?

23   A.  Yes, sir.

24   Q.  "The foyer door open"; correct?

25   A.  Yes, sir.

-32-

```
 1          Q.   Now, at this point in time was that the

 2   first time you had seen Deputy Wilhite and Patrolman

 3   Miller?

 4          A.   No, sir.  Patrolman Miller was on the scene

 5   when I arrived.

 6          Q.   Oh, he was?

 7          A.   Yes, sir.

 8          Q.   Where was Miller when you arrived on the

 9   scene?

10          A.   I don't remember exactly where he was.  He

11   was either in the parking lot.  He was right there in

12   front of the police station.  He was in close

13   proximity to the police station.

14          Q.   Okay.  You had the parking lot.  That's Main

15   Cross?

16          A.   Yes, sir.  The parking lot would be right

17   here.

18          Q.   Right there?

19          A.   Yes, sir.

20          Q.   Okay.  Mark parking lot?

21          A.   Okay.  (Witness complies.)  Okay.

22                    (A drawing made during Officer

23   Keefer's testimony was thereupon marked for

24   identification as EXHIBIT NO. 7 and is attached

25   hereto.)
```

— 33 —

1        Q.   Miller was in the parking lot?

2        A.   He would have been somewhere in this

3   vicinity.   I don't know exactly where he was

4   standing.

5        Q.   And he was there when you pulled in?

6        A.   Yes, sir.

7        Q.   And did you see him get out of the vehicle?

8        A.   No, sir.   He was already out of the vehicle

9   when I arrived.

10       Q.   Okay.   And do you know where he was?

11       A.   No, sir.

12       Q.   You just saw his cruiser?

13       A.   Yes, sir.

14       Q.   Okay.   You saw his cruiser.   You recognized

15   it to be Miller's cruiser?

16       A.   Yes, sir.   I'm sure I saw him in the parking

17   lot right there in the area.   I just don't know where

18   he was standing at in the area.

19       Q.   Now, do you know how he gained entry?

20   Through the rear door or what?

21       A.   No.   He was with me.

22       Q.   Oh, he was with you?

23       A.   Yes, sir.

24       Q.   When you first went in?

25       A.   Yes, sir.

— 34 —

1     Q.   And he was with you when you first went in

2  and you deployed your Taser; correct?

3     A.   Yes, sir.

4     Q.   And was Deputy Wilhite with you when you

5  first went in?

6     A.   Not when I deployed my Taser, he was not.

7         MR. CONLEY:  Mike, I just want to make

8  sure we understand his entry, because it's when he

9  first went in that he deployed his Taser.  I think he

10  testified that he deployed it before they gained

11  entry.

12         MR. CURTIS:  Right, right.  Yes, yes.

13         MR. CONLEY:  Okay.  I just want to

14  make sure we're on the same page with that.

15         MR. CURTIS:  Right.

16     Q.   Okay.  And Miller was with you?

17     A.   Yeah.  He was in the area during that time.

18     Q.   And you all attempted to gain control of

19  Billy; right?  Let's read this.  "At this point

20  Deputy Wilhite, Patrolman Miller and myself forced

21  the foyer door open and attempted to gain control of

22  Billy"?

23     A.   Yes, sir.

24     Q.   I guess he what?

25     A.   Continued.

CRIGGER REPORTING SERVICE

1      Q.   "He continued to resist, and I struck him in

2   the left jaw"?

3      A.   Yes, sir.

4      Q.   Now, when you say he continued to resist and

5   I struck him in the left jaw, while trying to gain

6   control of him; correct?

7      A.   Yes, sir.

8      Q.   And what did you use to strike him in the

9   left jaw with?

10     A.   My hand.

11     Q.   Your hand?

12     A.   Yes, sir.

13     Q.   You didn't use the ASP?

14     A.   No, sir.

15     Q.   And the left jaw.  Let's see those photos.

16  That would be the left side of his face; right?

17  Which is Exhibit 2; correct?

18     A.   Yes, sir.

19     Q.   Now, did you cause any of those injuries

20  affected in there?

21          MR. CONLEY:  Let me enter an objection

22  for the record to the form.  And, you know, again,

23  he's not a qualified medical professional.

24          MR. CURTIS:  I understood.

25          MR. CONLEY:  But go ahead and answer

—36—

CRIGGER REPORTING SERVICE

1    it if you can.

2         A.  Not that I recall, no.

3         Q.  Now, as Mr. Collins is depicted in Exhibit

4    2, he didn't look like that when you first approached

5    him --

6         A.  No, sir.

7         Q.  -- facially?

8         A.  No, sir.

9              MR. GADANSKY:  Do we know, Frenchie,

10   when those were taken, when the postmortem photos

11   were taken?

12             MR. CURTIS:  Those were taken by the

13   medical examiner.

14             MR. GADANSKY:  No.  I mean the length

15   of time between time of death and --

16             MR. CURTIS:  I have no idea right now.

17             MR. GADANSKY:  Okay.  I'm just

18   curious.

19             MR. CURTIS:  Normally, they're taken

20   immediately when the body arrives.

21             MR. GADANSKY:  That's what I figured.

22             MR. CURTIS:  In every case I've ever

23   had, that's when the photos.  I've done several

24   murder cases in my lifetime.

25             MR. GADANSKY:  Yes.

—37—

1      Q.   But you did not use an ASP?

2      A.   No, sir.

3      Q.   Now, you said "we got him on the ground, and

4    he continued to resist"; correct?

5      A.   Yes, sir.

6      Q.   "And I struck him in the left ribs with my

7    closed ASP"?

8      A.   Yes, sir.

9      Q.   "While trying to get control of his left

10   arm"; correct?

11     A.   Yes, sir.

12     Q.   Now, you did not strike him in the left arm;

13   correct?

14     A.   At that point I had not struck him in the

15   left arm, no.

16     Q.   And when you say closed ASP, what do you

17   mean by closed ASP?

18     A.   The ASP is collapsable.  When you pull it

19   out it will open up to different lengths, depending

20   on the ASP that you have.  And it wasn't open at that

21   time.

22     Q.   Okay.  At any time was it open?

23     A.   I believe it did come open, yes.

24     Q.   Now, "at this point in time when we got him

25   on the ground," who is we?

