1               UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2               EASTERN DIVISION OF ASHLAND

3 _____

4

5 ESTATE OF BILLY COLLINS, JR.;
BILLY JOSEPH COLLINS, ADMINISTRATOR

6     Plaintiff,

7 versus               ACTION NO. 0:16-cv-00068-HRW

8 STEPHEN WILBURN, ET. AL.,

9     Defendants.

10 _____

11     **DEPOSITION OF OFFICER STEPHEN WILBURN**

12     On the 7th day of March, 2017, beginning at
approximately 1:00 p.m., at the law office of Eldred
13 E. Adams, Jr., located at 110 East Main Street,
Louisa, Kentucky, before me, Angela F. Crigger, a
14 Stenotype Reporter and Notary Public within and for
the Commonwealth of Kentucky, appeared **OFFICER**
15 **STEPHEN WILBURN**, Witness, who being by me first duly
sworn, gave his oral deposition in the causes
16 pursuant to Notice of Counsel for the respective
parties as hereinafter set forth.  Said deposition is
17 taken for purposes of discovery and all other
purposes under the Federal Rules of Civil Procedure.

18

19

20

21

22         **ANGELA F. CRIGGER REPORTING**
          **POST OFFICE BOX 1035**
23       **WARFIELD, KENTUCKY  41267**
        **\* (304) 393-4320 \***

24

25

———————————————1———————————————

A P P E A R A N C E S:

<u>On Behalf of the Plaintiff:</u>

Michael J. Curtis, Esq.
CURTIS LEGAL SERVICES, INC.
1212 Bath Ave., 6th Floor
Post Office Box 1455
Ashland, Kentucky  41101

<u>On Behalf of the Defendants:</u>

Shawn Conley, Esq.
PORTER, SCHMITT, BANKS & BALDWIN
Post Office Drawer 1767
Paintsville, Kentucky  41240-1448

Chris J. Gadansky, Esq.
McBRAYER, McGINNIS, LESLIE & KIRKLAND, PLLC
9300 Shelbyville Road, Suite 110
Louisville, Kentucky  40222

-2-

```
 1                    I N D E X

 2

 3   EXAMINATION OF WITNESS:

 4   OFFICER STEPHEN WILBURN

 5   Direct Examination by Mr. Curtis          Page 04

 6

 7   EXHIBITS:

 8   Plaintiff's Exhibit No. 1 - Photograph    Page 62
     Plaintiff's Exhibit No. 2 - Photograph    Page 63
 9   Plaintiff's Exhibit No. 3 - Photograph    Page 64
     Plaintiff's Exhibit No. 4 - Photograph    Page 64
10   Plaintiff's Exhibit No. 5 - Photograph    Page 65
     Plaintiff's Exhibit No. 6 - Photograph    Page 75
11

12

     Reporter's Certificate - Page 85
13

14

15

16

17

18

19

20

21

22

23

24

25
```

— 3 —

```
 1              OFFICER STEPHEN WILBURN, called as a
 2   witness, after first being duly sworn, was examined
 3   and testified as follows, to wit:
 4                    DIRECT EXAMINATION
 5   BY MR. CURTIS:
 6        Q.  State your name, please.
 7        A.  Steven Wilburn.
 8        Q.  Have you ever given a deposition before?
 9        A.  No, sir.
10        Q.  What I'm going to do, Mr. Wilburn, is ask
11   you a series of questions, and if you don't
12   understand the question then ask me to repeat it.
13        A.  Okay.
14        Q.  Otherwise, if you give an answer to the
15   question that I posed to you, then it's a given that
16   you understood the question and your response is in
17   regards to the question.
18        A.  Okay.
19        Q.  If you answer, please don't say uh-huh or
20   huh-uh, or anything like that.  Just yes or no.
21   Please, say yes or no.
22        A.  Okay.
23        Q.  What is your date of birth?
24        A.  May 23rd, 1986.
25        Q.  And place of birth?
```

—4—

1          A.   Louisa, Kentucky.

2          Q.   And do you have family here in Louisa,

3    Kentucky?

4          A.   That's correct.

5          Q.   Parents?

6          A.   Yes.   One is still living here.

7               MR. CURTIS:   If this case goes to

8    trial, give me the relatives all the way to first

9    cousins?

10               MR. GADANSKY:   Sure.

11               MR. CURTIS:   And likewise, we'll do

12    the same.

13               MR. GADANSKY:   That will be fine.   I

14    was going to say, if you're going to ask like Social

15    Security and that kind of --

16               MR. CURTIS:   I'm not.

17               MR. GADANSKY:   Okay.

18          Q.   So are you married?

19          A.   Yes, I am.

20          Q.   And what is your wife's name?

21          A.   Heather Wilburn.

22          Q.   What was her maiden name?

23          A.   James.

24          Q.   James?

25          A.   Yes.

─5─

1      Q.   And you all have children?

2      A.   Yes, we do.

3      Q.   How many?

4      A.   Five.

5      Q.   Five?

6      A.   Uh-huh.

7      Q.   All between you all, or were you married in

8    the past or was she married in the past?

9      A.   No.  They're all ours.

10      Q.   Okay.  And I don't guess any of them are 18

11    or older?

12      A.   No.

13      Q.   Now, where did you go to school?

14      A.   Lawrence County.

15      Q.   Elementary school?

16      A.   Yes.  Louisa Elementary all the way up to

17    Lawrence County High School.

18      Q.   And what year did you graduate?

19      A.   2005.

20      Q.   Did you play any sports?

21      A.   No.

22      Q.   Any school activities?

23      A.   No.

24      Q.   What year was it you graduated in?  2005;

25    right?

─────── 6 ───────

1          A.   That's correct.

2          Q.   After you graduated, what did you do?

3          A.   I went to Ashland Community and Technical

4     College.

5          Q.   And what was your study there?

6          A.   Fire Science.

7          Q.   Did you graduate?

8          A.   No.

9          Q.   Why did you leave?

10         A.   I just started working and then got married

11    and had kids.

12         Q.   Where did you start working?

13         A.   First -- well, I was with Lawrence County

14    911.

15         Q.   And who hired you?

16         A.   Jeff Pack was the coordinator at that time,

17    and I can't remember who the county judge was

18    exactly.  It might have been Phillip Carter.

19         Q.   Okay.  What kind of training did you receive

20    for the job?

21         A.   Just had on-the-job training, how to operate

22    all the systems and computers and everything, and

23    then went to Department of Criminal Justice training

24    for four weeks for the Telecommunications Academy.

25         Q.   Telecommunications Academy?

-7-

1      A.   Yes, sir.

2      Q.   Did you receive any certificate from there?

3      A.   Yes.   Received a certificate of completion,

4   being certified and a distinguished graduate.

5      Q.   Certified in what?

6      A.   As a telecommunicator in the state of

7   Kentucky.

8      Q.   Okay.   Is that certification still in effect

9   right now?

10     A.   No.   I think you have to stay employed as a

11  telecommunicator and keep up inservice training for

12  it to stay.

13     Q.   Okay.   How long did you work there?

14     A.   About two years.

15     Q.   Why did you leave?

16     A.   I got a job at the U.S. Army Corps of

17  Engineers at Yatesville Lake as a co-op park ranger.

18     Q.   That's a federal job; right?

19     A.   Yes, sir.

20     Q.   Was that a full time job?

21     A.   No.   It was just part time.   It was kind of

22  when I was going to school, and they had a co-op

23  program.

24     Q.   Still going to ACC?

25     A.   Yes, sir.

—8—

1      Q.   And you were going to ACC when you were

2   certified?

3      A.   Yes, sir.

4      Q.   How long did you go to ACC?

5      A.   That was probably over a span of four years,

6   just on and off, took a semester off here and there.

7      Q.   Okay.  And who was your boss there with the

8   Corps?

9      A.   Susan Maynard, I believe, was the one at

10   that time was the manager out there.

11      Q.   And was this just a summer job?

12      A.   I worked there for probably about six

13   months.  It was just during one semester.

14      Q.   Did you work full time?

15      A.   No.  It was just about 30, 32 hours a week.

16      Q.   30, 32 hours a week?

17      A.   Yes, sir.

18      Q.   And so you quit after six months?

19      A.   Yes.

20      Q.   Did you quit or what?

21      A.   Just in order to stay in that co-op program,

22   they was wanting me to sign up for a different major,

23   take some different classes I was interested in, and

24   I got a job at the City as a police officer.

25      Q.   Now, the job, if you'd stayed more than six

—9—

```
 1   months it would have been a merit system job;

 2   correct?

 3        A.   I don't recall how all of that was set up.

 4        Q.   And you were periodically evaluated;

 5   correct?

 6        A.   Yes.

 7        Q.   And Susan Maynard did the evaluations?

 8        A.   Yes.

 9        Q.   Were the evaluations positive or negative?

10        A.   I think I had one while I was there, and it

11   was positive.

12        Q.   And you'd also had evaluations on dealing

13   with the public; correct?

14        A.   It seems like there might have been part of

15   it was that.

16        Q.   And were any complaints made against you?

17        A.   No.

18        Q.   No complaints?

19        A.   No, sir.

20        Q.   So you got a job with the City; correct?

21        A.   That's correct.

22        Q.   As a police officer?

23        A.   Yes, sir.

24        Q.   What was the date of hire?

25        A.   Either March or April of 2008.
```

—10—

1          Q.   So would it be correct to say that from

2     either March or April of 2008 until March or April of

3     2017, you've been with the City for almost nine

4     years?

5          A.   Yes, sir.

6          Q.   When you hired in, what was your rank?

7          A.   Just a patrolman.

8          Q.   How long were you a patrolman?

9          A.   Until August of 2009.  I believe it was

10    August when I left.

11         Q.   When you left?

12         A.   I went to work at the House-Hasson Hardware.

13    It's just a distribution warehouse in Prichard.  I

14    was there for a couple of months, and then I came

15    back to Louisa Water Company.

16         Q.   Louisa Water Company?

17         A.   Yes, sir.

18         Q.   How long did you stay at Louisa Water

19    Company?

20         A.   I actually worked there -- I was full time

21    for a couple of years, about a year and a half or two

22    years.  And I worked part time there up until just

23    this last year.

24         Q.   And then you went back to the police

25    department?

-11-

CRIGGER REPORTING SERVICE

1       A.   Yes.   I came back to police department in

2   October, I believe it was, of 2011.

3       Q.   2011?

4       A.   Yes, sir.

5       Q.   So you hired in March or April of 2008 as a

6   police officer, and left the City in August of 2009;

7   right?

8       A.   Right about there, yes.

9       Q.   And then you went to work for that hardware

10  place, and then left there and went work for Louisa

11  Waterworks; correct?

12      A.   Yes, that's correct.

13      Q.   And you stayed there until October of 2011?

14      A.   Full time, yes.

15      Q.   Full time?

16      A.   Yes.   I worked part time after that up until

17  last year.

18      Q.   But you went back to the police department

19  in October of 2011?

20      A.   Yes, sir.

21      Q.   Full time.   And worked part time with the

22  water company; is that correct?

23      A.   That's correct, sir.

24      Q.   Now, let's go back to when you hired in in

25  March or April of 2008.   Did you have to take a test,

—12—

CRIGGER REPORTING SERVICE

1    any type of employment test?

2         A.   Just did the state required testing,

3    suitability screener and the physical agility

4    testing.

5         Q.   And who administered that?

6         A.   Instructors with the Department of Criminal

7    Justice training.

8         Q.   And was that at Eastern?

9         A.   It was in Ashland, there by the Boyd County

10   High School.

11        Q.   And who was the instructor?

12        A.   I don't recall.  There was two of them.

13        Q.   That was the only testing?

14        A.   Yes, sir.

15        Q.   Did you go to the Academy?

16        A.   Yes, I did.

17        Q.   And when was that?

18        A.   From August 2008 until the first week of

19   January in 2009.

20        Q.   August.  So you were there from August until

21   January?

22        A.   Yes, sir.

23        Q.   And that was at Eastern; correct?

24        A.   That's correct.

25        Q.   And did you receive any type of degree or

—13—

1    anything?

2        A.   Certificate and certification as a police

3    officer in the state of Kentucky upon completion.

4        Q.   And going from August until January, you

5    would go to school Monday through Friday; right?

6        A.   That's correct.

7        Q.   How many hours would be classroom?

8        A.   It just varied each week.  Usually, roughly

9    eight hours a day.

10        Q.   Eight hours a day.  And what were the

11    classes?

12        A.   It was just different stuff.  We had gone

13    over the laws, use of force stuff, driving, shooting,

14    first aid.

15        Q.   Use of force stuff, how many hours did you

16    have in use of force?

17        A.   I don't recall.

18        Q.   Was it more than four?

19        A.   Oh, yes, sir.  It was spread out over the 18

20    weeks, just different blocks.

21        Q.   Spread out over the 18 weeks?

22        A.   Yes, sir.

23        Q.   What about the shooting?

24        A.   I don't know how many hours.  It was

25    probably half of the Academy time was spent shooting.

—14—

1      Q.   Any training on the use of Tasers?

2      A.   No, sir.  Not at the Academy.

3      Q.   How many hours of training did you have in

4  the use of the ASP?

5      A.   I don't know the exact hours.  They had

6  probably a one-week block where you did training with

7  the ASP baton.

8      Q.   Did you have any training on how to deal

9  with mentally handicapped individuals?

10      A.   There was some material in different parts.

11      Q.   Tell me about that training?

12      A.   Just talking about -- what I can recall,

13  just when you're talking with them, always have a

14  backup officer with you.

15      Q.   Did they tell you try not to agitate the

16  situation?

17      A.   Yes.

18      Q.   Not to try to provoke it?

19      A.   Yes.

20      Q.   Try to make sure it's calm, cool,

21  collective?

22      A.   Yes.

23      Q.   Because you're dealing with a mentally

24  disturbed person?

25      A.   That's correct.

—15—

1      Q.   And that force should only be used as a last
2   resort?
3      A.   If they become combative, get the situation
4   under control.
5      Q.   And did they tell you how you should
6   approach a mentally handicapped person?
7      A.   Not that I recall, no specific approach.
8   Just kind of whatever the call is, to approach it
9   that way and kind of figure out what's going on.
10      Q.   Okay.  Did they talk to you about the
11   continuum use of force?
12      A.   Yes, sir.
13      Q.   Tell me what your understanding was about
14   the continuum use of force?
15      A.   As far as the levels of it?
16      Q.   Right.
17      A.   When you show up, of course, you know, in a
18   situation, it's your officer presence.  Then if the
19   person is verbally resistant, you can do soft empty
20   hand control to detain them if you need to.  If they
21   start getting --
22      Q.   Let me ask you this.  How can a person be
23   verbally resistant?
24      A.   If you're giving them instructions, they
25   tell you no or ignore you, tell you they're not going

—16—

1    to comply.

2         Q.   Well, first of all, you have to an

3    articulable suspicion in order to seize a person;

4    correct?

5         A.   That's correct.

6         Q.   And what would that articulable suspicion

7    be?

8         A.   Just if you show up -- just depending on

9    what kind of call it is.

10        Q.   If you show up and the guy tells you to get

11   the hell out of dodge, he doesn't want to talk to

12   you, he doesn't have to, does he?

13        A.   Not necessarily, I don't guess.

14        Q.   And it all depends on the type of individual

15   you're dealing with; correct?

16        A.   Yes.

17        Q.   And you knew Billy Collins prior to his

18   death?  I mean -- yes.  Billy Collins prior to his

19   death, didn't you?

20        A.   Yes.  I knew who he was.

21        Q.   And in fact, he lived next to you; correct?

22        A.   No.

23        Q.   He lived close, in the same apartment

24   complex?

25        A.   Yes, sir.

—17—

1      Q.   And that was several years prior to his

2  death; correct?

3      A.   Yes, sir.

4      Q.   What apartment complex are we talking about?

5      A.   Ray Williams Villa.

6           MR. CONLEY:   What was that?

7           THE WITNESS:   Ray Williams Villa.

8      Q.   And where is that located?

9      A.   On Gene Wilson Boulevard.

10     Q.   And how long did you live there?

11     A.   For about three years, I believe.

12     Q.   What years were those?

13     A.   From about, let's see, I think 2010 up to

14  2013 maybe.

15     Q.   2010 to 2013; correct?

16     A.   Roughly, yes, sir.

17     Q.   Then you knew about an incident in 2012,

18  about Billy throwing coffee on the mayor; right?

19     A.   Yes, sir.  I responded.

20     Q.   We'll get back to that.  So you were in the

21  Academy from August of 2009 until January 2010?

22     A.   No, sir.

23     Q.   When, now?

24     A.   August 2008 to January of 2009.

25     Q.   Okay.  And you graduated and received your

—18—

1    certificate; correct?

2         A.   Yes, sir.

3         Q.   Did you receive any honors or anything like

4    that while at the Academy, awards?

5         A.   No, sir.

6         Q.   Do you belong to any professional police

7    organizations?

8         A.   No, sir.

9         Q.   Are you certified by any policing agencies?

10        A.   Just the Department of Criminal Justice

11   training.

12        Q.   Just that?

13        A.   And the Kentucky Law Enforcement Council.

14        Q.   And the what?

15        A.   Kentucky Law Enforcement Council.

16        Q.   When did you receive your certificate from

17   the Kentucky Law Enforcement Council?

18        A.   The same day I graduated from the Academy.

19        Q.   Okay.  Now, do you ever have to go back to

20   the Academy to get recertified?

21        A.   You have the forty-hour inservice each year.

22        Q.   Forty hours?

23        A.   Yes, sir.

24        Q.   Now, I'm sort of confused.  Maybe it's just

25   me.  But you were a police officer from March or

—19—

1    April of 2008 up until August of 2009, and then you

2    didn't come back until 2011; right?

3         A.   That's correct.

4         Q.   And did you keep your 40 hours training up

5    to date during that period, 2009 and 2010?

6         A.   No, sir.

7         Q.   So when you came back, all you had to do was

8    40 hours training?

9         A.   I had to take two -- or no.  Just one 40-

10   hour class.  It was broke up into two.  It was a 16-

11   hour class and a 24-hour class in one week.

12        Q.   Okay.  That was in one week?

13        A.   Yes, sir.

14        Q.   And when was that?

15        A.   The later part of 2011, or the first part of

16   2012.  It was during the winter.

17        Q.   Was it basically a refresher course or what?

18        A.   Just penal code and constitutional update.

19   They just go over the laws and any changes in the

20   Kentucky laws.

21        Q.   Now, did you have any training on the use of

22   force?

23        A.   No, sir.  Not during that.

24        Q.   Training on dealing with mentally

25   challenging individuals?

