UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action No. 16-68-HRW

ESTATE OF BILLY COLLINS, JR.,
BILLY JOE COLLINS, ADMINISTRATOR, PLAINTIFF,

v. **MEMORANDUM OPINION AND ORDER**

STEPHEN WILBURN,
*Individually and in his Official Capacity*,
JORDAN MILLER,
*Individually and in his Official Capacity*,
GREG FUGITT,
*Individually and in his Official Capacity*,
LOUISA CITY POLICE DEPARTMENT
and CITY OF LOUISA, KENTUCKY, DEFENDANTS.

This matter is before the Court upon the Defendants' Motion for Summary Judgment [Docket No. 71]. The matter has been fully briefed by the parties [Docket Nos. 71-1, 82 and 83]. For the reasons stated herein, the Court finds that the Defendants are entitled to judgment as a matter of law.

I.

This case arises from the arrest of Billy Collins, Jr. on May 29, 2015 in Louisa, Kentucky. On that night, Sergeant Stephen Wilburn of the Louisa City Police Department ("LPD") was working a local high school graduation assigned to crowd and traffic control. [Docket No. 62, Deposition of Sergeant Wilburn, p. 46].

After the graduation ceremony concluded, as traffic was letting out, Chief Greg Fugitt of LPD observed Collins' truck, which had been driven over a hill, through a grassy area and into a

ditch. *Id.* He asked Sergeant Wilburn to investigate, which he did. *Id.* at pp.46-47.

Sergeant Wilburn approached Collins' vehicle and asked what was going on and how he ended up there. *Id.* at p. 49. He also obtained Collins' license, insurance information, and ran his tags. *Id.* Collins was driving on a suspended license. Sergeant Wilburn testified that he suspected Collins may have been under the influence of alcohol since he observed a bucket of beer on ice sitting in the passenger seat of the truck and numerous open beer bottles and cans strewn about the cabin. *Id.* at pp. 49-50, 53. Sergeant Wilburn attempted to keep speaking with Collins while trying to conduct a field sobriety test to ensure he was not under the influence. *Id.* at p. 50. Ultimately, however, Sergeant Wilburn did not observe any positive indications of alcohol intoxication.

During and after the field sobriety test, while he was attempting to speak with Collins, Collins was screaming and cursing at people who were leaving the graduation, despite Sergeant Wilburn asking him to stop. *Id.* at pp. 53-55. He did not. Therefore, Sergeant Wilburn informed Collins he was going to be charged with disorderly conduct and placed under arrest. *Id.* At that time, Sergeant Wilburn filed out a citation for disorderly conduct and for operating on a suspended license. *Id.* at p.56.

After placing Collins under arrest, Sergeant Wilburn did not handcuff Collins. During his deposition, he explained that Collins was very agitated at that point and Wilburn believed that if he could get Collins to come sit in his patrol car uncuffed, Collins would be more willing to cooperate. *Id.* at p. 57. This proved to be correct, and Collins agreed to sit in the back seat of the patrol vehicle. *Id.*

2

Upon arriving at the LPD headquarters, Collins refused to exit the patrol vehicle, despite being requested to do so, repeatedly by Sergeant Wilburn. *Id.* at p. 58. After telling Sergeant Wilburn he preferred to stay in the patrol car, he eventually agreed: "Fuck you motherfucker, I guess I'll go." [Docket No. 65, Kentucky State Police Investigative Report, p. 11, Page ID# 1010].

Collins eventually exited the vehicle and continued cursing at Sergeant Wilburn. [Docket No. 62, Depo. of Sergeant Wilburn, p. 58].

As Sergeant Wilburn escorted Collins up the ramp outside of the police department, Collins suddenly turned and with both hands grabbed the railing and refused to let go after Sergeant Wilburn instructed him to do so. *Id.* at pp. 58-59.

At the time, the video camera attached to Sergeant's Wilburn's vest, commonly known as a body cam, began recording. A CD of the recording is part of the record herein at Docket No. 71-2. The undersigned has viewed the recording.

The recording begins with Sergeant Wilburn repeatedly asked him to let go of the railing, yet Collins refused to turn the rail loose while screaming and yelling. *Id.* at p. 59; and CD of Sergeant Wilburn Body Camera Video, 20:19:40 – 20:20:05.