—38—

1      A.   That referred to the officers in the foyer.

2      Q.   So that would have been Wilhite, Miller and

3   Wilburn?

4      A.   Wilhite and Miller.  Wilburn was not

5   actually in there with us at that point in time.

6      Q.   "And he was holding his arms under his

7   stomach.  I gained control of his arm.  It was

8   already"?

9      A.   Cuffed.

10      Q.   Cuffed?

11      A.   Yes, sir.

12      Q.   "Patrolman Miller then gained control of his

13   right arm"; right?

14      A.   Looks like, yes, sir.

15      Q.   "And placed a second set of handcuffs on

16   him.  Both sets were then cuffed together.  After the

17   situation was declared safe, we rolled Billy on his

18   side and EMS was called."  Who called EMS?

19      A.   I don't recall.  It was not me.

20      Q.   During the struggle my whistle chain?  Read

21   that last, during the struggle?

22      A.   "During the struggle my whistle chain,

23   containing an extra cuff key, was torn off my uniform

24   and found on the floor."

25      Q.   Did you see anyone kick Collins?

-39-

1              A.   No, sir.

2              Q.   Did you see anyone take an ASP and strike

3       him in the face?

4              A.   No, sir.

5              Q.   Did you see anyone take an ASP and strike

6       him in the forearms, right or left?

7              A.   I believe I struck him in the arm, which

8       would have been the left arm.

9              Q.   Would that have been the --

10             A.   That appears to be the left arm.  I would

11      have struck him on the bottom side of his left arm,

12      not the top.

13             Q.   On the bottom side?

14             A.   Yes.  Because he was laying on his hands.

15             Q.   Do you know who struck him on the top side?

16             A.   I do not, no.

17             Q.   Do you know if anyone kicked him in the

18      face?

19             A.   I do not, no.  I did not see that.

20             Q.   Or in the head?

21             A.   No, sir.

22             Q.   Did all the officers have boots on them?

23             A.   Have?

24             Q.   Boots?

25             A.   I don't recall, sir.

—40—

1      Q.   Did you have boots?

2      A.   Yes, sir.

3      Q.   There appears to be a laceration on No. 2,

4  on the forehead?

5      A.   Where at?  I don't see.

6             MR. CONLEY:  Let me enter an objection

7  to any questions about the condition of the body in

8  that photograph.  Go ahead and answer the question if

9  you can.

10      A.   Yeah.  It appears that there's an abrasion

11  of some sort there.

12      Q.   Do you know how that was caused?

13      A.   I do not.

14      Q.   There appears to be an abrasion on the back

15  of the head, too, around the crown?

16             MR. CONLEY:  Same objection.

17      A.   Yeah.  There appears to be a bunch.  I don't

18  know what's there.

19      Q.   Okay.  Did Miller have his ASP out?

20      A.   I don't recall when we were in the foyer if

21  he had it out or not.  I couldn't see.  I was facing

22  towards Collins' feet.  I couldn't see the other side

23  of him.

24      Q.   Okay.  You were facing toward Collins' feet?

25      A.   Yes, sir.

1      Q.   Where was Miller in relation to you?

2      A.   I would have been on Collins' left side, and

3   Miller would have been on his right side.

4      Q.   Miller would have been on the right side?

5      A.   Yes, sir.

6      Q.   And where would Wilhite have been?

7      A.   Up towards his head and shoulders.

8      Q.   Up towards the head and shoulders?

9      A.   Yes, sir.

10     Q.   Okay.  Now, was he still breathing inside

11  the police station?

12     A.   Yes, sir.

13     Q.   And when did you become aware that he had

14  expired?

15     A.   Expired?  I believe I was already at the

16  sheriff's office when I had heard that he had

17  expired.

18     Q.   Do you know what time he died?

19     A.   I do not.  No, sir.

20            MR. CURTIS:  I think that's it.

21            MR. CONLEY:  No questions.

22            MR. GADANSKY:  No questions.

23            (This concludes the testimony of

24  Officer Mason Keefer.)

25                  *  *  *  *  *

CRIGGER REPORTING SERVICE

```
 1                    REPORTER'S CERTIFICATE

 2

 3    COMMONWEALTH OF KENTUCKY)

 4    COUNTY OF LAWRENCE)

 5         I, Angela F. Crigger, a Court Reporter and

 6    Notary Public in and for the State of Kentucky At

 7    Large, do hereby certify that the foregoing

 8    deposition of OFFICER MASON KEEFER was taken before

 9    me at the time and place and for the purposes in the

10    caption stated; that the witness was first duly sworn

11    by me to tell the truth, the whole truth and nothing

12    but the truth; that the deposition was recorded

13    stenographically by me in the presence of the

14    witness; that the foregoing is a full, true and

15    correct transcript of the deposition so given to the

16    best of my ability; that there was no request that

17    the witness read and sign the deposition; that the

18    appearances were as stated in the caption.

19         I further certify that my Commission as Notary

20    Public will expire June 2nd, 2018.

21         GIVEN UNDER MY HAND, this the 16th day of March,

22    2017.

23                    _____
                      KENTUCKY NOTARY PUBLIC,
24                    STATE AT LARGE
                      NOTARY ID: 511182
25
```

-43-



**'**

**5**

'08 [2] - 6:18, 7:4

511182 [1] - 43:24

**0**

**6**

04 [1] - 3:5
0:16-cv-00068-HRW
[1] - 1:7

6th [1] - 2:6

**7**

**1**

7 [2] - 3:8, 33:24
7th [1] - 1:12

1035 [1] - 1:22
110 [2] - 1:13, 2:15
1212 [1] - 2:6
1455 [1] - 2:6
16 [1] - 9:3
16th [1] - 43:21
1767 [1] - 2:12
18 [2] - 9:5, 9:6