—20—

```
 1          A.   No, sir.
 2          Q.   Since 2011, prior to Mr. Collins' death, had
 3     you had any training on the use of force?
 4          A.   Yes, sir.
 5          Q.   Prior to the 40 hours?
 6          A.   I'm sorry?
 7          Q.   Prior to the 40 hours?
 8          A.   No, sir.
 9          Q.   What training was it?
10          A.   Just departmental training.
11          Q.   When you say departmental training, what are
12     you talking about?
13          A.   It's just inhouse department training.  We
14     did Taser training and reviewed our use of force
15     policy.
16          Q.   And who would conduct departmental training?
17          A.   It would just be either the chief or myself
18     would just go over something with everybody.
19          Q.   How long would the training program last?
20          A.   Just anywhere from an hour to -- the Taser
21     training would be usually about four to six hours.
22          Q.   And how often would this training be, on a
23     yearly basis?
24          A.   Once a year.
25          Q.   Once a year.  And are there records
```

CRIGGER REPORTING SERVICE

1    documenting the training?

2        A.  Yes, sir.

3        Q.  On the use of force?

4        A.  Just reviewing our policy, yes, sir, on the

5    use of force.

6        Q.  And who documented that training?

7        A.  We'd fill out a roster, just a sign-in

8    sheet, and put the title of it, and it's in a folder.

9    It would either be the chief or myself would record

10   that.

11       Q.  And would there be materials that would be

12   furnished to you?

13       A.  On that stuff we would just review our

14   policy and talk about different stuff, any updates

15   and laws and stuff like that.

16       Q.  Had the policy been updated at all from 2011

17   until Mr. Collins' death?

18       A.  I don't believe so.

19       Q.  Not at all?

20       A.  Not that I recall, no.

21       Q.  Now, am I correct that the Taser is a

22   defensive instrument?

23               MR. GADANSKY:  Object to the form.

24   Answer it if you know.

25       Q.  Do you know?  Is the Taser a defensive

—22—

1    instrument, yes or no?

2         A.   I'm really not sure how you're --

3         Q.   Is a Taser an instrument that's used to

4    defend yourself?

5         A.   Yes.  It could be, yes.

6         Q.   And it can be an offensive instrument?

7         A.   Yes.

8         Q.   In the Collins' case, it was an offensive

9    instrument, wasn't it?

10        A.   No.

11        Q.   It wasn't.  It was a defensive instrument?

12        A.   It changed, I guess you could say.

13        Q.   So depending on what's occurring, based on

14   the video, it could go from being a defensive

15   instrument to an offensive instrument, back to a

16   defensive instrument; correct?

17        A.   Yes.

18        Q.   Who had the body cam on?

19        A.   I did.

20        Q.   Who furnished the body cam?

21        A.   The City of Louisa.

22        Q.   Any other officers have the use of body cam?

23        A.   Not during that incident, no.

24        Q.   None?

25        A.   No, sir.

—23—

1    Q.   Now, who was the Taser instructor?

2    A.   We used Adam Crum.  He was the chief of the

3    Inez Police Department for several years, and then he

4    quit doing it.  James Frint was the other one we

5    used.

6    Q.   James who?

7    A.   Frint, F-R-I-N-T.

8    Q.   Who was he?

9    A.   He was a police officer with Carter County

10   at the time, I believe.

11   Q.   So Adam Crum did the Taser training back in

12   2011, 2012?

13   A.   I'm not sure when he quit doing it and we

14   started using the other guy.

15   Q.   Was Frint the Taser prior to Mr. Collins'

16   death?

17   A.   Yes, I believe so.

18   Q.   And how long had he been the Taser

19   instructor prior to Mr. Collins' death?

20   A.   Just a couple of years as ours.

21   Q.   So he'd been the Taser training, say, 2014,

22   2015?

23   A.   Somewhere in that range, yes.

24   Q.   Now, what was the date of this incident with

25   Mr. Collins?

—24—

1      A.  May of 2015.  I don't remember the exact

2    date.

3      Q.  Now, in January up to prior to his death in

4    2015, had you had any Taser training?

5      A.  We did one.  I can't recall exactly when it

6    was.

7      Q.  Well, just give me your best guess?

8      A.  I believe it was prior to that we'd had one,

9    but I don't remember exactly when it was.

10     Q.  Was it January, February, March, April?

11     A.  I can't remember if it was at the end of

12   2014 or first part of 2015.

13     Q.  Okay.  And that was done by Mr. Frint?

14     A.  Yes, sir.

15     Q.  And who all received training?

16     A.  Everyone that was currently employed at the

17   time by the Louisa Police Department and Lawrence

18   County Sheriff's Office.

19     Q.  So the training was provided jointly to the

20   City and the sheriff's office; correct?

21     A.  Yes, sir.

22     Q.  And were you all taught significant

23   differences that exist between different Taser 2

24   models, conductor of electric weapons?

25     A.  Not that I recall.

CRIGGER REPORTING SERVICE

1      Q.   Tell me what the warnings are for the Taser?

2      A.   I'm not sure what --

3      Q.   Tasers, when you're trained, you're trained

4  not only in the instruction on how to use it, but

5  that there's warnings; correct?

6      A.   Yes, sir.

7      Q.   What are the warnings?

8      A.   If anybody's got water on them, try not to

9  use it on them, if you can deploy pepper spray.

10  There's a risk of fire hazard.  They tell you to

11  avoid shooting in the chest area if you can, if at

12  all possible.  And try not to aim at the head and the

13  face.

14      Q.   Okay.  Now, was there a policy in effect at

15  the City on the use or deployment of Tasers back in

16  2015?

17      A.   Yes.

18      Q.   Who prepared that policy?

19      A.   I'm not sure.

20      Q.   And was it a written policy?

21      A.   Yes, sir.

22           MR. CURTIS:  And do we have a copy of

23  that policy?

24           MR. GADANSKY:  I can get you one,

25  yeah.  I think it's part of the discovery requests.

—26—

1    It will be in there.

2         Q.   Now, how long had that policy been in

3    effect?

4         A.   For several years.

5         Q.   Since you went back full time in 2011?

6         A.   Yes, sir.

7         Q.   And that policy had not been changed at all

8    since 2011?

9         A.   Not to my knowledge, no.

10         Q.   Were you also taught that the Taser can

11    cause physiologic effects?  In other words, harm to

12    the body that may increase the risk of death or

13    serious injury?

14         A.   No.

15         Q.   You weren't?  Okay.  Would you agree that

16    Mr. Collins was agitated?

17         A.   Yes.

18         Q.   And you would agree that a Taser can cause

19    severe physical problems to a person who is agitated;

20    correct?

21              MR. GADANSKY: Objection to the form,

22    but answer if you know.

23         A.   No.

24         Q.   You weren't trained in that?

25         A.   I don't recall all of the exact material.

—27—

CRIGGER REPORTING SERVICE

1      Q.   Now, would you agree that there was

2  simultaneous deployments of the Taser on Mr. Collins?

3      A.   Yes.  One after being ineffective, there was

4  others, yes.

5      Q.   Were you taught that simultaneous deployment

6  of Tasers was acceptable?

7      A.   Yes.

8      Q.   Who taught you that?

9      A.   I believe it was during the material.  It

10 said not to have two Tasers deployed on a person at

11 the same time.  But if it's infective, then you can

12 deploy --

13     Q.   Back to back?

14     A.   -- another?

15     Q.   In other words, back to back?

16     A.   Yes.

17          MR. GADANSKY:  Yes.  I want to make

18 sure.  Are you saying simultaneous in the sense of

19 all at the same time or back to back?

20     Q.   At the same time.

21     A.   No.  At the same time, no.

22     Q.   Back to back?

23     A.   Back to back, yes.

24     Q.   And it's acceptable to use multiple Tasers?

25     A.   Not at the same time, no.

-28-

1          Q.   Not at the same time?

2          A.   No.

3          Q.   But back to back; correct?

4          A.   Yes.

5          Q.   At any time was your Taser deployed in the

6     stun mode?

7          A.   Yes, it was.

8          Q.   And was it deployed in the Taser mode where

9     it discharges?

10         A.   Yes.  Yes, sir.

11         Q.   And how many Tasers did you discharge?

12         A.   Cartridge discharge?

13         Q.   Cartridge?

14         A.   Just one.

15         Q.   Just one?

16         A.   Yes, sir.

17         Q.   Now, there was a total of five cartridge

18    discharges; correct?

19         A.   No, sir.

20         Q.   How many cartridge discharges were there

21    during the Collins' incident?

22         A.   There would have been only three cartridge

23    discharges.

24         Q.   How many stun?

25         A.   Just one stun.

-29-

CRIGGER REPORTING SERVICE

1      Q.   And that was you?

2      A.   Yes, sir.

3      Q.   Anyone else use the stun mode?

4      A.   Not that I recall.

5      Q.   What was your agency, what was the City of

6   Louisa's policy as to regards if medical care is

7   needed after the deployment of the Taser?

8      A.   That you summons medical attention.

9      Q.   After you deploy it and you summons medical

10  attention immediately?

11     A.   Yes.

12     Q.   Is there a time limit?

13     A.   Not that I recall.

14     Q.   So each time you've ever deployed the Taser,

15  you have summoned medical attention?  Is that a fair

16  statement?

17     A.   That I've actually used it on someone, I've

18  had the person checked out.  Yes, sir.

19     Q.   Have you gone to EMS or taken them to the

20  hospital?

21     A.   Just had EMS check them out.

22     Q.   Had EMS?

23     A.   Yes, sir.

24     Q.   That's each and every time.  Prior to Mr.

25  Collins in May of 2015, how many times had you used

1    the Taser prior to that point in time?

2         A.  Actually used it on someone, there was only

3    two instances.  And then I've deployed it to gain

4    compliance several times, which has worked.

5         Q.  Okay.  You've deployed it several times?

6         A.  Just pulling it out of the holster and

7    warning that I was going to use, yes.

8         Q.  But you didn't actually use it?

9         A.  No, sir.

10        Q.  If you use the Taser you have to do a

11   report, a written report; correct?

12        A.  That's correct.

13        Q.  How many times have you filed a written

14   report with your superior?

15        A.  I couldn't tell you an exact number without

16   looking back through.

17             MR. CURTIS:  Would you furnish me a

18   copy of all of that?

19             MR. GADANSKY:  Yeah, sure.

20        Q.  And even in the stun mode, you have to file

21   a written report; correct?

22        A.  Yes, sir.

23        Q.  And did you ever use your ASP on Mr.

24   Collins?

25        A.  No, sir.

—31—

1      Q.   Was an ASP used?

2      A.   Yes, sir.

3      Q.   And do you know who used the ASP?

4      A.   I believe Officer Miller had his out at one

5    point and one of the deputies.

6      Q.   Would it be correct to say that you were the

7    one in charge of the scene at that time?

8      A.   Yes.

9      Q.   Yes.  And you were giving orders; is that

10   correct?

11     A.   Somewhat, yes.

12     Q.   You've seen photos, haven't you?

13     A.   Yes, sir.

14     Q.   I'll go over those in a few minutes.  So,

15   2010, 2013, you lived in the apartments, the same

16   general area where Mr. Collins lived; correct?

17     A.   Yes, sir.

18     Q.   When was the first time you had an encounter

19   with Mr. Collins?

20     A.   Do you mean when I lived there?

21     Q.   Yeah.  When you lived there?

22     A.   I don't recall.  I know sometimes he would

23   be outside just walking around.

24     Q.   And did you ever have any conversations with

25   him?

—32—

```
 1          A.   Just he would talk about the weather or
 2    something like that.   There never was anything
 3    farther than that that I recall.
 4          Q.   Did you all ever get into a argument, verbal
 5    argument?
 6          A.   No.
 7          Q.   A fight?
 8          A.   No, sir.
 9          Q.   While you lived there?
10          A.   No, sir.
11          Q.   None at all?
12          A.   No.
13          Q.   Over him being loud?
14          A.   No.
15          Q.   Over him maybe saying something
16    inappropriate in front of your kids?
17          A.   No, sir.
18          Q.   None whatsoever?
19          A.   Not that I recall.
20          Q.   You would recall if you had an argument?
21          A.   I believe so, yes.
22          Q.   So it's your answer there was never any
23    argument between you and Mr. Collins at the
24    apartments; correct?
25          A.   That's correct.
```

—33—

1          Q.   Now, when you would see him out, you know

2     how you can tell, you know, there's people act

3     differently; correct?

4          A.   Yes.

5          Q.   And he didn't act like you; correct?  Or me

6     or any of these people here; correct?  I mean, let me

7     ask you this way.  Did you ever hear him talking and

8     hallucinating?

9          A.   Not while he lived by me, no.

10         Q.   You knew that he hallucinated; correct?

11         A.   No.

12         Q.   He was hallucinating when he threw the hot

13    coffee on the mayor; right?  Weren't you told that?

14         A.   No.

15         Q.   By having lived in this area with him, you

16    knew he had some mental problems?

17         A.   No.

18         Q.   You didn't know that?

19         A.   No.

20         Q.   None whatsoever?

21         A.   It been may have been a rumor that he had

22    took spells where he would get kind of out of

23    control, but I did not know that then for a fact that

24    he had mental problems.

25         Q.   It had been rumored; right?

CRIGGER REPORTING SERVICE

1          A.   Yes, sir.

2          Q.   And who told you about this rumors?

3          A.   I don't recall.

4          Q.   But this was prior to the mayor's incident;

5     correct?

6          A.   Yes, sir.

7          Q.   And so you weren't surprised when he threw

8     the coffee on the mayor, were you?

9          A.   Could you repeat that question?

10         Q.   I said you weren't surprised when he threw

11    the coffee on the mayor, were you?

12         A.   Yes, I was.

13         Q.   You was?

14         A.   Yes.

15         Q.   This took place at City Hall; correct?

16         A.   No.

17         Q.   Where?

18         A.   At the mayor's home.

19         Q.   At the mayor's home?

20         A.   Yes, sir.

21         Q.   So you responded; correct?

22         A.   That's correct.

23         Q.   And did you place him under arrest?

24         A.   Yes, I did.

25         Q.   And did you charge him?

—35—

1          A.   Yes, I did.

2          Q.   You charged him with assault fourth, second

3     or what?

4          A.   Assault fourth.

5          Q.   Any other charges?

6          A.   I believe menacing and disorderly conduct.

7          Q.   Who was with you as your backup?

8          A.   I was by myself that day, the best I can

9     recall.

10         Q.   What time of day did this take place?

11         A.   Mid morning, maybe before noon.

12         Q.   Now, did the sheriff's department respond,

13    too, to the mayor's residence?

14         A.   Not that I can recall.

15         Q.   Do you remember who the officer was with

16    you?

17         A.   To my knowledge, there was no one with me.

18         Q.   Please?  I didn't hear you?

19         A.   To my knowledge, there was no one with me,

20    that I can recall.

21         Q.   No one?

22         A.   It's been a while.

23         Q.   Did you get the 202, the mental petition?

24         A.   No, sir.

25         Q.   Were you aware that there was a mental

—36—

```
 1    petition filed?

 2         A.  No, sir.

 3         Q.  You weren't?

 4         A.  No, sir.

 5         Q.  You didn't know that the County Attorney and

 6    the sheriff's department got a mental petition?

 7         A.  Not that I recall, no.

 8         Q.  Now, think?  You're sure?  You're not aware

 9    that there was a mental petition that was sought by

10    the County Attorney for Billy Collins?

11         A.  Not that I recall.

12         Q.  Whatever happened to your charge of assault

13    four?  Dismissed?

14         A.  I'm not sure.  I would have to look.

15         Q.  Well, you had to know.  I mean, you're

16    talking about the mayor.  The mayor is your boss,

17    isn't he?

18         A.  Yes, sir.

19         Q.  And you would want to let the mayor know the

20    status of the case with someone trying to assault

21    him; correct?

22         A.  Yes.

23         Q.  Who was the mayor?

24         A.  Teddy Preston.

25         Q.  Because the mayor would also want to know
```

—37—

```
1    why this person would do this; right?
2              MR. GADANSKY:  Object to the form.
3         Q.  I mean, someone assaults a public official,
4    that individual would want to know what prompted
5    this?
6         A.  Yes.  I would imagine they would.
7         Q.  And did you ever have any discussions with
8    the mayor about this?
9         A.  Yes.  After the fact.
10        Q.  What were the discussions?
11        A.  If I can recall, that charge was dismissed.
12   The mayor said that he didn't want to push the issue.
13        Q.  The mayor said because he was sick; right?
14        A.  No, sir.
15        Q.  He didn't?
16        A.  No.
17        Q.  Did you ever have any conversations with the
18   sheriff's department about Billy?
19        A.  Not during that time, not that I can think
20   of.
21        Q.  You weren't aware they took him to the
22   Kentucky state's medical or psychiatric ward?
23        A.  No, sir.
24        Q.  No one ever told you he was committed?
25        A.  If they did, I don't recall.  That's
```

CRIGGER REPORTING SERVICE

1    something that stands out.

2        Q.  Did you take Mr. Collins to the police

3    station and book him in and took him to the holdover

4    jail for him to be transported to the Johnson County

5    Detention Center?

6        A.  During the coffee incident?

7        Q.  Right.

8        A.  Yes.  I took him to the police department,

9    and then the transport officer come and picked him up

10   and took him to the jail.

11       Q.  And were you sure that he was lodged in the

12   jail in 2012?  That was around December the 8th of

13   2012; right?

14       A.  I don't recall the exact date.

15               MR. CONLEY:  What did you say,

16   Frenchie?  September what?

17               MR. CURTIS:  December the 8th, 2012.

18               MR. GADANSKY:  That was the coffee

19   incident?

20               MR. CURTIS:  Yes.

21       Q.  Do you know how he got to Three Rivers

22   Medical Center?

23               MR. GADANSKY:  I object because he's

24   testified he didn't even know he was sent to Three

25   Rivers.

—39—

1           MR. CURTIS:  Well, he could have

2    learned about it later.

3         A.  To my knowledge, I don't remember anything

4    about that.

5         Q.  When you arrested Billy for the assault

6    fourth and menacing and disorderly, did he resist?

7         A.  Yes.  When I was trying to place him in

8    handcuffs he was pulling away from me.  I had to

9    restrain him.  And then once we got to the police

10   department he kept being aggressive and banging on

11   the desk, acting like he was going to fight me.

12        Q.  He was agitated, wasn't he?

13        A.  Yes, sir.

14        Q.  And you saw him agitated; correct?

15        A.  Yes, sir.

16        Q.  Were you scared of him?

17        A.  No.

18        Q.  What was he saying to you?

19        A.  I don't recall.  That's been a while.  I

20   just remember him being aggressive and pounding on

21   the desk and stuff.

22        Q.  And was he saying stuff like, I'm God, or

23   I'm here to take you out?

24        A.  No.  Just cussing me out and stuff is pretty

25   much what I can recall.

—40—

1      Q.   That made you mad, him cussing you out,

2    didn't it?

3      A.   No, sir.  People cuss me out all the time.

4      Q.   Now, after that incident in December of

5    2012, did you see Billy back in the apartments after

6    that?

7      A.   I'm not sure of the time frames.

8      Q.   Let me ask you this.  Prior to his death in

9    May of 2015, when was the last time you Billy

10   Collins?

11     A.   The best I can recall, it was when the

12   sheriff's office that arrested him for a DUI.  It was

13   probably several weeks prior to that.  I'm not sure

14   exactly when it was.

15     Q.   How did you know they arrested him for DUI?

16     A.   I was there at the traffic stop for a few

17   moments.