Sergeant Wilburn again used asked Collins to let go of the rail so that they could go inside, to which again Collins refused. *Id.* It is at this time that Sergeant Wilburn stated to Collins that if he did not let go of the railing he would have to cuff him behind his back. *Id.*

When Sergeant Wilburn attempted to put a handcuff on Collins, he only succeeded in cuffing the left wrist of Collins before he tensed up, pulled away from the officer, and became more agitated. *Id.* at pp. 59-60 and CD, 20:20:00 – 20:20:05.

3

Collins refused to physically let go of the railing and allow handcuffs to be applied. Sergeant Wilburn warned Collins he was going to deploy his taser should he continue to refuse stating: "I'm gonna light you up. Let go of the rail right now. We can do this easy or hard, come on. Billy?" CD, 20:20:05 – 20:20:19. Collins continued to curse and yell at Sergeant Wilburn, yelling "Bullshit! You ain't my goddamn boss!" CD, 20:20:23 – 20:20:25. "You better let the fuck go of me. I'm gonna get pissed off. You ain't gonna like it." CD, 20:20:25 – 20:20:33.

Collins continued to refuse to let go of the rail. Only one handcuff was applied at this point to Collins' left wrist. Collins then taunted Sergeant Wilburn stating, "Why don't you go ahead and get mad. Go and get mad. I want you to get mad. Get mad, boy. Go ahead." CD,20:20:34 – 20:20:41. Sergeant Wilburn was still asking Collins to "come on" and to release the rail so that they could go inside.

At this point Sergeant Wilburn radioed Officer Miller to confirm he was on his way as backup. CD, 20:20:43 – 20:20:50. Sergeant Wilburn again requested Collins to "let go of the banister," and again Collins refused, responding "Fuck you." CD, 20:20:50 – 20:20:52.

With Officer Miller pulling into LPD's parking lot, Sergeant Wilburn again repeatedly asked Collins – almost a dozen times in fact – to let go of the banister, and at that time pulled his Taser to apply a drive-stun if Collins continued to refuse while giving Collins two warnings he was going to be tased if he did not comply. [Docket No. 62, Depo. of Sergeant Wilburn, pp. 60, 76; CD, 20:20:52 – 20:21:27].

At that time Sergeant Wilburn issued a drive-stun to the upper shoulder of Collins, which was not effective as Collins immediately turned towards Sergeant Wilburn and began to physically assault him by first striking him in the chest and then taking a swing at Sergeant

4

Wilburn's face. *Id.* at pp. 75-77; CD, 20:21:27 – 20:21:30.

Officer Miller testified that when he arrived on scene, he witnessed Sergeant Wilburn speaking with Collins and that Collins was yelling and screaming, refusing to go inside. [Docket No. 63, Deposition of Officer Miller, p. 9]. At that time, based on his angle in relation to Sergeant Wilburn and Collins, Officer Miller did not know that Sergeant Wilburn had his Taser out to apply a drive-stun. *Id.* After initiating the drive-stun, Officer Miller witnessed Collins turn around and start striking Sergeant Wilburn with a closed fist to Sergeant Wilburn's upper torso. *Id.* at pp. 9-10. Upon witnessing this, Officer Miller tased Collins. *Id.* at pp. 12-13. Collins again grabbed the wires and yanked the probes out. *Id.* at p. 13. Collins then fell backwards into the door of LPD, entered the foyer, and shut the door behind him, barricading himself inside the LPD headquarters. *Id.* at p. 18; CD, 20:21:33 – 20:21:41.

Sergeant Wilburn then requested additional backup at LPD. CD, 20:21:42: - 20:21:45. Collins had one hand pushed against the door while Sergeant Wilburn and Officer Miller attempted to push it open but were unable to do so. [Docket No. 62, Depo. of Sergeant Wilburn, p.79; CD, 20:21:45 – 20:21:55].

Deputy Mason Keefer with the Lawrence County Sheriff's Office arrived on scene to provide backup. As Sergeant Wilburn testified, he felt it was imperative to breach the door as quickly as possible or find another means of subduing Collins, since Collins was now inside the LPD and could have access to other weapons or items that could be used as weapons including chairs, staplers, scissors, or even firearms if he was able to make his way into the office of LPD. [Docket No. 62, Depo. of Sergeant Wilburn, p. 73].