**9**

9300 [1] - 2:15

**A**

**2**

2 [3] - 36:17, 37:4,
41:3
2008 [1] - 6:18
2011 [1] - 7:5
2012 [3] - 4:11, 4:12,
22:21
2015 [3] - 11:1, 14:21,
14:24
2017 [2] - 1:12, 43:22
2018 [1] - 43:20
29th [3] - 14:21, 14:24,
17:5
2nd [1] - 43:20

abdomen [2] - 12:22,
26:12
ability [1] - 43:16
able [1] - 27:20
abrasion [2] - 41:10,
41:14
Academy [2] - 6:18,
10:11
according [1] - 17:7
ACTION [1] - 1:7
actual [3] - 13:19,
29:4, 31:3
Adams [1] - 1:13
ADMINISTRATOR [1]
- 1:5
affected [2] - 26:19,
36:20
afraid [1] - 11:23
agency [2] - 7:1, 8:12
ahead [7] - 21:11,
23:17, 23:23, 24:3,
29:6, 36:25, 41:8
AL [1] - 1:8
alcohol [1] - 15:9
ANGELA [1] - 1:21
Angela [2] - 1:13, 43:5
answer [3] - 23:23,
36:25, 41:8
APD [1] - 7:14
appear [1] - 23:16
appearances [1] -
43:18
appeared [3] - 1:14,
25:22, 26:18
applied [1] - 7:1
approach [1] - 24:4
approached [4] -

**3**

304 [1] - 1:23
32 [3] - 4:15, 15:7,
15:8
33 [1] - 3:8
37 [2] - 6:10, 6:11
393-4320 [1] - 1:23
3:05 [1] - 1:12

**4**

40-hour [1] - 9:18
40222 [1] - 2:15
41101 [1] - 2:7
41240-1448 [1] - 2:12
41267 [1] - 1:22
43 [1] - 3:10

24:21, 24:23, 25:9,
37:4
area [12] - 12:22, 13:5,
15:8, 19:15, 19:20,
20:13, 20:16, 20:21,
21:4, 34:17, 34:18,
35:17
argumentative [1] -
16:9
arm [9] - 38:10, 38:12,
38:15, 39:7, 39:13,
40:7, 40:8, 40:10,
40:11
arms [1] - 39:6
arrested [4] - 14:23,
15:7, 15:9, 16:4
arrived [3] - 33:5,
33:8, 34:9
arrives [1] - 37:20
ASHLAND [1] - 1:2
Ashland [7] - 2:7, 7:7,
7:8, 7:11, 7:18, 7:20
ASP [10] - 36:13, 38:1,
38:7, 38:16, 38:17,
38:18, 38:20, 40:2,
40:5, 41:19
assist [1] - 18:5
AT [1] - 43:24
attached [1] - 33:24
attempted [2] - 35:18,
35:21
August [2] - 4:11, 4:12
Ave [1] - 2:6
aware [7] - 22:20,
22:24, 23:3, 23:6,
23:7, 23:10, 42:13

**B**

bachelor's [1] - 5:6
backup [5] - 15:14,
15:16, 15:20, 18:8,
18:10
BALDWIN [1] - 2:11
BANKS [1] - 2:11
barricaded [5] - 18:13,
19:24, 20:8, 20:10,
20:12
barricading [1] -
22:11
basis [1] - 11:17
Bath [1] - 2:6
become [1] - 42:13
began [1] - 26:23
begin [1] - 18:8
beginning [1] - 14:24
Behalf [2] - 2:4, 2:10
behind [2] - 15:19,
20:25

Bellamy [1] - 5:11
beside [2] - 24:18,
25:2
best [2] - 25:16, 43:16
between [1] - 37:15
beyond [1] - 24:1
big [1] - 7:1
Billy [9] - 9:20, 12:3,
12:13, 22:15, 26:12,
32:12, 35:19, 35:22,
39:17
BILLY [2] - 1:4, 1:5
blocks [2] - 17:12,
17:13
body [2] - 37:20, 41:7
Booth [1] - 5:14
boots [2] - 40:22,
40:24, 41:1
born [1] - 4:16
bottom [2] - 40:11,
40:13
BOX [1] - 1:22
Box [1] - 2:6
Boyd [1] - 8:11
breathing [1] - 42:10
broken [1] - 21:23
Brothers [2] - 18:7,
27:8
building [5] - 20:12,
25:4, 25:12, 27:9,
27:10
bunch [1] - 41:17
BY [1] - 4:5

**C**

Cabell [3] - 5:16, 5:18,
6:24
calm [1] - 16:5
capacity [1] - 24:1
caption [2] - 43:10,
43:18
carpet [1] - 5:13
Carpet [1] - 5:14
cartridge [3] - 12:18,
13:1, 13:20
case [2] - 12:14, 37:22
cases [1] - 37:24
CAT [1] - 5:25
caused [1] - 41:12
causes [1] - 1:15
Certificate [1] - 3:10
CERTIFICATE [1] -
43:1
certify [2] - 43:7,
43:19
chain [3] - 8:8, 39:20,
39:22
challenged [2] - 9:14,

22:15
charge [2] - 10:18,
14:17
chief [2] - 8:13, 8:15
Chris [1] - 2:14
Chuck [1] - 8:20
city [1] - 6:21
City [10] - 7:16, 17:11,
20:1, 20:3, 20:5,
21:2, 28:14, 29:15,
30:6, 30:7
Civil [1] - 1:17
close [2] - 6:13, 33:12
closed [3] - 38:7,
38:16, 38:17
club [1] - 11:24
coffee [2] - 22:22,
23:14
collapsable [1] -
38:18
collective [1] - 16:5
college [3] - 4:22,
5:12, 5:17
COLLINS [2] - 1:4, 1:5
Collins [9] - 9:20,
14:23, 16:4, 18:13,
31:7, 31:10, 31:22,
37:3, 39:25
Collins' [5] - 12:3,
12:14, 41:22, 41:24,
42:2
coming [2] - 28:18,
30:13
command [1] - 8:9
commands [2] -
15:12, 16:13
Commission [1] -
43:19
Commonwealth [1] -
1:14
COMMONWEALTH
[1] - 43:3
commotion [2] - 18:2,
18:3
complied [1] - 16:13
complies [6] - 29:3,
29:25, 30:12, 31:13,
31:20, 33:21
comply [2] - 11:22,
15:12
concludes [1] - 42:23
condition [1] - 41:7
conducts [1] - 10:17
confused [1] - 27:21
confusion [2] - 28:4,
30:24
Conley [1] - 2:11
CONLEY [24] - 8:17,
11:8, 11:21, 16:20,
20:18, 21:9, 21:11,