18     Q.   How did Billy react?  Was he agitated?

19     A.   Not that I recall, no.

20     Q.   Did he resist arrest?

21     A.   I don't believe so.

22     Q.   Do you remember who arrested him?

23     A.   Deputy Keefer, I believe.

24     Q.   Was anyone else with Deputy Keefer?

25     A.   There was another deputy there, I can't

———41———

CRIGGER REPORTING SERVICE

1    remember who it was.

2        Q.  What time of day was this?

3        A.  It would have been in the evening time.  It

4    was after dark as I recall.

5        Q.  Was that the only time you seen him in 2015

6    prior to this incident?

7        A.  That's the only thing that sticks out to me.

8        Q.  Now, when you hired on as a city police

9    officer in 2008, who was chief of police?

10       A.  Kevin Adkins.

11       Q.  And where is he now?

12       A.  I have no idea.

13       Q.  Do you know why he left or anything?

14       A.  He resigned.

15       Q.  Do you know why he resigned?

16       A.  There was the case with the Commonwealth

17   Attorney.  They were not presenting cases to the

18   grand jury or something to that effect.

19       Q.  He resigned because the Commonwealth

20   Attorney wasn't presenting cases?

21       A.  No.  I guess it was an issue with the police

22   department presenting cases.

23       Q.  How long was he police chief?

24       A.  I have no idea.

25       Q.  When you came back in 2011, who was police

—42—

1    chief?

2         A.   Greg Fugitt.

3         Q.   Is he still police chief today?

4         A.   Yes, sir.

5         Q.   Since you've been a police officer, have you

6    had any complaints made against you by members of the

7    public?

8         A.   No, sir.

9         Q.   None at all?

10        A.   No, sir.

11        Q.   Is there a procedure in effect for the

12   public to make complaints?

13        A.   Yes.

14        Q.   And how long has that procedure been in

15   effect?

16        A.   I don't know.  It's through the -- I guess

17   it's a KRS, through the policeman's bill of rights on

18   how that's supposed to --

19        Q.   Who is the one that handles complaints?

20        A.   It would go through the Chief.

21        Q.   Go through the Chief?

22        A.   Yes, sir.

23        Q.   Now, did your wife ever have any problems

24   with Billy?

25        A.   Not that I recall.

—43—

1      Q.   What about your kids?

2      A.   No.

3      Q.   Any people that come over to visit you all,

4  did they ever voice any concerns about Mr. Collins?

5      A.   No.

6      Q.   Did you know Mr. Collins' family?

7      A.   Yes.

8      Q.   Did you know his son and daughters?

9      A.   Yes.  From going to school.

10     Q.   How did you get along with them?

11     A.   In high school I had a few classes with him

12  son, and I always got along with him.

13     Q.   See, he wasn't married at that time of his

14  death, was he?

15     A.   Who?

16     Q.   Billy Collins?

17     A.   I don't guess so.

18     Q.   Did you know his wife?

19     A.   I knew who she was.  I didn't really know

20  her.

21     Q.   Did you see her at the apartments?

22     A.   No.

23     Q.   Did you ever have any contact with her?

24     A.   She was a nurse at the emergency room.  Just

25  if I was out there on something.

—44—

1        Q.   Have you ever had any contact with any of

2    his children since his death?

3        A.   No, sir.

4        Q.   With his ex-wife?

5        A.   Just being, again, at the hospital on

6    different calls.

7        Q.   Has she ever asked you about what happened?

8        A.   No, sir.

9        Q.   Has she always been polite and courteous?

10       A.   Yes, sir.

11       Q.   Okay.  Now, you've viewed the video of this

12   incident, haven't you?

13       A.   Not since after it happened.

14       Q.   Not since after it happened?

15       A.   No, sir.

16       Q.   In reviewing the video, is there anything

17   you would have done differently?

18       A.   Not that I can think of.

19       Q.   So in reviewing the video, as your actions

20   are reflected in the video, you would have still done

21   the same thing?

22       A.   Given the situation, yes.

23       Q.   Given the situation.  Now, the evening of

24   his death, it was graduation; right?

25       A.   That's correct.

—45—

1      Q.   And you were there at the high school

2   graduation; correct?

3      A.   Yes, sir.

4      Q.   And Mr. Collins was there; correct?

5      A.   Yes, sir.

6      Q.   And you saw Mr. Collins; correct?

7      A.   Not during the graduation, I did not.

8      Q.   Did not see him?

9      A.   No, sir.

10     Q.   Were there any complaints made against Mr.

11  Collins?

12     A.   Not that I recall, no.

13     Q.   And you had contact with him; correct?

14     A.   Yes, sir.

15     Q.   How did this contact take place?

16     A.   As Chief Fugitt was going down the road, I

17  guess it would still be considered Bulldog Lane,

18  between the baseball field and where the bus garage

19  is, and observed Mr. Collins' truck in a ditch there.

20     Q.   And what did he say?

21     A.   I don't recall.  Just told me there was a

22  truck in the ditch.  I was sitting at the top of the

23  hill and watching traffic, making sure everything was

24  flowing smoothly.

25     Q.   So he wanted you to come down and

—46—

1    investigate it?

2         A.   Yes, sir.

3         Q.   So Fugitt wanted you to investigate it;

4    right?

5         A.   Yes, sir.

6         Q.   And that would all be captured on the CAD

7    report; correct?

8         A.   Should be, yes.

9              MR. CURTIS:   Do would we have the CAD

10   report?

11             MR. GADANSKY: Yes.

12        Q.   What was your unit number?

13        A.   523.

14        Q.   And what's Fugitt's?

15        A.   826.

16        Q.   Is Officer Moore the other police officer?

17        A.   Miller.

18        Q.   Miller, I mean?

19        A.   Yes, sir.

20        Q.   What's his unit number?

21        A.   322.

22        Q.   And so you go down, and you see the truck in

23   the ditch; correct?

24        A.   Yes, sir.

25        Q.   And no one had called Chief Fugitt about the

—47—

1      truck being in the ditch; is that correct?

2          A.   That's correct.

3          Q.   And he just happened to observe it, so you

4      go down and check on it; correct?

5          A.   Yes, sir.

6          Q.   And you approach the truck?

7          A.   Yes, sir.

8          Q.   And did you know whose truck it was?

9          A.   No, sir.

10         Q.   Prior to approaching truck, you could see

11     the tags.  Did you run the tags?

12         A.   No.  The way the truck was angled, I could

13     not see the tags at that time.

14         Q.   When you approached the truck, was Mr.

15     Collins inside the vehicle?

16         A.   Seems like maybe he was just stepping out,

17     the best I can recall.

18         Q.   From the driver's side or the passenger's

19     side?

20         A.   Driver's side.

21         Q.   As he was stepping out, was there anything

22     in his hands?

23         A.   Not that I can recall.

24         Q.   How was he dressed?

25         A.   Seems like he might have had a T-shirt on,

———48———

1    blue jeans.

2        Q.   And when he was stepping out, you pulled in

3    behind; correct?

4        A.   No, sir.

5        Q.   Why?

6        A.   The way he was, I couldn't pull around

7    behind him.  I stayed on the blacktop.  He was over

8    in the grass on the hillside.

9        Q.   So you get out of your vehicle to approach

10   him; correct?

11       A.   Yes, sir.

12       Q.   And when you approach him, you don't have a

13   gun drawn or anything, do you?

14       A.   No, sir.

15       Q.   You don't have a Taser drawn?

16       A.   No, sir.

17       Q.   When you approach him, tell me what

18   happened?

19       A.   I just believe I asked him what was going

20   on, how he ended up there.  I got his information,

21   his ID and his insurance information, and ran his

22   tags, ran his license.

23       Q.   And what come back?

24       A.   They said his license was suspended.

25       Q.   Suspended for what?

————49————

1      A.   I don't recall.

2      Q.   And when a license is suspended, do you

3   normally arrest someone or cite them?

4      A.   Normally arrest.

5      Q.   Normally arrest?  You don't have to?  You

6   can cite them, too?

7      A.   That is correct.

8      Q.   But you arrested him; right?  Instead of

9   citing him; correct?

10      A.   Yes.

11      Q.   And when you saw that the license was

12   suspended, did you ask Mr. Collins to place his hands

13   behind his back so you could handcuff him and take

14   him to the city police department when he was being

15   transported?

16      A.   No, sir.

17      Q.   What did you do?

18      A.   At that time I kept talking to him.  I was

19   trying to conduct a field sobriety test to make sure

20   he wasn't under the influence.

21      Q.   You didn't smell any alcohol, did you?

22      A.   No, sir.

23      Q.   You knew wasn't a drug addict?  You didn't

24   see any needle marks in his arms, did you?

25      A.   No.

-50-

```
 1        Q.   And you could see his arms; correct?

 2        A.   The best I can recall, he had a T-shirt on.

 3        Q.   He had a T-shirt on, no needle marks, when

 4   you were conducting a field sobriety test?

 5        A.   Yes.

 6        Q.   Where was the field sobriety test being

 7   conducted?

 8        A.   There on a blacktop pad, just over from his

 9   truck.

10        Q.   Just over from his truck?

11        A.   Yes, sir.

12        Q.   And it's a slight incline, isn't it?

13        A.   No, sir.

14        Q.   Was it level?

15        A.   Fairly, yes.

16        Q.   When you say fairly, it wasn't level, was

17   it?

18        A.   I can't say precisely that it was level.

19        Q.   And this is on Bulldog Lane; correct?

20        A.   Yes, sir.

21        Q.   And as you come out from Bulldog Lane,

22   you're headed to old 23; right?

23        A.   Yes, sir.

24        Q.   And from Bulldog Lane, on the left there's

25   some doctors offices and pharmacy and stuff like
```

—51—

1    that; right?

2         A.  Across from it, yes, sir.

3         Q.  Across from it.  And exactly where did the

4    truck go off at?

5         A.  If you're coming up Bulldog Lane from the

6    hospital and doctors offices looking at the high

7    school, there's a road that goes to the left down by

8    the bus garage, fire station, baseball field, it was

9    there.

10        Q.  It was there.  So did Billy say he didn't

11   want to do the field sobriety test?

12        A.  From what I can recall, he kind of was, you

13   know, apprehensive about it, kept giving me the

14   runaround, but he eventually did.

15        Q.  He did haven't to?  It's not a law that he

16   has to do the field sobriety test; right?

17        A.  No, sir.

18        Q.  So if he didn't want to do it, he didn't

19   have to do it; right?

20        A.  That's correct.

21        Q.  You kept pushing him to do it?

22        A.  I just made one or two attempts.

23        Q.  You just made one or two?  It sounds like

24   you made more than one or two?

25        A.  No, sir.

—52—

1      Q.   He didn't have to do it, did he?

2      A.   Not if he didn't want to.

3      Q.   And he sort of hem hawed around, he didn't

4 want to?

5      A.   No, sir.

6      Q.   You didn't smell any alcohol?

7      A.   No, sir.

8      Q.   You searched his vehicle, didn't you?

9      A.   I didn't search it.  I just kind of looked

10 in it.

11     Q.   You looked in it.  You didn't see any

12 needles, didn't see any beer cans, didn't see any

13 bourbon bottles, any vodka, any type of liquor

14 whatsoever?

15     A.   There was a bucket of beer sitting in the

16 passenger's seat.

17     Q.   But none of it was open?

18     A.   No.  There was open empty beer cans and

19 bottles in the back of his truck.

20     Q.   In the back.  But you don't know how long

21 those had been there, do you?

22     A.   No.

23     Q.   You didn't smell any alcohol on him?

24     A.   No.

25     Q.   So he hem haws around, and he does a halfway

```
 1    field sobriety test; right?  Does he do the one-leg

 2    stand?

 3         A.   I don't think he did that.

 4         Q.   Did he do the heel-to-toe?

 5         A.   I don't recall.  I don't believe he did

 6    that.

 7         Q.   Did you an eye nystagmus test?

 8         A.   Yes, sir.

 9         Q.   And what did that show?

10         A.   I didn't observe anything.

11         Q.   You didn't observe anything?

12         A.   He kept moving around.

13         Q.   At that point in time you didn't observe

14    anything because they weren't constricted?  That's an

15    indication they're not under the influence; correct?

16         A.   That would be one clue, yes.

17         Q.   And the other clue is based on your personal

18    observation; right?

19         A.   Yes, sir.

20         Q.   And the other clue is sort of like an

21    equilibrium test; right?  In other words, see how you

22    can maintain your balance?

23         A.   Yes, sir.

24         Q.   And did you make him walk the line?

25         A.   No, sir.
```

—54—

1      Q.   Okay.  Did you charge him with DUI?

2      A.   No, sir.

3      Q.   How long did all of this take?

4      A.   I couldn't tell you an exact time.

5      Q.   Okay.  10 minutes, 15?

6      A.   Probably 10 to 15 minutes that we were there

7  with him.

8      Q.   And prior to administering him or having

9  this conversation about the field sobriety test, was

10  he under arrest?

11     A.   Not at that time, no.

12     Q.   Not at that time.  After the field sobriety

13  tests were completed, was he under arrest?

14     A.   After those, yes.

15     Q.   And did you tell him what he was being

16  arrested for, or just placed him under arrest?

17     A.   Well, during that time talking with him, he

18  kept screaming and cussing at people going by and

19  being loud.  I repeatedly asked him not to do that.

20  And then I believe I did inform him that he was going

21  to be charged for being disorderly.

22     Q.   Did you charge him with disorderly?

23     A.   Yes.

24     Q.   You did?

25     A.   I filled out a citation, but it was never

-55-

1    turned in due to the circumstances.

2              MR. CURTIS:  I'd like to have a copy

3    of the citation.

4        Q.  Filled out a citation for disorderly and for

5    operating on a suspended license; correct?

6        A.  Yes, sir.

7        Q.  And now it appears that you're the one that

8    agitated him there at the scene?

9              MR. GADANSKY: Object to the form.

10   That's not a question.

11       Q.  Let me ask you this.  Was anyone else there

12   with you when you were confronting Mr. Collins?

13       A.  Yes, sir.

14       Q.  Who?

15       A.  Chief Fugitt, Office Miller, and I believe

16   Deputy Wilhite had stopped there briefly.  He was

17   driving by there on his way to work.

18       Q.  And what all did Chief Fugitt observe?

19       A.  I couldn't attest to what he observed.

20       Q.  Did he observe you administering the field

21   sobriety test?

22              MR. GADANSKY: Object to the form.

23       Q.  Do you know?

24       A.  I can't answer that.  He was present.

25       Q.  How do you know he was present?

-56-

1      A.   Because I seen him there and talked to him.

2      Q.   After you placed him under arrest?

3      A.   He was there during the whole contact.

4      Q.   Tell me the conversation you and Chief had?

5      A.   I couldn't recall the conversation we had.

6      Q.   You can't?

7      A.   No, sir.

8      Q.   And Wilhite was there; correct?

9      A.   Yes.  Briefly.

10     Q.   And did you have a conversation with

11  Wilhite?

12     A.   I did not, no.

13     Q.   Okay.  Who transported Mr. Collins to the

14  police station?

15     A.   I did.

16     Q.   And prior to transporting him, did you

17  handcuff him?

18     A.   No, sir.

19     Q.   Why?

20     A.   Because he was, again, yelling, being

21  agitated.  And I asked him if he would come and sit

22  in my car if I didn't handcuff him, and cooperate,

23  and he agreed and then went and sit in my car.

24     Q.   And he sit in the car.  Front seat?

25     A.   No.  Back seat.

—57—

1        Q.   Back seat?

2        A.   Yes, sir.

3        Q.   So you took him to the police station;

4   right?

5        A.   Yes.

6        Q.   And he got out and you got out, and his arms

7   are on the handrail; correct?

8        A.   Eventually, yes.  He at first didn't want to

9   get out of the car.  He kept telling me no, and

10  cussing at me.

11       Q.   The body cam wasn't on then, was it?

12       A.   No, sir.

13       Q.   Now, does the body cam have voice

14  activation?

15       A.   No, sir.

16       Q.   It doesn't?

17       A.   No, sir.

18       Q.   How does the body cam work?

19       A.   It's just got a button that you have to push

20  down to turn it on.

21       Q.   Do you push down and turn it on, or did Mr.

22  Collins?

23       A.   No.  I turned it on when it came on.

24       Q.   What made you decide to turn it on?

25       A.   Just when he grabbed ahold of the rail and

-58-

1    began yelling.  And then when I placed my hand on him

2    to ask him to come off, he tensed up.  I felt like

3    that it was going to escalate, and I remembered that

4    I had the body cam on we'd just gotten.  Hadn't had

5    them very long.

6                   MR. CURTIS:  Okay.  Let's take a

7    break.

8                   (Off the record, briefly.)

9        Q.  (By Mr. Curtis) Mr. Wilburn, I believe we

10   left off with Billy holding on to the railing;

11   correct?

12       A.  That's correct.

13       Q.  And when he was holding on to the railing,

14   that's when you drew your Taser; correct?

15       A.  No.

16       Q.  You didn't?

17       A.  When I went to get him out of the car, he

18   began cursing at me, telling me he wasn't to get out,

19   started getting agitated at that point.  I finally

20   talked him into getting out of the car to go in so we

21   could do the paperwork.  And then as we were walking

22   up to the door, he grabbed on to the banister.  I

23   kept asking him to let go of it, and he kept cussing

24   at me, yelling.  I then attempted to put a handcuff

25   on him.  I told him I was going to have to handcuff

1    him and get him inside.  And when I was trying to put

2    the -- I got it on one wrist, and he tensed up and

3    pulled it away from me.  And then after that I warned

4    him that if he didn't let get go, I was going to pull

5    my Taser.  And then that's when I pulled it out and

6    delivered a drive-stun to his shoulder.

7         Q.  And all of that's recorded on the video,

8    what you just described?

9         A.  To the point to where he grabs ahold of the

10   banister is when I started recording.

11        Q.  And that's when you drew your Taser X26 and

12   threatened to light him up?

13        A.  Yes.

14        Q.  And just seconds later is when the first

15   Taser was deployed; correct?

16        A.  I don't know about seconds later.  I kept

17   giving him commands to let go and several warnings

18   that I was going to using it.

19        Q.  You would agree that what is recorded in the

20   video would be the best evidence; correct?

21        A.  Yes, sir.

22        Q.  Of exactly what took place?

23        A.  From that point on, yes.

24        Q.  You would agree there was no steps taken to

25   calm the situation; correct?

—60—

1        A.   No.   I did try to calm the situation.   Kept

2   talking to him in a calm voice, trying to get him to

3   let go, go inside so we could get the paperwork

4   done.

5        Q.   And that would be on the video, too;

6   correct?

7        A.   Yes.

8        Q.   And you would agree that you did nothing to

9   excite this person; correct?

10       A.   No.

11       Q.   Correct?

12            MR. GADANSKY:   No, you agree or?

13       A.   No, I didn't do anything to excite him.   I

14   was calm with him.   I didn't talk out of the way to

15   him or anything like that.