5

Once Deputy Keefer arriving, the officers agreed to get the door open as wide as possible so that Deputy Keefer could attempt to deploy his Taser. [Docket No. 60, Deposition of Deputy Keefer, pp. 25-26; CD, 20:22:00 – 20:22:45].

Yet, as he had done with Officer Miller's Taser probes, Collins simply grabbed the wires and pulled the probes out. [Docket No. , Depo. of Deputy Keefer, p. 25].

Deputy Keefer testified that with Collins holding the wires in his hands, he attempted to cycle the Taser again in the hopes that it would have some effect, but it did not. *Id.* Collins slammed the door shut again, again barricading himself inside LPD, and banging on the glass windows of the door. CD, 20:22:26 – 20:22:34.

At this time, Deputy Douglas Wilhite arrived as further backup. [Docket No. 61, Deposition of Deputy Wilhite, CD, 20:22:40].

On the recording, it appears as though, at this point, Sergeant Wilburn realized that he had a key to the backdoor of LPD. He told the other officers he would attempt to approach Collins from behind. [Docket No. 62, Depo. of Sergeant Wilburn, pp. 80 – 81; CD, 20:22:47 – 20:22:51].

Wilburn ran to the back of the station and, according to his testimony, gained access thru the rear door, and positioned himself outside of the rear foyer door where Collins was barricaded. He testified that when he came through the door behind Collins, he observed Collins still holding the other door shut and continuing to act aggressively towards the other officers. [Docket No. 62, Depo. of Sergeant Wilburn, p. 81].

At this point, Sergeant Wilburn deployed his Taser with the probes making contact against Collins' back. *Id.* at pp. 80-81; CD, 20:23:52 – 20:23:53. Even with the probes in his

back, Collins still refused to go to the ground, with Sergeant Wilburn demanding five times that he do so. CD, 20:23:54 – 20:24:03.

The three other officers got through the door. Collins still resisted both officer demands and their open-hand efforts to bring him to the ground. [Docket No. 62, Depo. of Sergeant Wilburn, p. 81].

Ultimately, the officers were able to bring Collins to the ground face down, and then proceeded to instruct him to put his hands behind his back which he refused to do. *Id.* at p. 69. Collins continued to struggle and pull away from the officers in an attempt to keep his hands underneath him. *Id.* Collins was repeatedly instructed to give his hands so that he could be handcuffed, but continued to refuse. *Id.* at p.71. Officer Miller struck on Collins' right arm with his baton, while using the baton to pry Collins' right hand free. [Docket No. Depo. of Sergeant Wilburn, p. 81; Docket No. , Depo. of Officer Miller, p. 20]. At the same time, Deputy Keefer was attempting to gain control of Collins' left hand, also using his baton on Collin's arm and using the baton to pry his left hand free. [Docket No. 60, Depo. of Deputy Keefer, p. 39].

After placing a second pair of handcuffs on Collins' right hand, those cuffs were then joined with the handcuffs that had been previously placed by Sergeant Wilburn on Collins' left hand. *Id.*

After securing the handcuffs, approximately a minute later Deputy Keefer and Deputy Wilhite rolled Plaintiff onto his side and then sat him upright. [Docket No. 60, Depo. of Deputy Keefer, p. 39; Docket No. 61, Depo. of Deputy Wilhite, p. 14]. Collins was unconscious.

Sergeant Wilburn requested EMS, although members of the fire department which was located across the street from LPD and had heard the request for backup come over the radio,

7

were present and on scene immediately and began administering CPR to Collins. *Id.* at p. 15.

EMS arrived, continued to administer care to Collins, at which point he was transported to Three Rivers Medical Center where he was pronounced dead. [Docket No. 65, KSP Report, p. 4, Page ID# 1003]. Cause of death per the state medical examiner was attributed to atherosclerotic cardiovascular disease, cardiomegaly, emphysema, and physical struggle. *Id.* at p. 43, Page ID# 1042.

During the melee, in total three Taser deployments one stun-drive deployment were made, minutes apart from each other. [Docket No. 62, Depo. of Sergeant Wilburn, p. 29; Docket No. 63, Depo. of Officer Miller, p. 13]. Of the three deployments and one stun-drive, only the last deployment was effective in subduing Collins as he managed to pull out the wires and probes from the other deployments made upon him during this incident. [Docket No. 62, Depo. of Sergeant Wilburn, p. 28].