22:17, 23:17, 23:22, 27:21, 27:24, 28:3, 28:11, 29:9, 30:23, 31:15, 35:7, 35:13, 36:21, 36:25, 41:6, 41:16, 42:21
consider [2] - 28:25, 29:4
consistent [1] - 9:9
Construction [1] - 5:11
contact [1] - 15:20
contain [1] - 17:4
containing [1] - 39:23
continued [4] - 35:25, 36:1, 36:4, 38:4
continuing [1] - 23:25
continuum [1] - 14:6
contractor [1] - 5:11
control [6] - 35:18, 35:21, 36:6, 38:9, 39:7, 39:12
cool [1] - 16:5
copy [3] - 11:7, 11:19, 14:12
correct [36] - 6:1, 8:23, 10:11, 11:3, 13:18, 14:1, 16:15, 16:18, 17:8, 17:17, 17:20, 18:9, 19:13, 19:14, 20:14, 20:17, 21:19, 21:20, 22:13, 22:14, 23:11, 23:21, 25:15, 26:1, 26:7, 26:20, 26:21, 26:22, 32:24, 35:2, 36:6, 36:17, 38:4, 38:10, 38:13, 43:15
correctly [1] - 26:22
Counsel [1] - 1:16
County [3] - 4:9, 6:11, 8:11
COUNTY [1] - 43:4
couple [1] - 7:9
COURT [1] - 1:1
Court [1] - 43:5
cousins [1] - 6:13
CRIGGER [1] - 1:21
Crigger [2] - 1:13, 43:5
criminal [1] - 5:2
Cross [4] - 29:13, 29:14, 29:16, 33:15
crown [1] - 41:15
cruiser [3] - 34:12, 34:14, 34:15
cuff [1] - 39:23
cuffed [3] - 39:9, 39:10, 39:16
curious [1] - 37:18

Curtis [2] - 2:5, 3:5
CURTIS [16] - 2:5, 4:5, 11:7, 11:19, 28:2, 29:8, 29:10, 31:8, 35:12, 35:15, 36:24, 37:12, 37:16, 37:19, 37:22, 42:20
cycled [2] - 12:18, 25:21

**D**

Danny [1] - 5:14
death [1] - 37:15
declared [1] - 39:17
Defendants [2] - 1:9, 2:10
degree [1] - 5:5
demanding [1] - 16:11
department [16] - 6:15, 6:21, 8:22, 11:10, 11:12, 14:1, 14:10, 17:14, 17:25, 23:4, 27:2, 28:13, 28:14, 29:5, 32:7, 32:12
Department [9] - 6:17, 6:22, 6:25, 7:5, 7:7, 7:12, 7:16, 9:1, 12:1
depicted [1] - 37:3
deployed [15] - 13:2, 13:3, 13:4, 13:5, 13:8, 13:13, 13:17, 24:15, 25:10, 25:11, 35:2, 35:6, 35:9, 35:10
deploying [1] - 13:1
DEPOSITION [1] - 1:11
deposition [6] - 1:15, 1:16, 43:8, 43:12, 43:15, 43:17
deputies [1] - 8:14
Deputy [4] - 32:18, 33:2, 35:4, 35:20
deputy [4] - 8:3, 8:4, 8:13, 8:15
Designs [1] - 5:15
destroying [2] - 21:4, 21:21
diagnosis [1] - 10:7
died [1] - 42:18
different [3] - 5:12, 10:14, 38:19
diffused [1] - 21:7
diffusing [1] - 21:15
Direct [1] - 3:5
direct [1] - 15:19
DIRECT [1] - 4:4

direction [1] - 29:17
directly [1] - 18:19
discovery [1] - 1:17
distant [2] - 6:8, 6:9
DISTRICT [2] - 1:1, 1:1
DIVISION [1] - 1:2
document [1] - 16:19
done [2] - 11:17, 37:23
door [57] - 19:24, 19:25, 20:1, 20:3, 20:7, 20:8, 20:10, 20:11, 20:25, 21:6, 22:13, 24:5, 24:7, 24:8, 24:12, 24:14, 24:23, 25:10, 26:11, 26:23, 27:2, 27:3, 27:4, 27:6, 27:7, 27:8, 27:13, 27:15, 27:17, 27:18, 27:22, 27:24, 27:25, 28:25, 29:1, 29:2, 29:4, 29:21, 29:22, 30:1, 30:2, 30:5, 30:9, 30:16, 30:17, 30:18, 30:19, 31:22, 32:2, 32:6, 32:9, 32:10, 32:11, 32:24, 34:20, 35:21
doors [1] - 21:1
doorway [3] - 18:23, 18:24, 19:13
down [2] - 5:14, 28:18
draw [2] - 28:5, 28:7
Drawer [1] - 2:12
Drawing [1] - 3:8
drawing [2] - 28:8, 33:22
drive [2] - 13:20, 13:23
drive-stun [2] - 13:20, 13:23
DUI [1] - 15:1
duly [3] - 1:15, 4:2, 43:10
during [5] - 33:22, 35:17, 39:20, 39:21, 39:22

**E**

early [1] - 6:19
easier [1] - 11:23
East [1] - 1:13
EASTERN [2] - 1:1, 1:2
effect [1] - 25:24
effective [1] - 25:18
either [3] - 6:19, 7:20, 33:11

Eldred [1] - 1:12
Elementary [1] - 4:20
employed [4] - 4:8, 4:10, 5:7, 5:9
EMS [2] - 39:18
enter [8] - 20:25, 23:17, 24:5, 24:6, 24:7, 29:5, 36:21, 41:6
entered [6] - 24:12, 24:14, 27:1, 27:17, 30:20, 30:21
entrance [2] - 27:11, 31:3
entrances [1] - 31:4
entry [5] - 19:25, 29:24, 34:19, 35:8, 35:11
Esq [3] - 2:5, 2:11, 2:14
ESTATE [1] - 1:4
ET [1] - 1:8
evening [1] - 7:15
events [1] - 17:5
exactly [2] - 12:17, 33:10, 34:3
EXAMINATION [2] - 3:3, 4:4
Examination [1] - 3:5
examined [1] - 4:2
examiner [1] - 37:13
EXHIBIT [1] - 33:24
Exhibit [3] - 3:8, 36:17, 37:3
EXHIBITS [1] - 3:7
exit [1] - 20:5
exited [2] - 18:12, 18:22
exiting [2] - 20:1, 20:3
expert [1] - 16:18
expertise [1] - 24:2
expire [1] - 43:20
expired [3] - 42:14, 42:15, 42:17
exterior [5] - 20:11, 24:7, 24:8, 24:12, 27:25
extra [1] - 39:23