16       Q.   Now, I'm going to show you an autopsy photo.

17       A.   Okay.   (Witness views photograph.)

18       Q.   Do you recognize that?

19       A.   Yes.

20       Q.   Do you see the right eye there?

21       A.   Yes, sir.

22       Q.   How did that happen?

23       A.   I have no idea.

24       Q.   He wasn't like that when he appeared at the

25   police station, was he?

—61—

1      A.   Not that I recall, no.

2      Q.   And when he was holding on to the railing,

3  he had no bruises on him whatsoever; correct?

4      A.   No.

5      Q.   Describe what you see in that photo?

6           MR. GADANSKY:   I'm going to object to

7  the extent that he's not a medical professional.

8           MR. CURTIS:   I know, but --

9           MR. GADANSKY:   Well, it's postmortem

10  photographs.  So, you know, there could be

11  physiological factors in place there that have

12  nothing to do with bruising, or this could be just

13  natural bruises.

14           MR. CURTIS:   I understand.  Mark that

15  as Plaintiff's Exhibit 1.

16           (Said photograph was thereupon marked

17  for identification as PLAINTIFF'S EXHIBIT NO. 1 and

18  is attached hereto.)

19      A.   That's a picture of Mr. Collins' face.

20      Q.   And do you see any injuries to the face?

21      A.   It looks like there's some bruising around

22  his -- it would be his left eye.

23      Q.   What about the right eye, right here?

24      A.   That's what I was referring to is his left

25  eye.

—62—

1          Q.   Okay.  As you're looking at, it would be --

2          A.   It would be to my right, yes.

3          Q.   Be to your right.  And there's some

4     bruising; correct?

5          A.   It appears to be, yes.

6          Q.   Okay.  I'm going to show you what's going to

7     be Plaintiff's Exhibit 2.  Can you identify that?

8               (Said photograph was thereupon marked

9     for identification as PLAINTIFF'S EXHIBIT NO. 2 and

10    is attached hereto.)

11         A.   (Witness views photograph.) It appears to be

12    the left side of Mr. Collins' head, face.

13         Q.   Do you see any bruising?

14         A.   There's some darkness on the left side of

15    his head in the picture.  I can't say for sure if

16    that's bruising or what.

17         Q.   Do you know how that occurred?

18         A.   No, sir.

19         Q.   Would it be correct to say that in

20    Plaintiff's Exhibit 1 and Plaintiff's Exhibit 2, that

21    you did not inflict any of these injuries?

22               MR. GADANSKY:  I'll object to the form

23    and whether they are actually injuries sustained

24    during the altercation.

25         Q.   You can answer?

—63—

1          A.   No.

2          Q.   No?

3          A.   No.

4          Q.   I'm going to hand you Plaintiff's Exhibit 3,

5     and it appears to be his left arm; correct?

6                    (Said photograph was thereupon marked

7     for identification as PLAINTIFF'S EXHIBIT NO. 3 and

8     is attached hereto.)

9          A.   (Witness views photograph.) It would appear

10    to be, yes.

11         Q.   And it appears to be bruising?

12                   MR. GADANSKY: Same objection.

13                   MR. CURTIS:  Right.

14         A.   Again, there's several dark spots on his

15    arm.  I can't say for sure if that's bruising or what

16    it is.

17         Q.   And you didn't cause that, did you?

18         A.   No.

19         Q.   Do you know how these bruises occurred?

20         A.   No, sir.

21         Q.   I'm going to show you what's marked as -- it

22    will be 4.  Can you identify that?  Do you see any

23    marks?

24                   (Said photograph was thereupon marked

25    for identification as PLAINTIFF'S EXHIBIT NO. 4 and

————— 64 —————

1    is attached hereto.)

2         A.   (Witness views photograph.) It appears to be

3    maybe his right side of his torso, stomach area.

4         Q.   Do you see what appears to be any probe

5    marks?

6         A.   Yes.   There is a blue -- above this blue

7    towel, I'm assuming it is, there's a place that looks

8    like it could be a Taser probe.

9         Q.   Do you see another Taser probe there, where

10   it's sort of reddish?

11        A.   Possibly.  I couldn't say for sure.

12        Q.   Do you know who deployed those?

13        A.   No, sir.

14        Q.   When you used your Taser, what area of the

15   body were you pointing at?

16        A.   His back.

17        Q.   His back?

18        A.   Yes, sir.

19        Q.   I'm going to show you a photo of his right

20   arm?

21             (Said photograph was thereupon marked

22   for identification as PLAINTIFF'S EXHIBIT NO. 5 and

23   is attached hereto.)

24        A.   (Witness views photograph.) Yes.

25        Q.   It appears to be bruises?

─── 65 ───

1        A.   There are dark marks, yes.

2        Q.   Did you cause those?

3        A.   No.

4        Q.   Do you know who caused them?

5        A.   No.

6        Q.   His arms weren't like that when he had his

7   hands on the railing, were they?

8        A.   No.

9        Q.   Now, did you provide a written statement to

10   your expert, who is Chief Michael D. Bosse,

11   B-O-S-S-E?

12        A.   I filled out a written statement.  I'm not

13   sure who it would have went to.

14        Q.   Did you ever talk to him?

15        A.   Me personally, no, sir.

16        Q.   Have you ever met him?

17        A.   Not that I know.

18        Q.   Now, were you interviewed by the Kentucky

19   State Police?

20        A.   Yes, sir, I was.

21        Q.   Was that interview recorded?

22        A.   Yes.  It should have been.

23        Q.   And who was it interviewed you?

24        A.   A Detective Chris Carter, and there was a

25   lieutenant with the state police there.  I don't

—66—

1    recall his name.

2         Q.   Where did the interview take place?

3         A.   Louisa City Hall.

4         Q.   And who was present when the interview took

5    place?

6         A.   Just Detective Carter and the lieutenant.

7         Q.   And you?

8         A.   Yes.

9         Q.   No one else?

10        A.   No.

11        Q.   And you voluntarily submitted to the

12   interview; right?

13        A.   Yes.

14        Q.   How long did the interview last?

15        A.   I'm not sure.

16        Q.   More than an hour or less than an hour?

17        A.   Less than an hour.

18        Q.   Now, were you ever provided with any

19   training as it relates to the Americans with

20   Disability Act that enables officers to recognize and

21   react appropriately to emotionally disturbed people?

22        A.   I'm not sure if it would have been

23   administered by them.  There were some blocks of

24   training in the Academy.

25        Q.   And in the Academy, that was back in 2008

—67—

1    and '09?

2         A.   Yes, sir.

3         Q.   You don't recall that, if you were?

4         A.   If that's who it was provided through or

5    whatever.  I think you mentioned an agency there or

6    something.

7         Q.   Were you ever provided any training by the

8    City of Louisa as to the Americans with Disabilities

9    Act as to recognize and react appropriately to

10   emotionally disturbed persons?

11        A.   Just through their going over and reviewing

12   our policies.

13        Q.   Do you have a policy on how to recognize

14   emotionally disturbed people?

15        A.   Not to recognize.  Just encountering people,

16   dealing with people.

17        Q.   And is that review done on a yearly basis?

18        A.   Just different policies reviewed.

19        Q.   And was that policy in effect in 2015?

20        A.   Yes.

21        Q.   And who prepared the policy?

22        A.   I don't know.

23        Q.   Who was the instructor on the policy?

24        A.   There was no instructor.  It was just most

25   of the time we go over, just kind of read over the

—68—

1    policy ourself and then discuss it as a group.

2        Q.   Who furnishes the policy?

3        A.   Usually the police chief will write up the

4    policy, but I'm not sure which police chief did that

5    one.

6               MR. CURTIS:  I'd like to have a copy

7    of that one?

8               MR. GADANSKY:  Sure thing.

9        Q.   Now, this whole struggle lasted

10   approximately three minutes, according to the video?

11   Would that be a fair statement?

12       A.   If that's what the video shows, yes.

13       Q.   And would it be correct that most of the

14   officers were winded and breathing hard; correct?

15       A.   I don't know.

16       Q.   Was Mr. Collins lying face down at any point

17   in time?

18       A.   Once they were trying to get him handcuffed,

19   I believe after I'd tased him from behind, and the

20   other officers came in was trying to gain control of

21   him to handcuff him, he went to the floor on his

22   stomach face down, and then they attempted, kept

23   trying to handcuff him, and he was struggling with

24   them, pulling away.  And then once they did get him

25   handcuffed, he was facedown at that point.

1      Q.   I didn't really hear Mr. Collins say a whole

2  lot in the video?

3      A.   No.  Just he was kind of like --

4      Q.   You can hear him --

5      A.   -- grunting and being like he was trying to

6  pull away and stuff.

7      Q.   Grunting like he was -- at least that's what

8  it appeared to you; correct?

9      A.   Yes.

10     Q.   How long was he facedown?

11     A.   I couldn't tell you.

12     Q.   Did anyone have his head facedown, had his

13  hands on his head to make sure -- to the floor

14  (indicating), so he couldn't get up?

15     A.   Not that I know of.

16     Q.   Who all had their ASP out?

17     A.   I believe Office Miller had pulled his out

18  and one of the deputies.  I don't recall which one.

19     Q.   And was Miller using his ASP?

20     A.   I believe he had used it to make strikes on

21  his arm inside to get him to release his arm to get

22  him handcuffed.

23     Q.   So Miller was striking his arm?

24     A.   The best I recall, yes.

25     Q.   Would it have been the right or left?

1      A.   I don't know.

2      Q.   Was anyone else striking his arm?

3      A.   I'm sure there was a strike delivered to his

4  arms because they were trying to get control, because

5  he kept pulling his arm backs to get him handcuffed.

6  I don't who was striking where.  I was standing back

7  in the door away from them.

8      Q.   No one said, Billy, get your hands behind

9  your back, did they?

10     A.   They repeatedly give him commands to give

11  his hands so they could handcuff him.

12     Q.   But it's not on the video?  There's voice on

13  the video; correct?

14     A.   Yes, there is.

15     Q.   And on the video, do you hear those repeated

16  commands?

17     A.   I would have to listen to the video again.

18  I don't recall the exact wording or what was --

19  again, I haven't viewed the video since after the

20  incident.

21     Q.   Let's see.  Would it be your testimony that

22  you complied with the continuum use of force as that

23  policy existed back in May of 2015 as it relates to

24  Mr. Collins?

25     A.   Yes, I did.

-71-

1      Q.   And at no time would you have changed the

2  use of force as it relates to Mr. Collins during this

3  incident; correct?

4      A.   No, sir.

5      Q.   And you were the one who was in charge of

6  the situation; correct?

7      A.   You could say that, yes.

8      Q.   Now, in the department itself, was there a

9  room where he could have been left alone within the

10  police department?

11      A.   No.

12      Q.   It had doors that shut off from inside and

13  outside, though, didn't it?

14      A.   Yes.

15      Q.   And you could have locked him in there and

16  let him calm down; right?

17      A.   You could not lock that door, no.

18      Q.   Well, you could have barricaded the door?

19      A.   He could have gained access through two

20  doors to either go into City Hall or into the police

21  department where there are other weapons and things.

22      Q.   You could have barricaded those, couldn't

23  you?

24      A.   If you could gain access into City Hall, I

25  guess you could have, yes.

-72-

1      Q.  And the access to the weapons, they're

2  locked, aren't they?

3      A.  Just through closet doors.  I mean, if you

4  kick then they will come open.  And there was other

5  items that could be used as weapons, chairs,

6  staplers, scissors and things of that nature.  And he

7  also had the handcuff on his one hand that he had

8  presented in a manner that could be used as a weapon.

9  You're taught that in the Academy, if somebody gets

10  one handcuff that that's a weapon against you.

11      Q.  Was that when he was facedown?

12      A.  No, sir.  That was when he had went into the

13  foyer and was holding the door.

14      Q.  And had one handcuff on him?

15      A.  Yes, sir.

16      Q.  And whose handcuff was it?

17      A.  That was mine.

18      Q.  And that was on his right hand?

19      A.  Should have been his left hand.

20      Q.  And you got it on the left hand; right?

21      A.  Yes, sir.

22      Q.  And who helped you get it on the left hand?

23      A.  I got it on there myself.

24      Q.  And you couldn't get it on the right hand?

25      A.  No, sir.  He tensed up more and kind of

CRIGGER REPORTING SERVICE

1    leaned over more and got a better grip on the rail

2    when I was trying to get it on.

3         Q.   Who called EMS?

4         A.   I did.

5         Q.   Did anyone provide Mr. Collins CPR?

6         A.   Yes.  Members of the Louisa Fire Department.

7         Q.   Did any members of the city police provide

8    CPR?

9         A.   No.  The fire department and the fire

10   fighters were right there, and they performed.

11        Q.   Any members of the sheriff's department

12   provide CPR?

13        A.   No, sir.

14        Q.   Would you classify Mr. Collins as sort of

15   obese?

16             MR. GADANSKY: Object to the form, but

17   you can answer.

18        Q.   I mean, you've seen a picture of his belly,

19   big belly; right?

20        A.   I mean, I couldn't -- from a medical

21   standpoint, I couldn't classify he's obese.  I mean,

22   I kind of have a big belly, too.

23             MR. CURTIS:  I'm going to show you --

24   what is this, 5 or 6?

25             COURT REPORTER: 6.

—74—

CRIGGER REPORTING SERVICE

1              MR. CURTIS:  6.

2              (Said photograph was thereupon marked

3     for identification as PLAINTIFF'S EXHIBIT NO. 6 and

4     is attached hereto.)

5         Q.  I'm going to show you a picture.  Would you

6     say he's obese based on that?

7              MR. GADANSKY:  Object to the form.

8         A.  I couldn't classify that he's obese.  He's

9     got kind of a bigger belly, same as I do.

10        Q.  So you're saying that Exhibit 6, his belly

11    is the same as yours; correct?

12        A.  I didn't say exactly the same, but just --

13        Q.  You're saying your all about the same size,

14    same belly?

15             MR. GADANSKY:  I don't think he said

16    that, but.

17        Q.  So he's not obese?

18        A.  Again, I wouldn't classify somebody as

19    obese.

20        Q.  Okay.  That's fair.  Was any officer hit by

21    Billy?

22        A.  Yes, I was.

23        Q.  How many times?

24        A.  One for sure that I can recall.  He struck

25    me in the chest.  And then I remember another time he

                              —75—

1    swung at my face.

2         Q.   He tried, but he didn't connect; right?

3         A.   That time, no.

4         Q.   Did he connect with your face at all during

5    the scuffle?

6         A.   Not that I recall, no.

7         Q.   You didn't receive any medical treatment,

8    did you?

9         A.   No.  I didn't go to the hospital for

10   nothing, no.

11        Q.   Your uniform wasn't ripped, was it?

12        A.   Mine was not.  I had a small scratch on one

13   of my hands that was bleeding.  I cleaned that up

14   myself and put a Band-Aid on it.

15        Q.   Your uniform wasn't shredded and ripped, was

16   it?

17        A.   No.

18        Q.   And when he swung at you, was that after the

19   Tasers had been deployed and probes?

20        A.   No.

21        Q.   That was before?

22        A.   Yes.  That was after I tried to get the

23   handcuff on him and he pulled away and had the

24   handcuff as a weapon.  And I delivered the drive-

25   stun to his shoulder to get him to try to release the

————76————

1    rails so I could gain control of him and get him

2    completely handcuffed.

3        Q.  Did you see anyone kick Billy in the head?

4        A.  No.  Not that I know of.

5        Q.  None?

6        A.  No.

7        Q.  Who opened the back door and started tasing

8    him?

9        A.  I did.

10       Q.  It says "subject has been tased multiple

11   times"?

12       A.  I may have been relaying to dispatch that

13   the Taser had been deployed multiple times.  That may

14   have been me.

15       Q.  And keeps yelling to put your hands behind

16   your back?

17       A.  Put your hands behind your back could have

18   been any one of the officers that was trying to get

19   him handcuffed in the foyer there.

20       Q.  And around towards the end of the video,

21   towards the end, the officer is still yelling, "I'm

22   going to light you again."  Is that you?

23       A.  No, sir.  There was no statement like that

24   made towards the end.

25       Q.  And at that time Billy is unresponsive right

1    after that?

2         A.   Within the time frame after he appeared to

3    still be responsive, was making noises, appeared to

4    be breathing.  And he was sat up at some point while

5    I was cleaning my hand up.

6         Q.   Do you remember, who was the deputy that

7    stood up and closed his ASP?

8         A.   I don't know.

9         Q.   It says someone says that there's stuff

10   everywhere.  What were you all referring to, "stuff

11   everywhere"?

12        A.   I don't know who would have said that, what

13   they were referring to.  I know that there was blood

14   that was noticeable and pieces of like a whistle

15   chain, keys and such.  I know that was laying around.

16   I'm not sure who said that, what they're referring

17   to.

18        Q.   Who said, "Billy, why do you got to act like

19   that?"  Was that you?

20        A.   I made some statement like that, yes.

21        Q.   And then you said you had a nick on your

22   finger?

23        A.   Yes.  I had a place I was bleeding from.  I

24   believe it was Deputy Keefer that had pointed that

25   out to me.

—78—

1        Q.   Who said we're going to pop him again?

2        A.   I don't recall anyone saying that.

3        Q.   Isn't it true that when Wilhite arrived, he

4    came as a backup; correct?

5        A.   Yes.

6        Q.   And you and Miller and Deputy Keefer were at

7    the door of the police department trying to gain

8    entry due to Billy being inside the foyer of the

9    police department, barricading himself; correct?

10       A.   He would have arrived sometime during when

11   all of that was going on, yes.

12       Q.   Was Billy in the foyer?

13       A.   I don't recall exact times that Deputy

14   Wilhite pulled in.  But at one point, yes, Billy did

15   end up in the foyer.

16       Q.   And he was barricading himself against the

17   door; correct?

18       A.   Yes.  He was standing one hand against the

19   door, and two of us trying to push it open and

20   couldn't get it open.

21       Q.   Now, is there another entry to the foyer

22   besides the one that he was trying to keep you all

23   from gaining entry to?

24       A.   There's a doorway that leads into City Hall,

25   which goes through locked doors that we don't have

1   access to, and then through the police department

2   itself.

3         Q.   And Billy wouldn't have access to them

4   either, would he?

5               MR. GADANSKY:   Object to the form.

6         A.   He could have kicked it opened.

7               MR. GADANSKY:   All right.   Go ahead.

8         Q.   You could have kicked it open; right?

9         A.   Yes.   I mean, gain entry illegally by

10   kicking it open, but as far as --

11         Q.   You'd be gaining entry illegally?

12         A.   We don't have access to City Hall, is what I

13   was saying, through the other doors to get to that

14   door.

15         Q.   Now, Wilhite said that as he approached the

16   doorway, he could see that Billy already been hit

17   with the Taser; correct?

18         A.   I can't testify to what he said or seen.

19         Q.   What was the other door of the police

20   department that you gained access to?

21         A.   That was the actual door into the police

22   department.

23         Q.   And that was behind Mr. Collins; correct?

24         A.   Yes.

25         Q.   And then that's when you deployed your Taser

 1    to the back of Mr. Collins; correct?

 2         A.   Once I came through and opened that door,

 3    yes.  He was still holding the other door and

 4    beating, hitting, punching the glass, being

 5    aggressive towards the other officers.