Collin's son, Billy Joseph Collins, as the Administrator of his father's estate, filed this lawsuit, alleging that Sergeant Stephen Wilburn, Officer Jordan Miller, Chief Greg Fugitt, the Louisa City Police Department, and the City of Louisa, Kentucky, as well as co-Defendants Lawrence County, Kentucky, Lawrence County Sheriff's Office, Lawrence County Sheriff Garrett Roberts, Deputy Mason Keefer, and Deputy Douglas Wilhite, through 42 U.S.C. § 1983, violated Plaintiff's rights under the United States Constitution to be free from unreasonable use of force, that Chief Fugitt failed to properly train or supervise his subordinates, and that the City of Louisa and LPD should be held vicariously liable for such violations by virtue of respondeat superior. Plaintiff also alleges negligent use of force under Kentucky law, and seeks

compensatory and punitive damages.[1]

Defendants seek summary judgment are entitled to qualified immunity as to all claims against them.

## II.

### A. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining whether qualified immunity is appropriate, courts engage in a two-step analysis. First, "courts must address the threshold question of whether . . . the alleged facts show the officer's conduct violated a constitutional right." *Fox v. DeSoto*, 489 F.3d 227, 235 (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If a constitutional violation exists, "the next step is to determine whether the right was clearly established in a particularized sense, such that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.*

### B. Summary Judgment Standard

On a motion for summary judgment the court must engage in this analysis while being careful to draw all factual inferences in favor of the nonmoving party.

However, there is wrinkle in this case pertaining to the factual record: the events in question were captured on Sergeant's Wilburn's body cam. No parties disputes the veracity of the video or its admissibility. Indeed, in his deposition, Plaintiff, the son of the deceased, testified

---

[1] The Lawrence County Defendants are no longer parties to this civil action.

that only facts known to him are what is depicted in the video and the police reports [Docket no. 58, Deposition of Billy Collins, pg. 19].

Therefore, the standard of review for this case is a little different. "[w]here a police dash-cam (or in this case, a body cam) depicts all of the genuinely disputed facts, we view the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381 (2007). *See also, Rudlaff v. Gillispie*, 791 F.3d 639 (6th Cir. 2015).

### C. Excessive Force

Claims that officers used excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Saucier* 533 U.S. at 204 (2001). *See also, Graham v. Connor*, 490 U.S. 386, 394-395 (1989).

Determining whether the officer's actions were objectively reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest." *Graham*, 490 U.S. at 396; *Cole v. City of Dearborn*, No. 10-2392, 2011 WL 5924562, at *3 (6th Cir. Nov. 28, 2011); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992). The Supreme Court has recognized that the right to make an investigatory stop "necessarily carries with it the right to use some degree of physical coercion" to effect it. *Graham*, 490 U.S. at 396.

As a general matter, the right to be free from excessive by police is a clearly established Fourth Amendment right. *Cole*, 2011 WL 5924562, at *4 (*citing Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001)). If a suspect is passively complying with the officer's commands, that suspect has a clearly established right to be free from force, beyond what may be necessary to

carry out an arrest. *Cole* at *5. *See also, Baker v. City of Hamilton*, 471 F.3d 601, 608 (6th Cir. 2006).

The use of force is reviewed from the perspective of a reasonable law enforcement officer at the scene. *Cole* at *3, *citing Saucier*, 533 U.S. at 209. The analysis must "allow[] for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.* at *3, *quoting Graham*, 490 U.S. at 396.

### III.

In this case, the video speaks for itself: Collins' actively resisted arrest, failed to comply with Sergeant Wilburn's directions, tensed up and refused to let go of the banister so that both hands could be handcuffed, became combative and aggressive, assaulted Sergeant Wilburn, barricaded himself inside LPD, refused to open the door, refused to get on the ground even after being successfully tased, and continued to refuse to give his hands to be handcuffed. He actively resisted arrest and the Officers resided with appropriate measures. Based upon the video alone, there is no factual dispute in this regard.