**F**

face [3] - 36:16, 40:3, 40:18
faced [1] - 27:8
facially [1] - 37:7
facing [2] - 41:21, 41:24
fact [1] - 22:1
familiar [1] - 20:13

family [1] - 6:11
far [2] - 20:20, 28:12
FD [1] - 29:25
Federal [1] - 1:17
feet [2] - 41:22, 41:24
fighting [1] - 12:12
figured [1] - 37:21
file [1] - 11:5
filed [1] - 22:25
fire [1] - 28:13
fired [2] - 12:18, 12:19
first [13] - 1:15, 4:2, 6:13, 6:14, 17:8, 24:14, 33:2, 34:24, 35:1, 35:5, 35:9, 37:4, 43:10
five [2] - 5:4, 5:5
Five [1] - 15:8
flee [1] - 12:12
floor [1] - 39:24
Floor [2] - 2:6, 5:15
follows [1] - 4:3
force [4] - 10:9, 10:16, 13:25, 14:6
forced [3] - 32:21, 32:22, 35:20
forearms [1] - 40:6
foregoing [2] - 43:7, 43:14
forehead [1] - 41:4
forget [1] - 11:23
Forks [1] - 15:8
form [2] - 21:9, 21:10, 36:22
forms [1] - 14:4
forth [1] - 1:16
foyer [14] - 18:14, 19:21, 21:1, 22:11, 28:1, 29:21, 29:22, 30:1, 30:20, 32:24, 35:21, 39:1, 41:20
Frenchie [1] - 37:9
front [12] - 17:3, 18:19, 19:5, 20:7, 27:15, 27:17, 29:12, 29:14, 31:21, 32:6, 32:9, 33:12
FUGITT [1] - 29:14
full [1] - 43:14
Furniture [1] - 27:8

**G**

Gadansky [1] - 2:14
GADANSKY [14] - 11:24, 21:10, 28:5, 28:9, 29:6, 29:11, 31:6, 31:11, 37:9, 37:14, 37:17, 37:21,

2

37:25, 42:22
**gain** [3] - 35:18, 35:21, 36:5
**gained** [4] - 34:19, 35:10, 39:7, 39:12
**given** [1] - 43:15
**GIVEN** [1] - 43:21
**glass** [6] - 18:25, 19:2, 19:5, 19:15, 21:22, 26:23
**grabbed** [2] - 25:19, 26:12
**graduated** [1] - 4:21
**grandmother** [1] - 6:10
**ground** [2] - 38:3, 38:25
**guess** [1] - 35:24
**guy** [1] - 6:24

**H**

**half** [3] - 5:22, 17:12, 17:13
**hall** [9] - 17:11, 20:1, 20:4, 20:5, 21:2, 28:14, 29:15, 30:6, 30:7
**hand** [3] - 25:23, 36:10, 36:11
**HAND** [1] - 43:21
**handcuffs** [1] - 39:15
**handed** [1] - 16:22
**handicap** [2] - 22:16, 25:3
**hands** [2] - 25:21, 40:14
**handwriting** [1] - 16:24
**head** [4] - 40:20, 41:15, 42:7, 42:8
**health** [3] - 9:19, 9:22, 23:20
**hear** [1] - 18:2
**heard** [10] - 9:23, 9:25, 10:5, 10:6, 10:7, 17:19, 18:3, 18:4, 18:8, 42:16
**hereby** [1] - 43:7
**hereinafter** [1] - 1:16
**hereto** [1] - 33:25
**High** [1] - 4:19
**high** [1] - 5:11
**himself** [1] - 21:18
**hired** [5] - 6:16, 6:20, 7:23, 8:21, 14:11
**hiring** [1] - 6:25
**holding** [3] - 21:5, 26:18, 39:6

**hoping** [1] - 25:23
**Hospital** [1] - 5:17
**Huntington** [3] - 4:17, 5:13, 5:16

**I**

**ID** [1] - 43:24
**idea** [1] - 37:16
**identification** [1] - 33:24
**immediately** [1] - 37:20
**implemented** [1] - 14:9
**INC** [1] - 2:5
**incident** [4] - 12:3, 15:5, 22:21, 23:10
**individual** [1] - 11:14
**inhouse** [1] - 10:15
**initial** [1] - 8:23
**injuries** [1] - 36:19
**inservice** [2] - 9:17, 9:18
**inside** [5] - 19:21, 25:4, 25:10, 30:2, 42:10
**instructor** [2] - 11:11, 11:12
**involving** [2] - 22:21, 23:10
**issues** [3] - 9:19, 9:22, 10:7
**itself** [4] - 20:2, 20:17, 21:16, 21:17

**J**

**Jackson** [4] - 8:20, 10:18, 10:23, 14:8
**jaw** [4] - 36:2, 36:5, 36:9, 36:15
**job** [2] - 6:15, 7:2
**jobs** [1] - 5:10
**join** [1] - 11:24
**Jordan** [1] - 17:20
**JOSEPH** [1] - 1:5
**JR** [1] - 1:4
**Jr** [1] - 1:13
**June** [1] - 43:20
**Justice** [1] - 5:2

**K**

**keefer** [2] - 31:15, 31:17
**Keefer** [3] - 4:7, 31:16, 42:24

**KEEFER** [5] - 1:11, 1:15, 3:4, 4:1, 43:8
**Keefer's** [1] - 33:23
**Kelley** [1] - 7:13
**Kellogg** [1] - 4:20
**Kelly** [2] - 18:7, 27:8
**Kenova** [1] - 6:6
**KENTUCKY** [4] - 1:1, 1:22, 43:3, 43:23
**Kentucky** [6] - 1:13, 1:14, 2:7, 2:12, 2:15, 43:6
**key** [1] - 39:23
**kick** [1] - 39:25
**kicked** [1] - 40:17
**kind** [1] - 10:4
**KIRKLAND** [1] - 2:14
**knowledge** [1] - 25:16