 6         Q.   And this allowed the other officers access

 7    to the doorway; correct?

 8         A.   Yes, sir.

 9         Q.   Did you see Billy push any officers?

10         A.   From my angle I couldn't, no.

11         Q.   How big of a space were you all in?

12         A.   I'd say it's approximately four foot by six

13    or seven foot.  Just a rough guess.

14         Q.   And there's four officers and the subject in

15    that area; correct?

16         A.   Just three officers.  I stayed actually in

17    the police department itself in the doorway.

18         Q.   So there's three officers and the suspect in

19    that area, and the three officers can't gain control

20    of the suspect in that area?

21         A.   Not at that point.  He kept pulling away

22    from them, and they were trying to get his hands back

23    to handcuff him.

24         Q.   All you had to do was takes his knees out

25    from under him to the floor, pop down on him?

1          MR. GADANSKY:  Is that a question?

2     Q.  Wouldn't you agree with that?

3     A.  There would be many different ways.  They

4 did end up taking him down.  But he was resisting

5 getting handcuffed.

6     Q.  I remember that from my training in the

7 military.  Take his knees out, he's down.  One

8 officer gets on his back, the other officer gets his

9 arms.  Very simple, isn't it?

10    A.  I wasn't taught to take someone's knees out,

11 but they got him down to the floor in the process of

12 coming through the door and getting hands on him,

13 trying to handcuff him.

14    Q.  Have you ever been taught to use an ASP to

15 take the knees out from a subject?

16    A.  No, sir.  Not the knees, no.  You hit them

17 in the thigh part of the leg.

18    Q.  Back of the knees?

19    A.  The thigh.  In the thigh of their leg.

20    Q.  The thigh?

21    A.  Yes.

22    Q.  Hit them in the thigh.  That wasn't done,

23 was it?

24    A.  Not that I recall, no.

25    Q.  Could have been done?

—82—

1   A. In that close of quarters, I don't --

2   Q. When he was on the floor, you didn't see

3 anyone kick him in the head?

4   A. No, sir.

5   Q. Didn't see any ASP being deployed on him;

6 correct?

7   A. I didn't see officer with their ASP out.  I

8 remember specifically one striking his arm trying to

9 get his arm to release, giving him commands.

10   Q. And that was Miller; correct?

11   A. Yes, sir.

12   Q. You were a sergeant at that time; correct?

13   A. Yes.

14   Q. When did you get promoted?

15   A. Let's see.  End of 2013, I believe it was.

16   Q. Are you second in command?

17   A. Not exactly.  Just the next rank, I guess.

18 We just have chief and then sergeants.

19   Q. So you would be number two; correct?

20   A. In some instances.  If the other sergeant

21 wasn't there, there's a senior sergeant.

22   Q. Who is the Senior Sergeant?

23   A. Ed Cordel.

24     MR. CURTIS:  I think that does it?

25     MR. GADANSKY: Any questions?

—83—

CRIGGER REPORTING SERVICE

1              MR. CONLEY:   No questions.

2              MR. GADANSKY:   No questions.

3              (This concludes the testimony of

4    Officer Stephen Wilburn.)

5                    *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                        .

25

————84————

```
 1                    REPORTER'S CERTIFICATE

 2

 3     COMMONWEALTH OF KENTUCKY)

 4     COUNTY OF LAWRENCE)

 5          I, Angela F. Crigger, a Court Reporter and

 6     Notary Public in and for the State of Kentucky At

 7     Large, do hereby certify that the foregoing

 8     deposition of STEPHEN WILBURN was taken before me at

 9     the time and place and for the purposes in the

10     caption stated; that the witness was first duly sworn

11     by me to tell the truth, the whole truth and nothing

12     but the truth; that the deposition was recorded

13     stenographically by me in the presence of the

14     witness; that the foregoing is a full, true and

15     correct transcript of the deposition so given to the

16     best of my ability; that there was no request that

17     the witness read and sign the deposition; that the

18     appearances were as stated in the caption.

19          I further certify that my Commission as Notary

20     Public will expire June 2nd, 2018.

21          GIVEN UNDER MY HAND, this the 17th day of March,

22     2017.

23                    _____

24                    KENTUCKY NOTARY PUBLIC,
                       STATE AT LARGE
25                    NOTARY ID: 511182
```

—85—

CRIGGER REPORTING SERVICE





PLAINTIFF'S
EXHIBIT
3-7-17   No. 1





PLAINTIFF'S
EXHIBIT
No. 2
3-7-17





PLAINTIFF'S
EXHIBIT
No. 3
37-17    a7c





PLAINTIFF'S
EXHIBIT

37-17  No 4 a7c





PLAINTIFF'S
EXHIBIT

No 5

3-7-17   97C

'

'09 [1] - 68:1

**0**

04 [1] - 3:5
0:16-cv-00068-HRW
[1] - 1:7

**1**

1 [4] - 3:8, 62:15,
62:17, 63:20
10 [2] - 55:5, 55:6
1035 [1] - 1:22
110 [2] - 1:13, 2:15
1212 [1] - 2:6
1455 [1] - 2:6
15 [2] - 55:5, 55:6
16 [1] - 20:10
1767 [1] - 2:12
17th [1] - 85:21
18 [3] - 6:10, 14:19,
14:21
1986 [1] - 4:24
1:00 [1] - 1:12

**2**

2 [5] - 3:8, 25:23, 63:7,
63:9, 63:20
2005 [2] - 6:19, 6:24
2008 [9] - 10:25, 11:2,
12:5, 12:25, 13:18,
18:24, 20:1, 42:9,
67:25
2009 [7] - 11:9, 12:6,
13:19, 18:21, 18:24,
20:1, 20:5
2010 [5] - 18:13,
18:15, 18:21, 20:5,
32:15
2011 [12] - 12:2, 12:3,
12:13, 12:19, 20:2,
20:15, 21:2, 22:16,
24:12, 27:5, 27:8,
42:25
2012 [7] - 18:17,
20:16, 24:12, 39:12,
39:13, 39:17, 41:5
2013 [4] - 18:14,
18:15, 32:15, 83:15
2014 [2] - 24:21, 25:12
2015 [10] - 24:22, 25:1,
25:4, 25:12, 26:16,
30:25, 41:9, 42:5,

68:19, 71:23
2017 [3] - 1:12, 11:3,
85:22
2018 [1] - 85:20
202 [1] - 36:23
23 [1] - 51:22
23rd [1] - 4:24
24-hour [1] - 20:11
2nd [1] - 85:20

**3**

3 [3] - 3:9, 64:4, 64:7
30 [2] - 9:15, 9:16
304 [1] - 1:23
32 [2] - 9:15, 9:16
322 [1] - 47:21
393-4320 [1] - 1:23

**4**

4 [3] - 3:9, 64:22,
64:25
40 [5] - 20:4, 20:8,
20:9, 21:5, 21:7
40222 [1] - 2:15
41101 [1] - 2:7
41240-1448 [1] - 2:12
41267 [1] - 1:22

**5**

5 [3] - 3:10, 65:22,
74:24
511182 [1] - 85:24
523 [1] - 47:13

**6**

6 [6] - 3:10, 74:24,
74:25, 75:1, 75:3,
75:10
62 [1] - 3:8
63 [1] - 3:8
64 [2] - 3:9, 3:9
65 [1] - 3:10
6th [1] - 2:6

**7**

75 [1] - 3:10
7th [1] - 1:12

**8**

826 [1] - 47:15

85 [1] - 3:12
8th [2] - 39:12, 39:17

**9**

911 [1] - 7:14
9300 [1] - 2:15

**A**

ability [1] - 85:16
Academy [12] - 7:24,
7:25, 13:15, 14:25,
15:2, 18:21, 19:4,
19:18, 19:20, 67:24,
67:25, 73:9
ACC [3] - 8:24, 9:1,
9:4
acceptable [2] - 28:6,
28:24
access [8] - 72:19,
72:24, 73:1, 80:1,
80:3, 80:12, 80:20,
81:6
according [1] - 69:10
Act [2] - 67:20, 68:9
act [3] - 34:2, 34:5,
78:18
acting [1] - 40:11
ACTION [1] - 1:7
actions [1] - 45:19
activation [1] - 58:14
activities [1] - 6:22
actual [1] - 80:21
Adam [2] - 24:2, 24:11
Adams [1] - 1:13
addict [1] - 50:23
Adkins [1] - 42:10
administered [2] -
13:5, 67:23
administering [2] -
55:8, 56:20
ADMINISTRATOR [1]
- 1:5
agencies [1] - 19:9
agency [2] - 30:5, 68:5
aggressive [3] -
40:10, 40:20, 81:5
agility [1] - 13:3
agitate [1] - 15:15
agitated [8] - 27:16,
27:19, 40:12, 40:14,
41:18, 56:8, 57:21,
59:19
agree [8] - 27:15,
27:18, 28:1, 60:19,
60:24, 61:8, 61:12,
82:2

agreed [1] - 57:23
ahead [1] - 80:7
ahold [2] - 58:25, 60:9
Aid [1] - 76:14
aid [1] - 14:14
aim [1] - 26:12
AL [1] - 1:8
alcohol [3] - 50:21,
53:6, 53:23
allowed [1] - 81:6
almost [1] - 11:3
alone [1] - 72:9
altercation [1] - 63:24
Americans [2] - 67:19,
68:8
Angela [2] - 1:13, 85:5
ANGELA [1] - 1:21
angle [1] - 81:10
angled [1] - 48:12
answer [8] - 4:14,
4:19, 22:24, 27:22,
33:22, 56:24, 63:25,
74:17
apartment [2] - 17:23,
18:4
apartments [4] -
32:15, 33:24, 41:5,
44:21
appear [1] - 64:9
appearances [1] -
85:18
appeared [5] - 1:14,
61:24, 70:8, 78:2,
78:3
apprehensive [1] -
52:13
approach [7] - 16:6,
16:7, 16:8, 48:6,
49:9, 49:12, 49:17
approached [2] -
48:14, 80:15
approaching [1] -
48:10
appropriately [2] -
67:21, 68:9
April [7] - 10:25, 11:2,
12:5, 12:25, 20:1,
25:10
area [8] - 26:11, 32:16,
34:15, 65:3, 65:14,
81:15, 81:19, 81:20
argument [4] - 33:4,
33:5, 33:20, 33:23
arm [10] - 64:5, 64:15,
65:20, 70:21, 70:23,
71:2, 71:5, 83:8,
83:9
arms [6] - 50:24, 51:1,
58:6, 66:6, 71:4,
82:9

Army [1] - 8:16
arrest [9] - 35:23,
41:20, 50:3, 50:4,
50:5, 55:10, 55:13,
55:16, 57:2
arrested [6] - 40:5,
41:12, 41:15, 41:22,
50:8, 55:16
arrived [2] - 79:3,
79:10
articulable [2] - 17:3,
17:6
ASHLAND [1] - 1:2
Ashland [3] - 2:7, 7:3,
13:9
ASP [11] - 15:4, 15:7,
31:23, 32:1, 32:3,
70:16, 70:19, 78:7,
82:14, 83:5, 83:7
assault [5] - 36:2,
36:4, 37:12, 37:20,
40:5
assaults [1] - 38:3
assuming [1] - 65:7
AT [1] - 85:24
attached [6] - 62:18,
63:10, 64:8, 65:1,
65:23, 75:4
attempted [2] - 59:24,
69:22
attempts [1] - 52:22
attention [3] - 30:8,
30:10, 30:15
attest [1] - 56:19
Attorney [4] - 37:5,
37:10, 42:17, 42:20
August [10] - 11:9,
11:10, 12:6, 13:18,
13:20, 14:4, 18:21,
18:24, 20:1
autopsy [1] - 61:16
Ave [1] - 2:6
avoid [1] - 26:11
awards [1] - 19:4
aware [3] - 36:25,
37:8, 38:21

**B**

backs [1] - 71:5
backup [3] - 15:14,
36:7, 79:4
balance [1] - 54:22
BALDWIN [1] - 2:11
Band [1] - 76:14
Band-Aid [1] - 76:14
banging [1] - 40:10
banister [2] - 59:22,
60:10

1

**BANKS** [1] - 2:11
**barricaded** [2] - 72:18, 72:22
**barricading** [2] - 79:9, 79:16
**baseball** [2] - 46:18, 52:8
**based** [3] - 23:13, 54:17, 75:6
**basis** [2] - 21:23, 68:17
**Bath** [1] - 2:6
**baton** [1] - 15:7
**beating** [1] - 81:4
**become** [1] - 16:3
**beer** [3] - 53:12, 53:15, 53:18
**began** [2] - 59:1, 59:18
**beginning** [1] - 1:12
**Behalf** [2] - 2:4, 2:10
**behind** [8] - 49:3, 49:7, 50:13, 69:19, 71:8, 77:15, 77:17, 80:23
**belly** [6] - 74:18, 74:19, 74:22, 75:9, 75:10, 75:14
**belong** [1] - 19:6
**best** [8] - 25:7, 36:8, 41:11, 48:17, 51:2, 60:20, 70:24, 85:16
**better** [1] - 74:1
**between** [4] - 6:7, 25:23, 33:23, 46:18
**big** [3] - 74:19, 74:22, 81:11
**bigger** [1] - 75:9
**bill** [1] - 43:17
**BILLY** [2] - 1:4, 1:5
**Billy** [24] - 17:17, 17:18, 18:18, 37:10, 38:18, 40:5, 41:5, 41:9, 41:18, 43:24, 44:16, 52:10, 59:10, 71:8, 75:21, 77:3, 77:25, 78:18, 79:8, 79:12, 79:14, 80:3, 80:16, 81:9
**birth** [2] - 4:23, 4:25
**blacktop** [2] - 49:7, 51:8
**bleeding** [2] - 76:13, 78:23
**block** [1] - 15:6
**blocks** [2] - 14:20, 67:23
**blood** [1] - 78:13
**blue** [3] - 49:1, 65:6
**body** [9] - 23:18,

23:20, 23:22, 27:12, 58:11, 58:13, 58:18, 59:4, 65:15
**book** [1] - 39:3
**boss** [2] - 9:7, 37:16
**Bosse** [1] - 66:10
**BOSSE** [1] - 66:11
**bottles** [2] - 53:13, 53:19
**Boulevard** [1] - 18:9
**bourbon** [1] - 53:13
**BOX** [1] - 1:22
**Box** [1] - 2:6
**Boyd** [1] - 13:9
**break** [1] - 59:7
**breathing** [2] - 69:14, 78:4
**briefly** [3] - 56:16, 57:9, 59:8
**broke** [1] - 20:10
**bruises** [4] - 62:3, 62:13, 64:19, 65:25
**bruising** [7] - 62:12, 62:21, 63:4, 63:13, 63:16, 64:11, 64:15
**bucket** [1] - 53:15
**Bulldog** [1] - 46:17, 51:19, 51:21, 51:24, 52:5
**bus** [2] - 46:18, 52:8
**button** [1] - 58:19
**BY** [1] - 4:5

## C

**CAD** [2] - 47:6, 47:9
**calm** [6] - 15:20, 60:25, 61:1, 61:2, 61:14, 72:16
**cam** [7] - 23:18, 23:20, 23:22, 58:11, 58:13, 58:18, 59:4
**cans** [2] - 53:12, 53:18
**caption** [2] - 85:10, 85:18
**captured** [1] - 47:6
**car** [6] - 57:22, 57:23, 57:24, 58:9, 59:17, 59:20
**care** [1] - 30:6
**Carter** [4] - 7:18, 24:9, 66:24, 67:6
**cartridge** [5] - 29:12, 29:13, 29:17, 29:20, 29:22
**case** [4] - 5:7, 23:8, 37:20, 42:16
**cases** [3] - 42:17, 42:20, 42:22

**caused** [1] - 66:4
**causes** [1] - 1:15
**Center** [2] - 39:5, 39:22
**certificate** [5] - 8:2, 8:3, 14:2, 19:1, 19:16
**CERTIFICATE** [1] - 85:1
**Certificate** [1] - 3:12
**certification** [2] - 8:8, 14:2
**certified** [4] - 8:4, 8:5, 9:2, 19:9
**certify** [2] - 85:7, 85:19
**chain** [1] - 78:15
**chairs** [1] - 73:5
**challenging** [1] - 20:25
**changed** [3] - 23:12, 27:7, 72:1
**changes** [1] - 20:19
**charge** [7] - 32:7, 35:25, 37:12, 38:11, 55:1, 55:22, 72:5
**charged** [2] - 36:2, 55:21
**charges** [1] - 36:5
**check** [2] - 30:21, 48:4
**checked** [1] - 30:18
**chest** [2] - 26:11, 75:25
**Chief** [7] - 43:20, 43:21, 46:16, 47:25, 56:18, 57:4, 66:10
**chief** [11] - 21:17, 22:9, 24:2, 42:9, 42:23, 43:1, 43:3, 56:15, 69:3, 69:4, 83:18
**children** [2] - 6:1, 45:2
**Chris** [2] - 2:14, 66:24
**circumstances** [1] - 56:1
**citation** [3] - 55:25, 56:3, 56:4
**cite** [2] - 50:3, 50:6
**citing** [1] - 50:9
**city** [3] - 42:8, 50:14, 74:7
**City** [15] - 9:24, 10:20, 11:3, 12:6, 23:21, 25:20, 26:15, 30:5, 35:15, 67:3, 68:8, 72:20, 72:24, 79:24, 80:12
**Civil** [1] - 1:17
**class** [3] - 20:10, 20:11

**classes** [3] - 9:23, 14:11, 44:11
**classify** [4] - 74:14, 74:21, 75:8, 75:18
**classroom** [1] - 14:7
**cleaned** [1] - 76:13
**cleaning** [1] - 78:5
**close** [2] - 17:23, 83:1
**closed** [1] - 78:7
**closet** [1] - 73:3
**clue** [3] - 54:16, 54:17, 54:20
**co** [3] - 8:17, 8:22, 9:21
**co-op** [3] - 8:17, 8:22, 9:21
**code** [1] - 20:18
**coffee** [6] - 18:18, 34:13, 35:8, 35:11, 39:6, 39:18
**collective** [1] - 15:21
**College** [1] - 7:4
**COLLINS** [3] - 1:4, 1:5
**Collins** [31] - 17:17, 17:18, 24:25, 27:16, 28:2, 30:25, 31:24, 32:16, 32:19, 33:23, 37:10, 39:2, 41:10, 44:4, 44:16, 46:4, 46:6, 46:11, 48:15, 50:12, 56:12, 57:13, 58:22, 69:16, 70:1, 71:24, 72:2, 74:5, 74:14, 80:23, 81:1
**Collins'** [10] - 21:2, 22:17, 23:8, 24:15, 24:19, 29:21, 44:6, 46:19, 62:19, 63:12
**combative** [1] - 16:3
**coming** [2] - 52:5, 82:12
**command** [1] - 83:16
**commands** [4] - 60:17, 71:10, 71:16, 83:9
**Commission** [1] - 85:19
**committed** [1] - 38:24
**Commonwealth** [3] - 1:14, 42:16, 42:19
**COMMONWEALTH** [1] - 85:3
**Community** [1] - 7:3
**Company** [3] - 11:15, 11:16, 11:19
**company** [1] - 12:22
**complaints** [6] - 10:16, 10:18, 43:6, 43:12, 43:19, 46:10
**completed** [1] - 55:13