Plaintiff insists that factual issues exist which preclude summary judgment but fails to specify what the disputed fact issues are, fails to demonstrate how they are genuine or materially relevant to summary judgment, and neglects to provide any evidence, record testimony, analysis, documentation, or proof of any kind supporting these completely subjective and speculative declarations of "disputed facts issues." A genuine issue of material fact does not exist simply because the Plaintiff states one exists. The law requires more in response to a properly supported

11

summary judgment motion. Recall the inelegant but effective *"put up or shut up"* imperative of *Anderson v. Liberty Lobby.*

Further, it appears that Plaintiff conflates the factual and legal inquiries in this case. Instead of contesting what the video depicts, to-wit, that Collins resisted arrest, he implies that questions of immunity are factual issues which preclude summary judgment.

Admittedly, qualified immunity is something of a sticky wicket. And, yes, often summary judgment is not appropriate. However, in this case, Plaintiff has not established that the Officers violated Collins' right to be free of excessive force because Plaintiff has not properly refuted that Collins resisted arrest.

Plaintiff also maintains that Collins had mental problems that the Defendants were aware of his issues and that this, somehow, precludes summary judgment. This argument is without merit. While Sergeant Wilburn testified he was generally familiar with Collins having lived in somewhat close proximity to him years prior, and having responded to previous calls involving Collins, he had no knowledge of Collins having any kind of mental disorder, that Collins had ever been given treatment for a mental disorder, or that he had ever been institutionalized due to a mental disorder. [Docket No. 62, Deposition of Sergeant Wilburn, pp. 34, 36-37]. Plaintiff has not offered any evidence suggesting otherwise.

Morever, even assuming he could provide such evidence, and assuming the Defendants possessed such knowledge prior to these events, there does not exist some type of heightened standard of care under the Fourth Amendment in dealing with mentally unstable individuals who are a risk or danger to investigating officers. The use of force analysis necessary to gain control

over such a suspect does not change simply because that suspect may suffer from a mental disorder. The question is not whether a different use of force continuum exists in that moment because the suspect has some unspecified mental disorder. The question is whether the use of force applied here was reasonable as a matter of law where that suspect, regardless of mental disorder or not, is a verifiable danger to himself, others, and the arresting officers. *See Untalan v. City of Lorain*, 430 F.3d 312, 313 (6th Cir. 2005)(mental illness does not exempt a person from the use of reasonable force by the police).

This case is a grievous one, indeed. However, that the taser may have contributed to Collins' death, while tragic, does not alter the analysis. "In determining whether there has been a violation of the Fourth Amendment, we consider not the extent of the injury inflicted but whether an officer subjects a detainee to gratuitous violence." *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010).

It is upon Plaintiff's to prove that the Defendants are not entitled to qualified immunity as a matter of law. *Wegener v. City of Covington*, 930 F.2d 390, 392 (6th Cir. 1991); Based upon the facts, as relayed through the testimony and video recording, Plaintiff cannot establish a violation of constitutional rights based upon the use of excessive force. Therefore, Defendants are entitled to qualified immunity.

## IV.

As for the remaining claims against the officers in their official capacities, the LPD and the City of Louisa, Plaintiff fails to provide any response to the Defendants' assertion that those claims asserted are duplicative, or that the Louisa Police Department is an entity *non sui juris*. Accordingly, as Plaintiff appears to have abandoned those claims, summary judgment is proper.

Judgment in favor of the Defendants is warranted upon the merits as well.

"Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 156-66, 105 S.Ct. 3099, 87 L.Ed.2d 144 (1985). Therefore, the claims against the individual Defendants in their official capacities represent claims against the entity for which they are agents and, pursuant to *Graham*, its predecessor *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny, are redundant and should be dismissed.

As for the state claw claims against the LPD and City of Louisa, those claims are barred by Kentucky's law of sovereign immunity, which precludes liability for subdivisions based upon the negligence of their employees. *Grayson Board of Education v. Casey*, 157 S.W.3d 201, 202-203 (Ky. 2005). Claims in the complaint based upon vicarious liability or respondeat superior liability must be dismissed as legally insufficient.

## V.

Accordingly, **IT IS HEREBY ORDERED** that the Defendants' Motion for Summary Judgment be **SUSTAINED**, the Plaintiff's claims against the Defendants be **DISMISSED** with prejudice.

This 15th day of September 2017.



Signed By:
*Henry R. Wilhoit, Jr.*
United States District Judge