**L**

**laceration** [1] - 41:3
**Large** [1] - 43:7
**LARGE** [1] - 43:24
**last** [5] - 10:22, 10:24, 10:25, 14:20, 39:21
**late** [1] - 6:19
**law** [1] - 1:12
**Lawrence** [1] - 4:9
**LAWRENCE** [1] - 43:4
**laying** [1] - 40:14
**least** [1] - 13:16
**leave** [1] - 7:6
**left** [17] - 7:21, 18:5, 26:12, 36:2, 36:5, 36:9, 36:15, 36:16, 38:6, 38:9, 38:12, 38:15, 40:6, 40:8, 40:10, 40:11, 42:2
**LEGAL** [1] - 2:5
**length** [1] - 37:14
**lengths** [1] - 38:19
**LESLIE** [1] - 2:14
**letting** [1] - 21:18
**lifetime** [1] - 37:24
**live** [1] - 6:1
**located** [1] - 1:13
**location** [2] - 12:21, 15:6
**look** [2] - 28:11, 37:4
**looks** [1] - 39:14
**Louisa** [10] - 1:13, 6:1, 6:16, 6:22, 6:25, 7:5, 7:16, 8:25, 12:1, 15:8
**Louisville** [1] - 2:15
**lower** [2] - 12:22, 32:15

**M**

**main** [1] - 29:14
**Main** [4] - 1:13, 29:13, 29:16, 33:14
**majority** [1] - 5:17
**March** [2] - 1:12, 43:21
**mark** [7] - 8:16, 8:19, 29:2, 29:6, 29:24, 30:11, 33:20
**Mark** [1] - 8:17
**marked** [1] - 33:23
**married** [1] - 6:3
**Marshall** [2] - 4:25, 5:3
**Mason** [1] - 42:24
**MASON** [5] - 1:11, 1:14, 3:4, 4:1, 43:8
**mason** [1] - 4:7
**matter** [1] - 17:16
**mayor** [3] - 22:21, 23:11, 23:14
**McBRAYER** [1] - 2:14
**McGINNIS** [1] - 2:14
**mean** [7] - 9:10, 16:21, 21:14, 23:23, 31:14, 37:14, 38:17
**medical** [2] - 36:23, 37:13
**mental** [8] - 9:19, 9:22, 10:4, 10:7, 22:16, 22:24, 23:20, 24:1
**mentally** [2] - 9:14, 22:15
**method** [1] - 13:21
**Michael** [1] - 2:5
**Michelangelo** [1] - 28:10
**Middle** [1] - 4:20
**middle** [1] - 28:22
**might** [1] - 11:23
**mike** [2] - 11:21, 35:7
**Miller** [17] - 17:20, 17:24, 18:1, 32:18, 33:3, 33:4, 33:8, 34:1, 35:16, 35:20, 39:2, 39:4, 39:12, 41:19, 42:1, 42:3, 42:4
**Miller's** [1] - 34:15
**mind** [1] - 29:7
**month** [3] - 10:24, 10:25
**months** [1] - 7:9
**move** [1] - 7:19
**MR** [51] - 4:5, 8:17, 11:7, 11:8, 11:21, 11:24, 16:20, 20:18,

21:9, 21:10, 21:11, 22:17, 23:17, 23:22, 27:21, 27:24, 28:2, 28:3, 28:5, 28:9, 28:11, 29:6, 29:8, 29:9, 29:10, 29:14, 30:23, 31:6, 31:8, 31:11, 31:15, 35:7, 35:12, 35:13, 35:15, 36:21, 36:24, 36:25, 37:9, 37:12, 37:14, 37:16, 37:17, 37:21, 37:22, 37:25, 41:6, 41:16, 42:20, 42:21, 42:22
**multiple** [1] - 14:15
**murder** [1] - 37:24
**MY** [1] - 43:21

**N**

**name** [4] - 4:6, 17:3, 29:7, 29:11
**need** [2] - 11:7, 11:19
**never** [2] - 7:16, 10:7
**nights** [1] - 7:17
**nightshift** [1] - 7:18
**NO** [2] - 1:7, 33:24
**normal** [2] - 18:4, 27:11
**normally** [1] - 37:19
**NOTARY** [2] - 43:23, 43:24
**Notary** [3] - 1:14, 43:6, 43:19
**note** [1] - 33:24
**nothing** [2] - 20:6, 43:11
**Notice** [1] - 1:16
**November** [4] - 6:17, 6:18, 6:19, 7:4

**O**

**object** [3] - 16:20, 21:10, 22:17
**objection** [7] - 20:18, 21:9, 23:18, 23:25, 36:21, 41:6, 41:16
**observed** [3] - 16:2, 18:13, 18:17
**obvious** [1] - 7:13
**occasions** [1] - 12:9
**occur** [1] - 10:20
**occurred** [1] - 17:5
**October** [3] - 6:17, 6:19, 7:4
**OF** [7] - 1:1, 1:2, 1:4, 1:11, 3:3, 43:3, 43:4

3

OFFICE [1] - 1:22
office [4] - 1:12, 17:8, 17:10, 42:16
Office [3] - 2:6, 2:12, 4:9
Officer [4] - 9:8, 18:1, 33:22, 42:24
OFFICER [5] - 1:11, 1:14, 3:4, 4:1, 43:8
officer [1] - 15:18
officers [8] - 12:12, 14:16, 15:17, 15:20, 22:12, 27:12, 39:1, 40:22
often [1] - 14:18
old [1] - 4:14
once [4] - 10:20, 25:10, 26:4, 26:5
one [7] - 12:18, 12:19, 14:8, 21:1, 21:2, 23:4, 28:25
open [7] - 26:11, 32:24, 35:21, 38:19, 38:20, 38:22, 38:23
opened [4] - 31:21, 32:6, 32:8, 32:9
opposite [1] - 7:18
oral [1] - 1:15
outside [3] - 15:7, 25:11, 25:13