**completely** [1] - 77:2
**completion** [2] - 8:3, 14:3
**complex** [2] - 17:24, 18:4
**compliance** [1] - 31:4
**complied** [1] - 71:22
**comply** [1] - 17:1
**computers** [1] - 7:22
**concerns** [1] - 44:4
**concludes** [1] - 84:3
**conduct** [3] - 21:16, 36:6, 50:19
**conducted** [1] - 51:7
**conducting** [1] - 51:4
**conductor** [1] - 25:24
**confronting** [1] - 56:12
**confused** [1] - 19:24
**Conley** [1] - 2:11
**CONLEY** [3] - 18:6, 39:15, 84:1
**connect** [2] - 76:2, 76:4
**considered** [1] - 46:17
**constitutional** [1] - 20:18
**constricted** [1] - 54:14
**contact** [5] - 44:23, 45:1, 46:13, 46:15, 57:3
**continuum** [3] - 16:11, 16:14, 71:22
**control** [7] - 16:4, 16:20, 34:23, 69:20, 71:4, 77:1, 81:19
**conversation** [4] - 55:9, 57:4, 57:5, 57:10
**conversations** [2] - 32:24, 38:17
**cool** [1] - 15:20
**cooperate** [1] - 57:22
**coordinator** [1] - 7:16
**copy** [4] - 26:22, 31:18, 56:2, 69:6
**Cordel** [1] - 83:23
**Corps** [2] - 8:16, 9:8
**correct** [103] - 5:4, 7:1, 10:2, 10:5, 10:13, 10:20, 10:21, 11:1, 12:11, 12:12, 12:22, 12:23, 13:23, 13:24, 14:6, 15:25, 17:4, 17:5, 17:15, 17:21, 18:2, 18:15, 19:1, 20:3, 22:21, 23:16, 25:20, 26:5, 27:20, 29:3, 29:18, 31:11, 31:12, 31:21, 32:6,

2

32:10, 32:16, 33:24, 33:25, 34:3, 34:5, 34:6, 34:10, 35:5, 35:15, 35:21, 35:22, 37:21, 40:14, 45:25, 46:2, 46:4, 46:6, 46:13, 47:7, 47:23, 48:1, 48:2, 48:4, 49:3, 49:10, 50:7, 50:9, 51:1, 51:19, 52:20, 54:15, 56:5, 57:8, 58:7, 59:11, 59:12, 59:14, 60:15, 60:20, 60:25, 61:6, 61:9, 61:11, 62:3, 63:4, 63:19, 64:5, 69:13, 69:14, 70:8, 71:13, 72:3, 72:6, 75:11, 79:4, 79:9, 79:17, 80:17, 80:23, 81:1, 81:7, 81:15, 83:6, 83:10, 83:12, 83:19, 85:15
**Council** [3] - 19:13, 19:15, 19:17
**Counsel** [1] - 1:16
**County** [9] - 6:14, 6:17, 7:13, 13:9, 24:9, 25:18, 37:5, 37:10, 39:4
**COUNTY** [1] - 85:4
**county** [1] - 7:17
**couple** [3] - 11:14, 11:21, 24:20
**course** [2] - 16:17, 20:17
**COURT** [2] - 1:1, 74:25
**Court** [1] - 85:5
**courteous** [1] - 45:9
**cousins** [1] - 5:9
**CPR** [3] - 74:5, 74:8, 74:12
**CRIGGER** [1] - 1:21
**Crigger** [2] - 1:13, 85:5
**Criminal** [3] - 7:23, 13:6, 19:10
**Crum** [2] - 24:2, 24:11
**cursing** [1] - 59:18
**Curtis** [3] - 2:5, 3:5, 59:9
**CURTIS** [20] - 2:5, 4:5, 5:7, 5:11, 5:16, 26:22, 31:17, 39:17, 39:20, 40:1, 47:9, 56:2, 59:6, 62:8, 62:14, 64:13, 69:6, 74:23, 75:1, 83:24
**cuss** [1] - 41:3

**cussing** [5] - 40:24, 41:1, 55:18, 58:10, 59:23

# D

**dark** [3] - 42:4, 64:14, 66:1
**darkness** [1] - 63:14
**date** [6] - 4:23, 10:24, 20:5, 24:24, 25:2, 39:14
**daughters** [1] - 44:8
**deal** [1] - 15:8
**dealing** [5] - 10:12, 15:23, 17:15, 20:24, 68:16
**death** [13] - 17:18, 17:19, 18:2, 21:2, 22:17, 24:16, 24:19, 25:3, 27:12, 41:8, 44:14, 45:2, 45:24
**December** [3] - 39:12, 39:17, 41:4
**decide** [1] - 58:24
**defend** [1] - 23:4
**Defendants** [2] - 1:9, 2:10
**defensive** [5] - 22:22, 22:25, 23:11, 23:14, 23:16
**degree** [1] - 13:25
**delivered** [3] - 60:6, 71:3, 76:24
**Department** [6] - 7:23, 13:6, 19:10, 24:3, 25:17, 74:6
**department** [22] - 11:25, 12:1, 12:18, 21:13, 36:12, 37:6, 38:18, 39:8, 40:10, 42:22, 50:14, 72:8, 72:10, 72:21, 74:9, 74:11, 79:7, 79:9, 80:1, 80:20, 80:22, 81:17
**departmental** [3] - 21:10, 21:11, 21:16
**deploy** [3] - 26:9, 28:12, 30:9
**deployed** [12] - 28:10, 29:5, 29:8, 30:14, 31:3, 31:5, 60:15, 65:12, 76:19, 77:13, 80:25, 83:5
**deployment** [3] - 26:15, 28:5, 30:7
**deployments** [1] - 28:2

**DEPOSITION** [1] - 1:11
**deposition** [7] - 1:15, 1:16, 4:8, 85:8, 85:12, 85:15, 85:17
**deputies** [2] - 32:5, 70:18
**Deputy** [6] - 41:23, 41:24, 56:16, 78:24, 79:6, 79:13
**deputy** [2] - 41:25, 78:6
**describe** [1] - 62:5
**described** [1] - 60:8
**desk** [2] - 40:11, 40:21
**detain** [1] - 16:20
**Detective** [2] - 66:24, 67:6
**Detention** [1] - 39:5
**differences** [1] - 25:23
**different** [10] - 9:22, 9:23, 14:12, 14:20, 15:10, 22:14, 25:23, 45:6, 68:18, 82:3
**differently** [2] - 34:3, 45:17
**Direct** [1] - 3:5
**DIRECT** [1] - 4:4
**Disabilities** [1] - 68:8
**Disability** [1] - 67:20
**discharge** [2] - 29:11, 29:12
**discharges** [4] - 29:9, 29:18, 29:20, 29:23
**discovery** [2] - 1:17, 26:25
**discuss** [1] - 69:1
**discussions** [2] - 38:7, 38:10
**dismissed** [2] - 37:13, 38:11
**disorderly** [5] - 36:6, 40:6, 55:21, 55:22, 56:4
**dispatch** [1] - 77:12
**distinguished** [1] - 8:4
**distribution** [1] - 11:13
**DISTRICT** [2] - 1:1, 1:1
**disturbed** [4] - 15:24, 67:21, 68:10, 68:14
**ditch** [4] - 46:19, 46:22, 47:23, 48:1
**DIVISION** [1] - 1:2
**doctors** [2] - 51:25, 52:6
**documented** [1] - 22:6
**documenting** [1] - 22:1
**dodge** [1] - 17:11

**done** [7] - 25:13, 45:17, 45:20, 61:4, 68:17, 82:22, 82:25
**door** [15] - 59:22, 71:7, 72:17, 72:18, 73:13, 77:7, 79:7, 79:17, 79:19, 80:14, 80:19, 80:21, 81:2, 81:3, 82:12
**doors** [5] - 72:12, 72:20, 73:3, 79:25, 80:13
**doorway** [4] - 79:24, 80:16, 81:7, 81:17
**down** [14] - 46:16, 46:25, 47:22, 48:4, 52:7, 58:20, 58:21, 69:16, 69:22, 72:16, 81:25, 82:4, 82:7, 82:11
**Drawer** [1] - 2:12
**drawn** [2] - 49:13, 49:15
**dressed** [1] - 48:24
**drew** [2] - 59:14, 60:11
**drive** [2] - 60:6, 76:24
**drive-stun** [1] - 60:6
**driver's** [2] - 48:18, 48:20
**driving** [2] - 14:13, 56:17
**drug** [1] - 50:23
**due** [2] - 56:1, 79:8
**DUI** [3] - 41:12, 41:15, 55:1
**duly** [3] - 1:15, 4:2, 85:10
**during** [16] - 9:13, 20:5, 20:16, 20:23, 23:23, 28:9, 29:21, 38:19, 39:6, 46:7, 55:17, 57:3, 63:24, 72:2, 76:4, 79:10

# E

**East** [1] - 1:13
**Eastern** [2] - 13:8, 13:23
**EASTERN** [2] - 1:1, 1:2
**Ed** [1] - 83:23
**effect** [7] - 8:8, 26:14, 27:3, 42:18, 43:11, 43:15, 68:19
**effects** [1] - 27:11
**eight** [2] - 14:9, 14:10
**either** [6] - 10:25, 11:2, 21:17, 22:9,

72:20, 80:4
**Eldred** [1] - 1:12
**electric** [1] - 25:24
**elementary** [1] - 6:15
**Elementary** [1] - 6:16
**emergency** [1] - 44:24
**emotionally** [3] - 67:21, 68:10, 68:14
**employed** [2] - 8:10, 25:16
**employment** [1] - 13:1
**empty** [2] - 16:19, 53:18
**EMS** [4] - 30:19, 30:21, 30:22, 74:3
**enables** [1] - 67:20
**encounter** [1] - 32:18
**encountering** [1] - 68:15
**end** [7] - 25:11, 77:20, 77:21, 77:24, 79:15, 82:4, 83:15
**ended** [1] - 49:20
**Enforcement** [3] - 19:13, 19:15, 19:17
**Engineers** [1] - 8:17
**entry** [5] - 79:8, 79:21, 79:23, 80:9, 80:11
**equilibrium** [1] - 54:21
**escalate** [1] - 59:3
**Esq** [3] - 2:5, 2:11, 2:14
**ESTATE** [1] - 1:4
**ET** [1] - 1:8
**evaluated** [1] - 10:4
**evaluations** [3] - 10:7, 10:9, 10:12
**evening** [2] - 42:3, 45:23
**eventually** [2] - 52:14, 58:8
**everywhere** [2] - 78:10, 78:11
**evidence** [1] - 60:20
**ex** [1] - 45:4
**ex-wife** [1] - 45:4
**exact** [8] - 15:5, 25:1, 27:25, 31:15, 39:14, 55:4, 71:18, 79:13
**exactly** [8] - 7:18, 25:5, 25:9, 41:14, 52:3, 60:22, 75:12, 83:17
**EXAMINATION** [2] - 3:3, 4:4
**Examination** [1] - 3:5
**examined** [1] - 4:2
**excite** [2] - 61:9, 61:13
**Exhibit** [12] - 3:8, 3:8, 3:9, 3:9, 3:10, 3:10,

3

62:15, 63:7, 63:20,
64:4, 75:10
**EXHIBIT** [6] - 62:17,
63:9, 64:7, 64:25,
65:22, 75:3
**EXHIBITS** [1] - 3:7
**exist** [1] - 25:23
**existed** [1] - 71:23
**expert** [1] - 66:10
**expire** [1] - 85:20
**extent** [1] - 62:7
**eye** [5] - 54:7, 61:20,
62:22, 62:23, 62:25

## F

**F-R-I-N-T** [1] - 24:7
**face** [8] - 26:13, 62:19,
62:20, 63:12, 69:16,
69:22, 76:1, 76:4
**facedown** [4] - 69:25,
70:10, 70:12, 73:11
**fact** [3] - 17:21, 34:23,
38:9
**factors** [1] - 62:11
**fair** [3] - 30:15, 69:11,
75:20
**fairly** [2] - 51:15, 51:16
**family** [2] - 5:2, 44:6
**far** [2] - 16:15, 80:10
**February** [1] - 25:10
**federal** [1] - 8:18
**Federal** [1] - 1:17
**felt** [1] - 59:2
**few** [4] - 32:14, 41:16,
44:11
**field** [11] - 46:18,
50:19, 51:4, 51:6,
52:8, 52:11, 52:16,
54:1, 55:9, 55:12,
56:20
**fight** [2] - 33:7, 40:11
**fighters** [1] - 74:10
**figure** [1] - 16:9
**file** [1] - 31:20
**filed** [2] - 31:13, 37:1
**fill** [1] - 22:7
**filled** [3] - 55:25, 56:4,
66:12
**finally** [1] - 59:19
**fine** [1] - 5:13
**finger** [1] - 78:22
**fire** [5] - 7:6, 26:10,
52:8, 74:9
**Fire** [1] - 74:6
**first** [12] - 1:15, 4:2,
5:8, 13:18, 14:14,
17:2, 20:15, 25:12,
32:18, 58:8, 60:14,

85:10
**First** [1] - 7:13
**five** [2] - 6:4, 6:5,
29:17
**floor** [5] - 69:21,
70:13, 81:25, 82:11,
83:2
**Floor** [1] - 2:6
**flowing** [1] - 46:24
**folder** [1] - 22:8
**follows** [1] - 4:3
**foot** [2] - 81:12, 81:13
**force** [13] - 14:13,
14:15, 14:16, 16:1,
16:11, 16:14, 20:22,
21:3, 21:14, 22:3,
22:5, 71:22, 72:2
**foregoing** [2] - 85:7,
85:14
**form** [9] - 22:23,
27:21, 38:2, 56:9,
56:22, 63:22, 74:16,
75:7, 80:5
**forth** [1] - 1:16
**forty** [2] - 19:21, 19:22
**forty-hour** [1] - 19:21
**four** [7] - 7:24, 9:5,
14:18, 21:21, 37:13,
81:12, 81:14
**fourth** [3] - 36:2, 36:4,
40:6
**foyer** [6] - 73:13,
77:19, 79:8, 79:12,
79:15, 79:21
**frame** [1] - 78:2
**frames** [1] - 41:7
**Frenchie** [1] - 39:16
**Friday** [1] - 14:5
**Frint** [3] - 24:4, 24:15,
25:13
**frint** [1] - 24:7
**front** [2] - 33:16, 57:24
**Fugitt** [6] - 43:2,
46:16, 47:3, 47:25,
56:15, 56:18
**Fugitt's** [1] - 47:14
**full** [8] - 8:20, 9:14,
11:20, 12:14, 12:15,
12:21, 27:5, 85:14
**furnish** [1] - 31:17
**furnished** [2] - 22:12,
23:20
**furnishes** [1] - 69:2

## G

**Gadansky** [1] - 2:14
**GADANSKY** [28] -
5:10, 5:13, 5:17,

22:23, 26:24, 27:21,
28:17, 31:19, 38:2,
39:18, 39:23, 47:11,
56:9, 56:22, 61:12,
62:6, 62:9, 63:22,
64:12, 69:8, 74:16,
75:7, 75:15, 80:5,
80:7, 82:1, 83:25,
84:2
**gain** [7] - 31:3, 69:20,
72:24, 77:1, 79:7,
80:9, 81:19
**gained** [2] - 72:19,
80:20
**gaining** [2] - 79:23,
80:11
**garage** [2] - 46:18,
52:8
**Gene** [1] - 18:9
**general** [1] - 32:16
**given** [5] - 4:8, 4:15,
45:22, 45:23, 85:15
**GIVEN** [1] - 85:21
**glass** [1] - 81:4
**God** [1] - 40:22
**grabbed** [2] - 58:25,
59:22
**grabs** [1] - 60:9
**graduate** [3] - 6:18,
7:7, 8:4
**graduated** [4] - 6:24,
7:2, 18:25, 19:18
**graduation** [3] -
45:24, 46:2, 46:7
**grand** [1] - 42:18
**grass** [1] - 49:8
**Greg** [1] - 43:2
**grip** [1] - 74:1
**group** [1] - 69:1
**grunting** [2] - 70:5,
70:7
**guess** [11] - 6:10,
17:13, 23:12, 25:7,
42:21, 43:16, 44:17,
46:17, 72:25, 81:13,
83:17
**gun** [1] - 49:13
**guy** [2] - 17:10, 24:14

## H

**half** [2] - 11:21, 14:25
**halfway** [1] - 53:25
**Hall** [6] - 35:15, 67:3,
72:20, 72:24, 79:24,
80:12
**hallucinated** [1] -
34:10
**hallucinating** [1] -

34:8, 34:12
**hand** [11] - 16:20,
59:1, 64:4, 73:7,
73:18, 73:19, 73:20,
73:22, 73:24, 78:5,
79:18
**HAND** [1] - 85:21
**handcuff** [16] - 50:13,
57:17, 57:22, 59:24,
59:25, 69:21, 69:23,
71:11, 73:7, 73:10,
73:14, 73:16, 76:23,
76:24, 81:23, 82:13
**handcuffed** [7] -
69:18, 69:25, 70:22,
71:5, 77:2, 77:19,
82:5
**handcuffs** [1] - 40:8
**handicapped** [2] -
15:9, 16:6
**handles** [1] - 43:19
**handrail** [1] - 58:7
**hands** [11] - 48:22,
50:12, 66:7, 70:13,
71:8, 71:11, 76:13,
77:15, 77:17, 81:22,
82:12
**hard** [1] - 69:14
**Hardware** [1] - 11:12
**hardware** [1] - 12:9
**harm** [1] - 27:11
**Hasson** [1] - 11:12
**hawed** [1] - 53:3
**haws** [1] - 53:25
**hazard** [1] - 26:10
**head** [7] - 26:12,
63:12, 63:15, 70:12,
70:13, 77:3, 83:3
**headed** [1] - 51:22
**hear** [5] - 34:7, 36:18,
70:1, 70:4, 71:15
**Heather** [1] - 5:21
**heel** [1] - 54:4
**heel-to-toe** [1] - 54:4
**hell** [1] - 17:11
**helped** [1] - 73:22
**hem** [2] - 53:3, 53:25
**hereby** [1] - 85:7
**hereinafter** [1] - 1:16
**hereto** [6] - 62:18,
63:10, 64:8, 65:1,
65:23, 75:4
**high** [3] - 44:11, 46:1,
52:6
**High** [2] - 6:17, 13:10
**hill** [1] - 46:23
**hillside** [1] - 49:8
**himself** [2] - 79:9,
79:16
**hire** [1] - 10:24