**P**

p.m [1] - 1:12
Page [3] - 3:5, 3:8, 3:10
page [1] - 35:14
Paintsville [1] - 2:12
parked [1] - 28:22
parking [10] - 18:18, 18:19, 28:21, 28:23, 33:11, 33:14, 33:16, 33:20, 34:1, 34:16
part [2] - 10:13, 11:4
parties [1] - 1:16
passing [1] - 18:7
patients [5] - 5:24, 5:25
patrolman [2] - 33:4, 39:12
Patrolman [3] - 17:23, 33:2, 35:20
people [2] - 9:14, 10:2
period [1] - 5:15
personnel [1] - 11:4
petition [1] - 22:25
Pfeifer [1] - 31:14
photograph [2] - 18:15, 41:8

photos [3] - 36:15, 37:10, 37:23
Pike [3] - 29:15, 29:18, 29:19
place [3] - 5:13, 14:18, 43:9
placed [1] - 39:15
Plaintiff [2] - 1:6, 2:4
Plaintiff's [1] - 3:8
PLLC [1] - 2:14
point [8] - 21:3, 21:5, 32:18, 33:1, 35:19, 38:14, 38:24, 39:5
police [19] - 6:15, 6:21, 17:14, 17:25, 18:19, 21:2, 21:18, 27:1, 28:14, 29:4, 29:5, 30:3, 31:4, 31:5, 32:6, 32:12, 33:12, 33:13, 42:11
Police [9] - 6:16, 6:22, 6:25, 7:5, 7:7, 7:11, 7:16, 8:25, 12:1
policies [1] - 14:9, 14:12, 14:15
policy [2] - 10:16, 13:25
polite [1] - 16:7
PORTER [1] - 2:11
POST [1] - 1:22
Post [2] - 2:6, 2:12
postmortem [1] - 37:10
poured [1] - 23:14
prepared [4] - 14:3, 14:7, 16:15, 16:23
presence [3] - 22:4, 22:5, 43:13
present [1] - 9:8
presented [2] - 21:16, 21:17
prevent [1] - 20:6
primary [1] - 15:18
printed [1] - 17:3
problems [1] - 10:4
Procedure [1] - 1:17
procedures [1] - 14:12
professional [2] - 23:20, 36:23
prompted [1] - 12:8
property [2] - 21:4, 21:21
proximity [1] - 33:13
psychiatrist [1] - 23:22
psychologist [1] - 23:23
Public [3] - 1:14, 43:6, 43:20
PUBLIC [1] - 43:23

pull [1] - 38:18
pulled [6] - 18:18, 25:19, 26:13, 26:15, 34:5
punched [1] - 21:22, 22:3, 22:4
punching [1] - 26:23
purposes [3] - 1:17, 43:9
pursuant [1] - 1:15
push [1] - 26:11
put [8] - 29:25, 31:6, 31:10, 31:12, 31:14, 31:17, 31:18, 31:19

**Q**

qualifications [1] - 23:19
qualified [1] - 36:23
questions [5] - 23:24, 23:25, 41:7, 42:21, 42:22
quickly [1] - 23:18

**R**

radio [3] - 17:20, 18:9, 18:11
radiology [2] - 5:21, 5:23
railing [2] - 19:6, 28:15
railings [1] - 20:7
raised [1] - 4:16
ramp [7] - 19:9, 19:10, 19:12, 25:3, 28:15, 28:16
rank [1] - 8:2
ranks [1] - 7:25
rational [1] - 23:13
rays [1] - 5:25
read [5] - 14:13, 35:19, 39:20, 43:17
reading [1] - 26:22
real [1] - 23:18
really [2] - 6:12, 14:16
rear [12] - 27:3, 27:4, 27:6, 27:7, 27:13, 27:18, 28:25, 29:2, 29:4, 30:9, 30:18, 34:20
reason [1] - 8:10
recognized [1] - 34:14
recollection [1] - 17:5
record [1] - 36:22
recorded [1] - 43:12
recycle [1] - 26:17

referred [1] - 39:1
referring [2] - 8:8, 31:22
regarding [1] - 23:25
related [1] - 9:13
relation [1] - 42:1
relatives [2] - 6:7, 6:8
remember [6] - 12:24, 14:20, 15:3, 15:21, 15:24, 33:10
report [8] - 16:15, 16:17, 16:22, 16:23, 17:4, 17:7, 27:7, 27:23
Reporter [2] - 1:14, 43:5
Reporter's [1] - 3:10
REPORTER'S [1] - 43:1
REPORTING [1] - 1:21
request [2] - 11:22, 43:16
resigned [1] - 7:20
resist [3] - 36:1, 36:4, 38:4
respective [1] - 1:16
responsible [1] - 11:9
ribcage [2] - 12:23, 13:4
ribs [1] - 38:6
road [2] - 28:18, 28:19
Road [2] - 2:15, 15:8
Roberts [1] - 7:23
rolled [1] - 39:17
rotation [1] - 7:18
Route [3] - 6:10, 15:7, 15:8
Rules [1] - 1:17
runs [1] - 29:16

**S**

safe [1] - 39:17
saw [4] - 19:15, 34:12, 34:14, 34:16
scans [1] - 5:25
scene [2] - 33:4, 33:9
schedules [1] - 7:19
SCHMITT [1] - 2:11
school [5] - 4:18, 4:21, 4:24, 5:7, 5:12
School [3] - 4:19, 4:20
scope [1] - 24:2
second [1] - 39:15
seconds [1] - 17:16
secure [1] - 20:21
secured [1] - 20:16
security [3] - 5:19, 5:21

see [22] - 6:12, 18:22, 19:1, 19:2, 19:19, 24:21, 27:3, 27:18, 27:20, 30:15, 31:23, 32:1, 32:3, 34:7, 36:15, 39:25, 40:2, 40:5, 40:19, 41:5, 41:21, 41:22
seem [1] - 18:4
send [1] - 11:22
sergeant [4] - 8:14, 8:19, 27:1, 32:5
Sergeant [9] - 10:18, 13:12, 14:8, 15:21, 17:19, 18:8, 24:17, 32:3, 32:9
SERVICES [1] - 2:5
set [2] - 1:16, 39:15
sets [1] - 39:16
several [5] - 5:10, 5:12, 9:17, 9:18, 26:17, 37:23
Shawn [1] - 2:11
Shelbyville [1] - 2:15
Sheriff [1] - 7:23
sheriff [1] - 8:13
Sheriff's [1] - 4:9
sheriff's [9] - 8:21, 11:10, 11:12, 14:1, 14:9, 17:8, 17:10, 23:4, 42:16
shift [1] - 7:15
short [1] - 5:15
shot [1] - 13:19
shoulders [2] - 42:7, 42:8
shut [2] - 5:14, 21:6
side [17] - 12:24, 12:25, 22:12, 26:12, 27:9, 27:10, 29:15, 30:13, 36:16, 39:18, 40:11, 40:13, 40:15, 41:22, 42:2, 42:3, 42:4
sign [4] - 14:13, 17:1, 17:2, 43:17
situation [3] - 21:7, 21:16, 39:17
smell [1] - 15:9
SO2 [3] - 8:6, 8:10
somewhere [1] - 34:2
sorry [3] - 19:18, 24:3
sort [2] - 8:11, 41:11
specifics [1] - 23:15
spring [1] - 4:19
standing [4] - 24:18, 25:2, 34:4, 34:18
started [4] - 5:19, 6:18, 7:17, 17:8
state [2] - 4:6, 24:1