**hired** [5] - 7:15, 11:6,
12:5, 12:24, 42:8
**hit** [4] - 75:20, 80:16,
82:16, 82:22
**hitting** [1] - 81:4
**holding** [5] - 59:10,
59:13, 62:2, 73:13,
81:3
**holdover** [1] - 39:3
**holster** [1] - 31:6
**home** [2] - 35:18,
35:19
**honors** [1] - 19:3
**hospital** [4] - 30:20,
45:5, 52:6, 76:9
**hot** [1] - 34:12
**hour** [7] - 19:21,
20:10, 20:11, 21:20,
67:16, 67:17
**hours** [15] - 9:15, 9:16,
14:7, 14:9, 14:10,
14:15, 14:24, 15:3,
15:5, 19:22, 20:4,
20:8, 21:5, 21:7,
21:21
**House** [1] - 11:12
**House-Hasson** [1] -
11:12

## I

**ID** [2] - 49:21, 85:24
**idea** [3] - 42:12, 42:24,
61:23
**identification** [6] -
62:17, 63:9, 64:7,
64:25, 65:22, 75:3
**identify** [2] - 63:7,
64:22
**ignore** [1] - 16:25
**illegally** [2] - 80:9,
80:11
**imagine** [1] - 38:6
**immediately** [1] -
30:10
**inappropriate** [1] -
33:16
**INC** [1] - 2:5
**incident** [12] - 18:17,
23:23, 24:24, 29:21,
35:4, 39:6, 39:19,
41:4, 42:6, 45:12,
71:20, 72:3
**incline** [1] - 51:12
**increase** [1] - 27:12
**indicating** [1] - 70:14
**indication** [1] - 54:15
**individual** [2] - 17:14,
38:4

4

individuals [2] - 15:9, 20:25
ineffective [1] - 28:3
Inez [1] - 24:3
infective [1] - 28:11
inflict [1] - 63:21
influence [2] - 50:20, 54:15
inform [1] - 55:20
information [2] - 49:20, 49:21
inhouse [1] - 21:13
injuries [3] - 62:20, 63:21, 63:23
injury [1] - 27:13
inservice [2] - 8:11, 19:21
inside [6] - 48:15, 60:1, 61:3, 70:21, 72:12, 79:8
instances [2] - 31:3, 83:20
instead [1] - 50:8
instruction [1] - 26:4
instructions [1] - 16:24
instructor [5] - 13:11, 24:1, 24:19, 68:23, 68:24
instructors [1] - 13:6
instrument [9] - 22:22, 23:1, 23:3, 23:6, 23:9, 23:11, 23:15, 23:16
insurance [1] - 49:21
interested [1] - 9:23
interview [5] - 66:21, 67:2, 67:4, 67:12, 67:14
interviewed [2] - 66:18, 66:23
investigate [2] - 47:1, 47:3
issue [2] - 38:12, 42:21
items [1] - 73:5
itself [3] - 72:8, 80:2, 81:17

## J

jail [3] - 39:4, 39:10, 39:12
james [1] - 24:6
James [3] - 5:23, 5:24, 24:4
January [7] - 13:19, 13:21, 14:4, 18:21, 18:24, 25:3, 25:10

jeans [1] - 49:1
Jeff [1] - 7:16
job [10] - 7:20, 7:21, 8:16, 8:18, 8:20, 9:11, 9:24, 9:25, 10:1, 10:20
Johnson [1] - 39:4
jointly [1] - 25:19
JOSEPH [1] - 1:5
JR [1] - 1:4
Jr [1] - 1:13
judge [1] - 7:17
June [1] - 85:20
jury [1] - 42:18
Justice [3] - 7:23, 13:7, 19:10

## K

Keefer [4] - 41:23, 41:24, 78:24, 79:6
keep [3] - 8:11, 20:4, 79:22
keeps [1] - 77:15
KENTUCKY [4] - 1:1, 1:22, 85:3, 85:23
Kentucky [16] - 1:13, 1:14, 2:7, 2:12, 2:15, 5:1, 5:3, 8:7, 14:3, 19:13, 19:15, 19:17, 20:20, 38:22, 66:18, 85:6
kept [14] - 40:10, 50:18, 52:13, 52:21, 54:12, 55:18, 58:9, 59:23, 60:16, 61:1, 69:22, 71:5, 81:21
Kevin [1] - 42:10
keys [1] - 78:15
kick [3] - 73:4, 77:3, 83:3
kicked [2] - 80:6, 80:8
kicking [1] - 80:10
kids [3] - 7:11, 33:16, 44:1
kind [14] - 5:15, 7:19, 8:21, 16:8, 16:9, 17:9, 34:22, 52:12, 53:9, 68:25, 70:3, 73:25, 74:22, 75:9
KIRKLAND [1] - 2:14
knees [6] - 81:24, 82:7, 82:10, 82:15, 82:16, 82:18
knowledge [4] - 27:9, 36:17, 36:19, 40:3
KRS [1] - 43:17

## L

Lake [1] - 8:17
Lane [1] - 46:17, 51:19, 51:21, 51:24, 52:5
LARGE [1] - 85:24
Large [1] - 85:7
last [6] - 11:23, 12:17, 16:1, 21:19, 41:9, 67:14
lasted [1] - 69:9
Law [3] - 19:13, 19:15, 19:17
law [2] - 1:12, 52:15
Lawrence [4] - 6:14, 6:17, 7:13, 25:17
LAWRENCE [1] - 85:4
laws [4] - 14:13, 20:19, 20:20, 22:15
laying [1] - 78:15
leads [1] - 79:24
leaned [1] - 74:1
learned [1] - 40:2
least [1] - 70:7
leave [2] - 7:9, 8:15
left [18] - 11:10, 11:11, 12:6, 12:10, 42:13, 51:24, 52:7, 59:10, 62:22, 62:24, 63:12, 63:14, 64:5, 70:25, 72:9, 73:19, 73:20, 73:22
leg [3] - 54:1, 82:17, 82:19
LEGAL [1] - 2:5
LESLIE [1] - 2:14
less [2] - 67:16, 67:17
level [3] - 51:14, 51:16, 51:18
levels [1] - 16:15
license [5] - 49:22, 49:24, 50:2, 50:11, 56:5
lieutenant [2] - 66:25, 67:6
light [2] - 60:12, 77:22
likewise [1] - 5:11
limit [1] - 30:12
line [1] - 54:24
liquor [1] - 53:13
listen [1] - 71:17
live [1] - 18:10
lived [9] - 17:21, 17:23, 32:15, 32:16, 32:20, 32:21, 33:9, 34:9, 34:15
living [1] - 5:6
located [2] - 1:13,

18:8
lock [1] - 72:17
locked [3] - 72:15, 73:2, 79:25
lodged [1] - 39:11
look [1] - 37:14
looked [2] - 53:9, 53:11
looking [3] - 31:16, 52:6, 63:1
looks [2] - 62:21, 65:7
loud [2] - 33:13, 55:19
Louisa [13] - 1:13, 5:1, 5:2, 6:16, 11:15, 11:16, 11:18, 12:10, 23:21, 25:17, 67:3, 68:8, 74:6
Louisa's [1] - 30:6
Louisville [1] - 2:15
lying [1] - 69:16

## M

mad [1] - 41:1
maiden [1] - 5:22
Main [1] - 1:13
maintain [1] - 54:22
major [1] - 9:22
manager [1] - 9:10
manner [1] - 73:8
March [9] - 1:12, 10:25, 11:2, 12:5, 12:25, 19:25, 25:10, 85:21
mark [1] - 62:14
marked [7] - 62:16, 63:8, 64:6, 64:21, 64:24, 65:21, 75:2
marks [2] - 50:24, 51:3, 64:23, 65:5, 66:1
married [5] - 5:18, 6:7, 6:8, 7:10, 44:13
material [3] - 15:10, 27:25, 28:9
materials [1] - 22:11
Maynard [2] - 9:9, 10:7
mayor [12] - 18:18, 34:13, 35:8, 35:11, 37:16, 37:19, 37:23, 37:25, 38:8, 38:12, 38:13
mayor's [4] - 35:4, 35:18, 35:19, 36:13
McBRAYER [1] - 2:14
McGINNIS [1] - 2:14
mean [11] - 17:18, 32:20, 34:6, 37:15,

38:3, 47:18, 73:3, 74:18, 74:20, 74:21, 80:9
Medical [1] - 39:22
medical [8] - 30:6, 30:8, 30:9, 30:15, 38:22, 62:7, 74:20, 76:7
members [4] - 43:6, 74:6, 74:7, 74:11
menacing [2] - 36:6, 40:6
mental [6] - 34:16, 34:24, 36:23, 36:25, 37:6, 37:9
mentally [4] - 15:9, 15:23, 16:6, 20:24
mentioned [1] - 68:5
merit [1] - 10:1
met [1] - 66:16
Michael [2] - 2:5, 66:10
mid [1] - 36:11
might [3] - 7:18, 10:14, 48:25
military [1] - 82:7
Miller [8] - 32:4, 47:17, 56:15, 70:17, 70:19, 70:23, 79:6, 83:10
miller [1] - 47:18
mine [2] - 73:17, 76:12
minutes [4] - 32:14, 55:5, 55:6, 69:10
mode [4] - 29:6, 29:8, 30:3, 31:20
models [1] - 25:24
moments [1] - 41:17
Monday [1] - 14:5
months [4] - 9:13, 9:18, 10:1, 11:14
Moore [1] - 47:16
morning [1] - 36:11
most [2] - 68:24, 69:13
moving [1] - 54:12
MR [50] - 4:5, 5:7, 5:10, 5:11, 5:13, 5:16, 5:17, 18:6, 22:23, 26:22, 26:24, 27:21, 28:17, 31:17, 31:19, 38:2, 39:15, 39:17, 39:18, 39:20, 39:23, 40:1, 47:9, 47:11, 56:2, 56:9, 61:12, 62:6, 62:8, 62:9, 62:20, 63:22, 64:12, 64:13, 69:6, 69:8, 74:16, 74:23, 75:1, 75:7, 75:15, 80:5,

5

80:7, 82:1, 83:24, 83:25, 84:1, 84:2
**multiple** [1] - 28:24, 77:10, 77:13
**MY** [1] - 85:21

## N

**name** [4] - 4:6, 5:20, 5:22, 67:1
**natural** [1] - 62:13
**nature** [1] - 73:6
**necessarily** [1] - 17:13
**need** [1] - 16:20
**needed** [1] - 30:7
**needle** [2] - 50:24, 51:3
**needles** [1] - 53:12
**negative** [1] - 10:9
**never** [3] - 33:2, 33:22, 55:25
**next** [2] - 17:21, 83:17
**nick** [1] - 78:21
**nine** [1] - 11:3
**NO** [7] - 1:7, 62:17, 63:9, 64:7, 64:25, 65:22, 75:3
**noises** [1] - 78:3
**none** [7] - 23:24, 33:11, 33:18, 34:20, 43:9, 53:17, 77:5
**noon** [1] - 36:11
**normally** [3] - 50:3, 50:4, 50:5
**NOTARY** [2] - 85:23, 85:24
**Notary** [3] - 1:14, 85:6, 85:19
**nothing** [4] - 61:8, 62:12, 76:10, 85:11
**Notice** [1] - 1:16
**noticeable** [1] - 78:14
**number** [4] - 31:15, 47:12, 47:20, 83:19
**nurse** [1] - 44:24
**nystagmus** [1] - 54:7

## O

**obese** [6] - 74:15, 74:21, 75:6, 75:8, 75:17, 75:19
**object** [9] - 38:2, 39:23, 56:9, 56:22, 62:6, 63:22, 74:16, 75:7, 80:5
**Object** [1] - 22:23
**objection** [2] - 27:21,

64:12
**observation** [1] - 54:18
**observe** [6] - 48:3, 54:10, 54:11, 54:13, 56:18, 56:20
**observed** [2] - 46:19, 56:19
**occurred** [2] - 63:17, 64:19
**occurring** [1] - 23:13
**October** [3] - 12:2, 12:13, 12:19
**OF** [7] - 1:1, 1:2, 1:4, 1:11, 3:3, 85:3, 85:4
**offensive** [3] - 23:6, 23:8, 23:15
**OFFICE** [1] - 1:22
**office** [3] - 1:12, 25:20, 41:12
**Office** [5] - 2:6, 2:12, 25:18, 56:15, 70:17
**officer** [18] - 9:24, 10:22, 12:6, 14:3, 15:14, 16:18, 19:25, 24:9, 36:15, 39:9, 42:9, 43:5, 47:16, 75:20, 77:21, 82:8, 83:7
**Officer** [3] - 32:4, 47:16, 84:4
**OFFICER** [4] - 1:11, 1:14, 3:4, 4:1
**officers** [12] - 23:22, 67:20, 69:14, 69:20, 77:18, 81:5, 81:6, 81:9, 81:14, 81:16, 81:18, 81:19
**offices** [2] - 51:25, 52:6
**official** [1] - 38:3
**often** [1] - 21:22
**old** [1] - 51:22
**older** [1] - 6:11
**on-the-job** [1] - 7:21
**once** [6] - 21:24, 21:25, 40:9, 69:18, 69:24, 81:2
**one** [50] - 5:6, 9:9, 9:13, 10:10, 15:6, 20:9, 20:11, 20:12, 24:4, 25:5, 25:8, 26:24, 28:3, 29:14, 29:15, 29:25, 32:4, 32:5, 32:7, 36:17, 36:19, 36:21, 38:24, 43:19, 47:25, 52:22, 52:23, 52:24, 54:1, 54:16, 56:7, 60:2, 67:9, 69:5, 69:7,

70:18, 71:8, 72:5, 73:7, 73:10, 73:14, 75:24, 76:12, 77:18, 79:14, 79:18, 79:22, 82:7, 83:8
**one-leg** [1] - 54:1
**one-week** [1] - 15:6
**op** [3] - 8:17, 8:22, 9:21
**open** [7] - 53:17, 53:18, 73:4, 79:19, 79:20, 80:8, 80:10
**opened** [3] - 77:7, 80:6, 81:2
**operate** [1] - 7:21
**operating** [1] - 56:5
**oral** [1] - 1:15
**order** [2] - 9:21, 17:3
**orders** [1] - 32:9
**organizations** [1] - 19:7
**otherwise** [1] - 4:14
**ourself** [1] - 69:1
**outside** [2] - 32:23, 72:13

## P

**p.m** [1] - 1:12
**Pack** [1] - 7:16
**pad** [1] - 51:8
**Page** [8] - 3:5, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 3:12
**Paintsville** [1] - 2:12
**paperwork** [2] - 59:21, 61:3
**parents** [1] - 5:5
**park** [1] - 8:17
**part** [10] - 8:21, 10:14, 11:22, 12:16, 12:21, 20:15, 25:12, 26:25, 82:17
**parties** [1] - 1:16
**parts** [1] - 15:10
**passenger's** [2] - 48:18, 53:16
**past** [2] - 6:8
**patrolman** [2] - 11:7, 11:8
**penal** [1] - 20:18
**people** [9] - 34:2, 34:6, 41:3, 44:3, 55:18, 67:21, 68:14, 68:15, 68:16
**pepper** [1] - 26:9
**performed** [1] - 74:10
**period** [1] - 20:5
**periodically** [1] - 10:4

**person** [10] - 15:24, 16:6, 16:19, 16:22, 17:3, 27:19, 28:10, 30:18, 38:1, 61:9
**personal** [1] - 54:17
**personally** [1] - 66:15
**persons** [1] - 68:10
**petition** [4] - 36:23, 37:1, 37:6, 37:9
**pharmacy** [1] - 51:25
**Phillip** [1] - 7:18
**photo** [3] - 61:16, 62:5, 65:19
**Photograph** [6] - 3:8, 3:8, 3:9, 3:9, 3:10, 3:10
**photograph** [11] - 61:17, 62:16, 63:8, 63:11, 64:6, 64:9, 64:24, 65:2, 65:21, 65:24, 75:2
**photographs** [1] - 62:10
**photos** [1] - 32:12
**physical** [2] - 13:3, 27:19
**physiologic** [1] - 27:11
**physiological** [1] - 62:11
**picked** [1] - 39:9
**picture** [4] - 62:19, 63:15, 74:18, 75:5
**pieces** [1] - 78:14
**place** [15] - 4:25, 12:10, 35:15, 35:23, 36:10, 40:7, 46:15, 50:12, 60:22, 62:11, 65:7, 67:2, 67:5, 78:23, 85:9
**placed** [3] - 55:16, 57:2, 59:1
**Plaintiff** [2] - 1:6, 2:4
**PLAINTIFF'S** [6] - 62:17, 63:9, 64:7, 64:25, 65:22, 75:3
**Plaintiff's** [11] - 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 62:15, 63:7, 63:20, 64:4
**play** [1] - 6:20
**PLLC** [1] - 2:14
**point** [11] - 31:1, 32:5, 54:13, 59:19, 60:9, 60:23, 69:16, 69:25, 78:4, 79:14, 81:21
**pointed** [1] - 78:24
**pointing** [1] - 65:15
**Police** [3] - 24:3, 25:17, 66:19

**police** [37] - 9:24, 10:22, 11:24, 12:1, 12:6, 12:18, 14:2, 19:6, 19:25, 24:9, 39:2, 39:8, 40:9, 42:8, 42:9, 42:21, 42:23, 42:25, 43:3, 43:5, 47:16, 50:14, 57:14, 58:3, 61:25, 66:25, 69:3, 69:4, 72:10, 72:20, 74:7, 79:7, 79:9, 80:1, 80:19, 80:21, 81:17
**policeman's** [1] - 43:17
**policies** [2] - 68:12, 68:18
**policing** [1] - 19:9
**policy** [19] - 21:15, 22:4, 22:14, 22:16, 26:14, 26:18, 26:20, 26:23, 27:2, 27:7, 30:6, 68:13, 68:19, 68:21, 68:23, 69:1, 69:2, 69:4, 71:23
**polite** [1] - 45:9
**pop** [2] - 79:1, 81:25
**PORTER** [1] - 2:11
**posed** [1] - 4:15
**positive** [2] - 10:9, 10:11
**possible** [1] - 26:12
**possibly** [1] - 65:11
**POST** [1] - 1:22
**Post** [2] - 2:6, 2:12
**postmortem** [1] - 62:9
**pounding** [1] - 40:20
**precisely** [1] - 51:18
**prepared** [2] - 26:18, 68:21
**presence** [2] - 16:18, 85:13
**present** [3] - 56:24, 56:25, 67:4
**presented** [1] - 73:8
**presenting** [3] - 42:17, 42:20, 42:22
**Preston** [1] - 37:24
**pretty** [1] - 40:24
**Prichard** [1] - 11:13
**probe** [3] - 65:4, 65:8, 65:9
**probes** [1] - 76:19
**problems** [4] - 27:19, 34:16, 34:24, 43:23
**Procedure** [1] - 1:17
**procedure** [2] - 43:11, 43:14
**process** [1] - 82:11
**professional** [2] -