4

**State** [1] - 43:6
**STATE** [1] - 43:24
**STATES** [1] - 1:1
**station** [9] - 18:20, 21:2, 29:4, 30:3, 31:4, 31:5, 33:12, 33:13, 42:11
**stenographically** [1] - 43:13
**Stenotype** [1] - 1:14
**STEPHEN** [1] - 1:8
**steps** [1] - 19:8
**Steven** [1] - 24:17
**still** [2] - 26:18, 42:10
**stomach** [1] - 39:7
**straight** [1] - 7:17
**Street** [2] - 1:13, 29:15
**street** [4] - 17:11, 29:7, 29:11, 29:18
**strike** [5] - 26:1, 36:8, 38:12, 40:2, 40:5
**struck** [9] - 25:15, 25:18, 36:1, 36:5, 38:6, 38:14, 40:7, 40:11, 40:15
**struggle** [3] - 39:20, 39:21, 39:22
**study** [1] - 5:1
**stuff** [1] - 10:16
**stun** [2] - 13:20, 13:23
**subject** [1] - 24:10
**subjects** [2] - 9:19, 12:11
**submitted** [1] - 16:17
**Suite** [1] - 2:15
**sworn** [3] - 1:15, 4:2, 43:10

**T**

**tangled** [1] - 25:24
**tase** [1] - 26:11
**tased** [1] - 32:12
**Taser** [26] - 11:9, 11:10, 11:11, 11:13, 11:25, 12:4, 12:13, 12:18, 13:2, 13:3, 13:9, 13:13, 13:21, 13:23, 24:15, 25:10, 25:11, 25:22, 25:25, 26:1, 26:18, 26:19, 35:2, 35:6, 35:9
**Tasers** [1] - 13:5
**taught** [1] - 11:13
**terms** [1] - 7:21
**testified** [5] - 4:3, 9:9, 9:11, 22:18, 35:10
**testimony** [2] - 33:23, 42:23

**THE** [5] - 8:18, 27:23, 29:13, 30:25, 31:9
**thereupon** [1] - 33:23
**threaten** [1] - 22:9
**three** [2] - 5:20, 12:7
**threw** [1] - 22:21
**Todd** [1] - 7:13
**together** [2] - 25:3, 39:16
**top** [2] - 40:12, 40:15
**torn** [1] - 39:23
**toward** [1] - 41:24
**towards** [3] - 41:22, 42:7, 42:8
**trained** [3] - 11:25, 14:8, 23:20
**training** [18] - 8:22, 8:23, 9:3, 9:11, 9:13, 9:16, 9:18, 10:9, 10:13, 10:15, 10:23, 11:4, 11:9, 11:10, 11:13, 14:17, 14:20, 24:2
**trainings** [5] - 9:17, 9:19, 10:14, 14:15, 14:18
**transcript** [1] - 43:15
**transported** [2] - 5:24, 23:5
**tried** [1] - 26:17
**true** [1] - 43:14
**truth** [3] - 43:11, 43:12
**trying** [3] - 12:12, 36:5, 38:9
**two** [8] - 5:22, 12:7, 17:12, 17:13, 21:1, 31:4

**U**

**UNDER** [1] - 43:21
**under** [3] - 1:17, 31:10, 39:6
**understood** [1] - 36:24
**uniform** [1] - 39:23
**UNITED** [1] - 1:1
**University** [1] - 4:25
**up** [5] - 22:6, 25:2, 38:19, 42:7, 42:8
**upper** [2] - 32:15, 32:16

**V**

**Valley** [1] - 4:19
**vehicle** [5] - 18:12, 18:22, 28:22, 34:7,

34:8
**versus** [1] - 1:7
**vicinity** [1] - 34:3
**views** [2] - 16:19, 18:15
**Virginia** [1] - 4:17

**W**

**walked** [1] - 25:2
**walking** [1] - 22:6
**WARFIELD** [1] - 1:22
**Wayne** [1] - 6:11
**weeks** [1] - 9:4
**West** [1] - 4:17
**Westmoreland** [1] - 4:19
**Wheeler** [3] - 8:16, 8:18, 8:19
**whistle** [2] - 39:20, 39:22
**whole** [1] - 43:11
**wife** [2] - 6:5, 7:19
**WILBURN** [1] - 1:8
**Wilburn** [21] - 9:8, 11:14, 13:12, 15:21, 17:19, 17:22, 18:8, 24:17, 24:19, 24:22, 27:1, 27:20, 30:9, 30:11, 31:19, 32:4, 32:5, 32:9, 39:3, 39:4
**Wilhite** [7] - 32:18, 33:2, 35:4, 35:20, 39:2, 39:4, 42:6
**window** [8] - 18:25, 19:1, 19:3, 19:5, 21:22, 21:23, 22:3, 22:4
**wire** [1] - 26:13
**wires** [5] - 25:19, 25:21, 25:23, 25:24, 26:19
**wit** [1] - 4:3
**Witness** [3] - 1:15, 18:15, 29:3
**WITNESS** [7] - 3:3, 8:18, 23:21, 27:23, 29:13, 30:25, 31:9
**witness** [11] - 4:2, 16:19, 28:8, 29:25, 30:12, 31:13, 31:20, 33:21, 43:10, 43:14, 43:17
**word** [1] - 32:20
**works** [1] - 8:12

**X**

**X-rays** [1] - 5:25

**Y**

**year** [4] - 5:21, 7:10, 10:15, 10:20
**yearly** [4] - 9:18, 10:13, 10:14, 11:17
**years** [5] - 5:4, 5:5, 5:17, 5:20, 5:22
**yell** [1] - 22:7
**yelling** [1] - 18:8

5