19:6, 62:7
**program** [3] - 8:23, 9:21, 21:19
**promoted** [1] - 83:14
**prompted** [1] - 38:4
**provide** [4] - 66:9, 74:5, 74:7, 74:12
**provided** [4] - 25:19, 67:18, 68:4, 68:7
**provoke** [1] - 15:18
**psychiatric** [1] - 38:22
**public** [4] - 10:13, 38:3, 43:7, 43:12
**Public** [3] - 1:14, 85:6, 85:20
**PUBLIC** [1] - 85:23
**pull** [3] - 49:6, 60:4, 70:6
**pulled** [6] - 49:2, 60:3, 60:5, 70:17, 76:23, 79:14
**pulling** [5] - 31:6, 40:8, 69:24, 71:5, 81:21
**punching** [1] - 81:4
**purposes** [3] - 1:17, 1:17, 85:9
**pursuant** [1] - 1:16
**push** [5] - 38:12, 58:19, 58:21, 79:19, 81:9
**pushing** [1] - 52:21
**put** [6] - 22:8, 59:24, 60:1, 76:14, 77:15, 77:17

---

**Q**

**quarters** [1] - 83:1
**questions** [4] - 4:11, 83:25, 84:1, 84:2
**quit** [4] - 9:18, 9:20, 24:4, 24:13

---

**R**

**rail** [2] - 58:25, 74:1
**railing** [4] - 59:10, 59:13, 62:2, 66:7
**rails** [1] - 77:1
**ran** [2] - 49:21, 49:22
**range** [1] - 24:23
**ranger** [1] - 8:17
**rank** [2] - 11:6, 83:17
**ray** [2] - 18:5, 18:7
**react** [3] - 41:18, 67:21, 68:9
**read** [2] - 68:25, 85:17

---

**really** [3] - 23:2, 44:19, 70:1
**receive** [6] - 7:19, 8:2, 13:25, 19:3, 19:16, 76:7
**received** [3] - 8:3, 18:25, 25:15
**recertified** [1] - 19:20
**recognize** [5] - 61:18, 67:20, 68:9, 68:13, 68:15
**record** [2] - 22:9, 59:8
**recorded** [4] - 60:7, 60:19, 66:21, 85:12
**recording** [1] - 60:10
**records** [1] - 21:25
**reddish** [1] - 65:10
**referring** [4] - 62:24, 78:10, 78:13, 78:16
**reflected** [1] - 45:20
**refresher** [1] - 20:17
**regards** [2] - 4:17, 30:6
**relates** [3] - 67:19, 71:23, 72:2
**relatives** [1] - 5:8
**relaying** [1] - 77:12
**release** [3] - 70:21, 76:25, 83:9
**remember** [13] - 7:17, 25:1, 25:9, 25:11, 36:15, 40:3, 40:20, 41:22, 42:1, 75:25, 78:6, 82:6, 83:8
**remembered** [1] - 59:3
**repeat** [2] - 4:12, 35:9
**repeated** [1] - 71:15
**repeatedly** [2] - 55:19, 71:10
**report** [6] - 31:11, 31:14, 31:21, 47:7, 47:10
**Reporter** [2] - 1:14, 85:5
**REPORTER** [1] - 74:25
**REPORTER'S** [1] - 85:1
**Reporter's** [1] - 3:12
**REPORTING** [1] - 1:21
**request** [1] - 85:16
**requests** [1] - 26:25
**required** [1] - 13:2
**residence** [1] - 36:13
**resigned** [3] - 42:14, 42:15, 42:19
**resist** [2] - 40:6, 41:20
**resistant** [2] - 16:19, 16:23
**resisting** [1] - 82:4

---

**resort** [1] - 16:2
**respective** [1] - 1:16
**respond** [1] - 36:12
**responded** [2] - 18:19, 35:21
**response** [1] - 4:16
**responsive** [1] - 78:3
**restrain** [1] - 40:9
**review** [2] - 22:13, 68:17
**reviewed** [2] - 21:14, 68:18
**reviewing** [4] - 22:4, 45:16, 45:19, 68:11
**rights** [1] - 43:17
**ripped** [2] - 76:11, 76:15
**risk** [2] - 26:10, 27:12
**Rivers** [2] - 39:21, 39:25
**Road** [1] - 2:15
**road** [2] - 46:16, 52:7
**room** [2] - 44:24, 72:9
**roster** [1] - 22:7
**rough** [1] - 81:13
**roughly** [2] - 14:8, 18:16
**Rules** [1] - 1:17
**rumor** [1] - 34:21
**rumored** [1] - 34:25
**rumors** [1] - 35:2
**run** [1] - 48:11
**runaround** [1] - 52:14

---

**S**

**sat** [1] - 78:4
**saw** [3] - 40:14, 46:6, 50:11
**scared** [1] - 40:16
**scene** [2] - 32:7, 56:8
**SCHMITT** [1] - 2:11
**school** [9] - 6:13, 6:15, 6:22, 8:22, 14:5, 44:9, 44:11, 46:1, 52:7
**School** [2] - 6:17, 13:10
**Science** [1] - 7:6
**scissors** [1] - 73:6
**scratch** [1] - 76:12
**screaming** [1] - 55:18
**screener** [1] - 13:3
**scuffle** [1] - 76:5
**search** [1] - 53:9
**searched** [1] - 53:8
**seat** [4] - 53:16, 57:24, 57:25, 58:1
**second** [2] - 36:2,

---

83:16
**seconds** [2] - 60:14, 60:16
**Security** [1] - 5:15
**see** [30] - 18:13, 34:1, 41:5, 44:13, 44:21, 46:8, 47:22, 48:10, 48:13, 50:24, 51:1, 53:11, 53:12, 54:21, 61:20, 62:5, 62:20, 63:13, 64:22, 65:4, 65:9, 71:21, 77:3, 80:16, 81:9, 83:2, 83:5, 83:7, 83:15
**seize** [1] - 17:3
**semester** [2] - 9:6, 9:13
**senior** [1] - 83:21
**Senior** [1] - 83:22
**sense** [1] - 28:18
**sent** [1] - 39:24
**September** [1] - 39:16
**sergeant** [3] - 83:12, 83:20, 83:21
**Sergeant** [1] - 83:22
**sergeants** [1] - 83:18
**series** [1] - 4:11
**serious** [1] - 27:13
**SERVICES** [1] - 2:5
**set** [2] - 1:16, 10:3
**seven** [1] - 81:13
**several** [8] - 18:1, 24:3, 27:4, 31:4, 31:5, 41:13, 60:17, 64:14
**severe** [1] - 27:19
**Shawn** [1] - 2:11
**sheet** [1] - 22:8
**Shelbyville** [1] - 2:15
**Sheriff's** [1] - 25:18
**sheriff's** [6] - 25:20, 36:12, 37:6, 38:18, 41:12, 74:11
**shirt** [3] - 48:25, 51:2, 51:3
**shooting** [4] - 14:13, 14:23, 14:25, 26:11
**shoulder** [2] - 60:6, 76:25
**show** [6] - 16:17, 17:8, 17:10, 54:9, 61:16, 63:6, 64:21, 65:19, 74:23, 75:5
**shows** [1] - 69:12
**shredded** [1] - 76:15
**shut** [1] - 72:12
**sick** [1] - 38:13
**side** [6] - 48:18, 48:19, 48:20, 63:12, 63:14, 65:3

---

**sign** [3] - 9:22, 22:7, 85:17
**sign-in** [1] - 22:7
**significant** [1] - 25:22
**simple** [1] - 82:9
**simultaneous** [3] - 28:2, 28:5, 28:18
**sit** [3] - 57:21, 57:23, 57:24
**sitting** [2] - 46:22, 53:15
**situation** [8] - 15:16, 16:3, 16:18, 45:22, 45:23, 60:25, 61:1, 72:6
**six** [5] - 9:12, 9:18, 9:25, 21:21, 81:12
**size** [1] - 75:13
**slight** [1] - 51:12
**small** [1] - 76:12
**smell** [3] - 50:21, 53:6, 53:23
**smoothly** [1] - 46:24
**sobriety** [9] - 50:19, 51:4, 51:6, 52:11, 52:16, 54:1, 55:9, 55:12, 56:21
**Social** [1] - 5:14
**soft** [1] - 16:19
**someone** [6] - 30:17, 31:2, 37:20, 38:3, 50:3, 78:9
**sometime** [1] - 79:10
**sometimes** [1] - 32:22
**somewhat** [1] - 32:11
**somewhere** [1] - 24:23
**son** [2] - 44:8, 44:12
**sorry** [1] - 21:6
**sort** [5] - 19:24, 53:3, 54:20, 65:10, 74:14
**sought** [1] - 37:9
**sounds** [1] - 52:23
**space** [1] - 81:11
**span** [1] - 9:5
**specific** [1] - 16:7
**specifically** [1] - 83:8
**spells** [1] - 34:22
**spent** [1] - 14:25
**sports** [1] - 6:20
**spots** [1] - 64:14
**spray** [1] - 26:9
**spread** [2] - 14:19, 14:21
**stand** [1] - 54:2
**standing** [2] - 71:6, 79:18
**standpoint** [1] - 74:21
**stands** [1] - 39:1

7

staplers [1] - 73:6
start [2] - 7:12, 16:21
started [5] - 7:10, 24:14, 59:19, 60:10, 77:7
State [2] - 66:19, 85:6
STATE [1] - 85:24
state [5] - 4:6, 8:6, 13:2, 14:3, 66:25
state's [1] - 38:22
statement [6] - 30:16, 66:9, 66:12, 69:11, 77:23, 78:20
STATES [1] - 1:1
station [5] - 39:3, 52:8, 57:14, 58:3, 61:25
status [1] - 37:20
stay [4] - 8:10, 8:12, 9:21, 11:18
stayed [4] - 9:25, 12:13, 49:7, 81:16
stenographically [1] - 85:13
Stenotype [1] - 1:14
Stephen [1] - 84:4
STEPHEN [6] - 1:8, 1:11, 1:15, 3:4, 4:1, 85:8
stepping [3] - 48:16, 48:21, 49:2
steps [1] - 60:24
Steven [1] - 4:7
sticks [1] - 42:7
still [9] - 5:6, 8:8, 8:24, 43:3, 45:20, 46:17, 77:21, 78:3, 81:3
stomach [2] - 65:3, 69:22
stood [1] - 78:7
stop [1] - 41:16
stopped [1] - 56:16
Street [1] - 1:13
strike [1] - 71:3
strikes [1] - 70:20
striking [4] - 70:23, 71:2, 71:6, 83:8
struck [1] - 75:24
struggle [1] - 69:9
struggling [1] - 69:23
study [1] - 7:5
stuff [13] - 14:12, 14:13, 14:15, 22:13, 22:14, 22:15, 40:21, 40:22, 40:24, 51:25, 70:6, 78:9, 78:10
stun [7] - 29:6, 29:24, 29:25, 30:3, 31:20, 60:6, 76:25
subject [3] - 77:10,

81:14, 82:15
submitted [1] - 67:11
suitability [1] - 13:3
Suite [1] - 2:15
summer [1] - 9:11
summoned [1] - 30:15
summons [2] - 30:8, 30:9
superior [1] - 31:14
supposed [1] - 43:18
surprised [2] - 35:7, 35:10
Susan [1] - 10:7
susan [1] - 9:9
suspect [2] - 81:18, 81:20
suspended [5] - 49:24, 49:25, 50:2, 50:12, 56:5
suspicion [2] - 17:3, 17:6
sustained [1] - 63:23
sworn [3] - 1:15, 4:2, 85:10
swung [2] - 76:1, 76:18
system [1] - 10:1
systems [1] - 7:22

T

T-shirt [3] - 48:25, 51:2, 51:3
tags [4] - 48:11, 48:13, 49:22
tased [2] - 69:19, 77:10
Taser [33] - 21:14, 21:20, 22:21, 22:25, 23:3, 24:1, 24:11, 24:15, 24:18, 24:21, 25:4, 25:23, 26:1, 27:10, 27:18, 28:2, 29:5, 29:8, 30:7, 30:14, 31:1, 31:10, 49:15, 59:14, 60:5, 60:11, 60:15, 65:8, 65:9, 65:14, 77:13, 80:17, 80:25
Tasers [8] - 15:1, 26:3, 26:15, 28:6, 28:10, 28:24, 29:11, 76:19
tasing [1] - 77:7
taught [7] - 25:22, 27:10, 28:5, 28:8, 73:9, 82:10, 82:14
Technical [1] - 7:3
Teddy [1] - 37:24
Telecommunication

s [1] - 7:24
telecommunications [1] - 7:25
telecommunicator [2] - 8:6, 8:11
tensed [3] - 59:2, 60:2, 73:25
test [12] - 12:25, 13:1, 50:19, 51:4, 51:6, 52:11, 52:16, 54:1, 54:7, 54:21, 55:9, 56:21
testified [2] - 4:3, 39:24
testify [1] - 80:18
testimony [2] - 71:21, 84:3
testing [3] - 13:2, 13:4, 13:13
tests [1] - 55:13
THE [1] - 18:7
thereupon [6] - 62:16, 63:8, 64:6, 64:24, 65:21, 75:2
thigh [5] - 82:17, 82:19, 82:20, 82:22
threatened [1] - 60:12
three [6] - 18:11, 29:22, 69:10, 81:16, 81:18, 81:19
Three [2] - 39:21, 39:24
threw [3] - 34:12, 35:7, 35:10
throwing [1] - 18:18
title [1] - 22:8
today [1] - 43:3
toe [1] - 54:4
took [10] - 9:6, 34:22, 35:15, 38:21, 39:3, 39:8, 39:10, 58:3, 60:22, 67:4
top [1] - 46:22
torso [1] - 65:3
total [1] - 29:17
towards [4] - 77:20, 77:21, 77:24, 81:5
towel [1] - 65:7
traffic [2] - 41:16, 46:23
trained [3] - 26:3, 27:24
training [36] - 7:19, 7:21, 7:23, 8:11, 13:7, 15:1, 15:3, 15:6, 15:8, 15:11, 19:11, 20:4, 20:8, 20:21, 20:24, 21:3, 21:9, 21:10, 21:11, 21:13, 21:14, 21:16,

21:19, 21:21, 21:22, 22:1, 22:6, 24:11, 24:21, 25:4, 25:15, 25:19, 67:19, 67:24, 68:7, 82:6
transcript [1] - 85:15
transport [1] - 39:9
transported [3] - 39:4, 50:15, 57:13
transporting [1] - 57:16
treatment [1] - 76:7
trial [1] - 5:8
tried [2] - 76:2, 76:22
truck [13] - 46:19, 46:22, 47:22, 48:1, 48:6, 48:8, 48:10, 48:12, 48:14, 51:9, 51:10, 52:4, 53:19
true [2] - 79:3, 85:14
truth [3] - 85:11, 85:12
try [7] - 15:15, 15:18, 15:20, 26:8, 26:12, 61:1, 76:25
trying [18] - 37:20, 40:7, 50:19, 60:1, 61:2, 69:18, 69:20, 69:23, 70:5, 71:4, 74:2, 77:18, 79:7, 79:19, 79:22, 81:22, 82:13, 83:8
turn [3] - 58:20, 58:21, 58:24
turned [2] - 56:1, 58:23
two [13] - 8:14, 11:21, 13:12, 20:9, 20:10, 28:10, 31:3, 52:22, 52:23, 52:24, 72:19, 79:19, 83:19
type [4] - 13:1, 13:25, 17:14, 53:13

U

U.S [1] - 8:16
UNDER [1] - 85:21
under [10] - 1:17, 16:4, 35:23, 50:20, 54:15, 55:10, 55:13, 55:16, 57:2, 81:25
understood [1] - 4:16
uniform [2] - 76:11, 76:15
unit [2] - 47:12, 47:20
UNITED [1] - 1:1
unresponsive [1] - 77:25
up [30] - 6:16, 8:11,

9:22, 10:3, 11:22, 12:16, 16:17, 17:8, 17:10, 18:13, 20:1, 20:4, 20:10, 25:3, 39:9, 49:20, 52:5, 59:2, 59:22, 60:2, 60:12, 69:3, 70:14, 73:25, 76:13, 78:4, 78:5, 78:7, 79:15, 82:4
update [1] - 20:18
updated [1] - 22:16
updates [1] - 22:14

V

varied [1] - 14:8
vehicle [3] - 48:15, 49:9, 53:8
verbal [1] - 33:4
verbally [2] - 16:19, 16:23
versus [1] - 1:7
video [17] - 23:14, 45:11, 45:16, 45:19, 45:20, 60:7, 60:20, 61:5, 69:10, 69:12, 70:2, 71:12, 71:13, 71:15, 71:17, 71:19, 77:20
viewed [2] - 45:11, 71:19
views [5] - 61:17, 63:11, 64:9, 65:2, 65:24
Villa [2] - 18:5, 18:7
visit [1] - 44:3
vodka [1] - 53:13
voice [4] - 44:4, 58:13, 61:2, 71:12
voluntarily [1] - 67:11

W

walk [1] - 54:24
walking [2] - 32:23, 59:21
ward [1] - 38:22
warehouse [1] - 11:13
WARFIELD [1] - 1:22
warned [1] - 60:3
warning [1] - 31:7
warnings [4] - 26:1, 26:5, 26:7, 60:17
watching [1] - 46:23
Water [3] - 11:15, 11:16, 11:18
water [2] - 12:22, 26:8
Waterworks [1] -

8

12:11

**ways** [1] - 82:3
**weapon** [3] - 73:8, 73:10, 76:24
**weapons** [4] - 25:24, 72:21, 73:1, 73:5
**weather** [1] - 33:1
**week** [7] - 9:15, 9:16, 13:18, 14:8, 15:6, 20:11, 20:12
**weeks** [4] - 7:24, 14:20, 14:21, 41:13
**whatsoever** [4] - 33:18, 34:20, 53:14, 62:3
**whistle** [1] - 78:14
**whole** [4] - 57:3, 69:9, 70:1, 85:11
**wife** [3] - 43:23, 44:18, 45:4
**wife's** [1] - 5:20
**Wilburn** [5] - 4:7, 4:10, 5:21, 59:9, 84:4
**WILBURN** [6] - 1:8, 1:11, 1:15, 3:4, 4:1, 85:8
**Wilhite** [6] - 56:16, 57:8, 57:11, 79:3, 79:14, 80:15
**Williams** [2] - 18:5, 18:7
**Wilson** [1] - 18:9
**winded** [1] - 69:14
**winter** [1] - 20:16
**wit** [1] - 4:3
**Witness** [3] - 1:15, 61:17, 63:11
**WITNESS** [2] - 3:3, 18:7
**witness** [7] - 4:2, 64:9, 65:2, 65:24, 85:10, 85:14, 85:17
**wording** [1] - 71:18
**words** [3] - 27:11, 28:15, 54:21
**wrist** [1] - 60:2
**write** [1] - 69:3
**written** [6] - 26:20, 31:11, 31:13, 31:21, 66:9, 66:12

## X

**X26** [1] - 60:11

## Y

**Yatesville** [1] - 8:17

**year** [8] - 6:18, 6:24, 11:21, 11:23, 12:17, 19:21, 21:24, 21:25
**yearly** [2] - 21:23, 68:17
**years** [11] - 8:14, 9:5, 11:4, 11:21, 11:22, 18:1, 18:11, 18:12, 24:3, 24:20, 27:4
**yelling** [5] - 57:20, 59:1, 59:24, 77:15, 77:21
**yourself** [1] - 23:4

9